# EXHIBIT 1

# Supplemented Complaint

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILDEARTH GUARDIANS, and<br>PHYSICIANS FOR SOCIAL RESPONSIBILITY | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-01724-RC |
| | ) | |
| SALLY JEWELL, NEIL KORNZE, and<br>U.S. BUREAU OF LAND MANAGEMENT | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| WESTERN ENERGY ALLIANCE,<br>PETROLEUM ASSOCIATION OF WYOMING,<br>and AMERICAN PETROLEUM INSTITUTE, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

---

**SUPPLEMENTED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

## INTRODUCTION

1.     This lawsuit challenges Federal Defendants' approval of 473 oil and gas leases

through 11 oil and gas lease sales encompassing 463,553 acres of public lands across three

western states—Colorado, Utah, Wyoming—without properly analyzing, at the programmatic or

project level, the ensuing direct, indirect, and cumulative impacts to our climate. It asks this

Court to set aside those approvals as violating the National Environmental Policy Act ("NEPA"),

42 U.S.C. §§ 4321-4370h, and to ensure that federal oil and gas leasing decisions await Federal

Defendants' compliance with the law.

2.     In 2014, President Obama described climate change as an "urgent and growing

threat . . . that will define the contours of this century more dramatically than any other." In that

same year, the U.S. pledged to reduce its greenhouse gas ("GHG") emissions 26-28 percent

below 2005 levels by 2020. Since then, the President has also announced a new goal to cut methane emissions from the oil and gas sector by 40-45 percent below 2012 levels by 2025, and set standards to reduce carbon dioxide emissions from the electricity sector by 32 percent from 2005 levels by 2030. In December, the President joined with 194 other nations in recognizing "that climate change represents an urgent and potentially irreversible threat to human societies and the planet" and reaffirmed prior U.S. commitments toward reducing GHG emissions. In his final State of the Union address, President Obama again noted the federal government's commitment to fighting climate change, vowing "to accelerate the transition away from old, dirtier energy sources," and making a powerful promise "to change the way we manage our oil and coal resources so that they better reflect the costs they impose on taxpayers and our planet."

3.      The U.S. Bureau of Land Management's ("BLM's") Oil and Gas Leasing Program contributes vast amounts of GHG pollution to the atmosphere. BLM manages nearly 700 million acres of subsurface minerals, and estimates that about half of this federal mineral estate contains oil and/or natural gas—two of the primary targets in President Obama's battle against climate change. Currently, over 32 million acres of federally managed lands are leased for oil and gas. From 2008–2010, GHG emissions from onshore federal oil and gas reserves resulted in the release of 612,309,429 metric tons of carbon dioxide equivalent ("MTCO$_2$e"). By comparison, from 2008–2010, the combined GHG emissions from Central American countries (Belize, Costa Rica, El Salvador, Guatemala, Honduras, Nicaragua, and Panama) resulted in the release of 549,760,000 MTCO$_2$e. In other words, during these years, BLM's Oil and Gas Leasing Program alone contributed more annual GHG pollution to the atmosphere than all of the approximately 40 million people of Central America combined.

4.      In spite of the President's commitment to U.S. leadership in moving towards a clean energy future—and the significant contribution to atmospheric GHG levels made by BLM's Oil and Gas Leasing Program—Federal Defendants continue to authorize the sale and issuance of hundreds of federal oil and gas leases on public lands across the Interior West without meaningfully acknowledging or evaluating the climate change implications of their actions.

5.      Since the beginning of 2015, BLM has held 11 oil and gas lease sales across three states—Colorado, Utah, Wyoming—authorizing the sale and issuance of 473 new leases encompassing 463,553 acres of public lands. The map on the following page shows the distribution of the challenged lease authorizations across the Interior West.

6.      Federal Defendants failed to analyze the direct, indirect, and cumulative effects of the sale and resulting development of these lands on the climate, in violation of NEPA. Specifically, in each of these lease authorizations, BLM: (1) failed to identify the direct GHG emissions and effects that will result from lease sale and resulting development; (2) failed to identify indirect, downstream GHG emissions and effects from oil and gas production resulting from each lease sale and resulting development; and (3) failed to identify cumulative GHG emissions and effects from each lease sale and resulting development when combined with GHG emissions from BLM's onshore Oil and Gas Leasing Program, which together account for over 200 million $MTCO_2e$ emissions each year based on GHG emissions estimates for 2012.



7.      BLM is poised to continue its ongoing pattern of unlawful lease authorization and issuance without addressing climate impacts for additional lease sales across the U.S.—including sales in Colorado, Montana, New Mexico, Utah, and Wyoming—before the end of 2016.

8.      In contrast, on January 15, 2016, the Department of the Interior announced that it was initiating a multi-year process to produce a program-wide climate study of the GHG emissions and climate impacts of its Federal Coal Leasing Program. The Department also announced that it would cease offering new coal leases during the pendency of that process. GHG emissions and climate impacts of BLM's Oil and Gas Leasing Program have never been studied at the programmatic level.

9.    Five days after the Department's announcement on coal, the University of California Irvine School of Law Environmental Law Clinic and Plaintiff WildEarth Guardians submitted a petition to the Department of the Interior under the Administrative Procedure Act calling for similar action for the Federal Oil and Gas Leasing Program. WildEarth Guardians requested a program-wide climate study of the GHG emissions and climate impacts of federal oil and gas leasing and a moratorium on new leasing during the pendency of that study. At the time of filing this Supplemented Complaint, more than ten months later, the Department still has not responded to that petition.

10.    Plaintiffs WildEarth Guardians and Physicians for Social Responsibility (collectively, "Citizen Groups") hereby bring this civil action for declaratory and injunctive relief against Sally Jewell, in her official capacity as Secretary of the U.S. Department of the Interior, Neil Kornze, in his official capacity as Director of the U.S. Bureau of Land Management ("BLM"), and the BLM (collectively, "Federal Defendants"), for their leasing authorizations encompassed in 11 separate lease sales in Colorado, Utah, and Wyoming in 2015 and 2016, in violation of NEPA and its implementing regulations.

## JURISDICTION & VENUE

11.    This action arises under NEPA, 42 U.S.C. §§ 4321-4370h, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

12.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because the action raises a federal question. The Court has authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706.

13.    This action reflects an actual, present, and justiciable controversy between Citizen Groups and Federal Defendants within the meaning of the Declaratory Judgment Act, 28 U.S.C.

§ 2201. Citizen Groups' interests will be adversely affected and irreparably injured if Federal

Defendants continue to violate NEPA as alleged herein, and if they affirmatively implement the

decisions challenged herein. These injuries are concrete and particularized, and fairly traceable to

Federal Defendants' challenged decisions, providing the requisite personal stake in the outcome

of this controversy necessary for this Court's jurisdiction.

14.     The requested relief would redress the actual, concrete injuries to Citizen Groups

caused by Federal Defendants' failure to comply with duties mandated by NEPA and its

implementing regulations.

15.     The challenged agency actions are final and subject to judicial review pursuant to

5 U.S.C. §§ 702, 704, & 706.

16.     Citizen Groups have exhausted any and all available and requested administrative

remedies.

17.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e) because officers of

the United States are named as Defendants in their official capacities and reside in this judicial

district, Plaintiff Physicians for Social Responsibility resides in this judicial district, and a

substantial part of the events or omissions giving rise to the claims, as well as the underlying

decisionmaking and guidance with respect to BLM's Oil and Gas Leasing Program as

disseminated to the agency's field offices, have occurred in this district due to decisions made

here by Federal Defendants.

## PARTIES

18.     Plaintiff WILDEARTH GUARDIANS ("Guardians") is a non-profit membership

organization based in Santa Fe, New Mexico, with offices throughout the West. Guardians has

168,458 members and activists, some of whom live, work, or recreate on public lands on and

near the leases challenged herein. Guardians and its members are dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Towards this end, Guardians and its members work to replace fossil fuels with clean, renewable energy in order to safeguard public health, the environment, and the Earth's climate.

19.    Plaintiff PHYSICIANS FOR SOCIAL RESPONSIBILITY ("PSR") is a nonprofit organization based in Washington, D.C., with chapters across the country and over 30,000 members and activists. PSR works to create a healthy, just, and peaceful world for current and future generations. PSR uses its medical and public health expertise to reverse the Earth's trajectory toward climate change and protect the public from the effects of climate change, protect the public and the environment from toxic chemicals, and eliminate the use of nuclear power.

20.    Citizen Groups' members use and enjoy the cultural resources, wildlands, wildlife habitat, rivers, streams, and healthy environment on BLM and other public lands in Colorado, Utah, and Wyoming that include lands in and adjacent to the lease sale parcels that are the subject of this Complaint, as well as areas outside the lease parcels that are affected by development of the leases in each lease sale, for hiking, fishing, hunting, camping, photographing scenery and wildlife, wildlife viewing, aesthetic enjoyment, and engaging in other vocational, scientific, and recreational activities.

21.    Citizen Groups' members frequently use public lands throughout Colorado that are on, around, or within view of lands affected by the leasing authorizations challenged herein including lands in the Pawnee National Grasslands in northeastern Colorado 80 miles north of Denver, BLM-managed lands within the Little Snake Field Office, and lands in the HD Mountains area of southwestern Colorado.

22.     Citizen Groups' members frequently recreate on public lands throughout Utah that include the leases that are the subject of the leasing authorizations challenged herein, or lands that are around or within view of lands affected by the leasing authorizations challenged herein. Citizen Groups' members have recreated on or around lands that are in the Castle Valley area in Emery County and near Price in Carbon County, lands that are in the Uinta Basin of northeastern Utah directly south of the Uinta Mountains, lands that are in the Richfield area (including in the Fishlake National Forest), and lands in the Grand County area north of Arches National Park.

23.     Citizen Groups' members frequently recreate on public lands throughout Wyoming that include the leases that are the subject of the leasing authorizations challenged herein, or lands that are around or within view of lands affected by the leasing authorizations challenged herein. Citizen Groups' members have recreated on leased lands in Carbon and Sweetwater Counties, the Battle Springs Draw area, and the Adobe Town/Kinney Rim area. In addition, Citizens Groups' members enjoy wildlife viewing and photography on and around leased lands in the Red Desert, Bighorn Basin, and BLM's Lander Field Office. Oil and gas development in these areas has negatively impacted wildlife by reducing their populations (making it more difficult to view and photograph wildlife) and causing behavioral shifts in wildlife that increase their avoidance of roads, resulting in fewer wildlife viewing opportunities.

24.     Citizens Groups' members derive recreational, inspirational, scientific, educational, and aesthetic benefit from their activities on lands that include the leases that are the subject of the leasing authorizations challenged herein, or on lands that are around or within view of lands affected by the leasing authorizations challenged herein as well as by subsequent lease development. The affected lands within or near the lease sale parcels include very popular and

iconic landscapes, including, but certainly not limited to, the Pawnee Buttes on the Pawnee National Grassland in Colorado, the San Juan Mountains near Colorado's HD Mountains leases, the San Rafael Swell near Utah's Castle Valley leases, the Uinta Mountains near Utah's Uinta Basin leases, the Bighorn Mountains near Wyoming's Bighorn Basin leases, and the Wind River Range near Wyoming's Pinedale Field Office leases.

25.    Citizen Groups' members intend to continue to use and to enjoy BLM and other public lands in Colorado, Utah, and Wyoming that include the leases that are the subject of the leasing authorizations challenged herein, and lands that are around or within view of lands affected by the leasing authorizations challenged herein as well as by subsequent lease development, to enjoy cultural resources, wildlands, wildlife habitat, rivers, streams, and healthy environments frequently and on an ongoing basis long into the future, including this summer, fall, and winter.

26.    Citizen Groups' members' enjoyment of public lands in and adjacent to the leases challenged herein will be adversely affected and diminished as a result of Federal Defendants' leasing actions.  Citizen Groups' members have not only recreated on public lands that include the lease sale parcels that are the subject of this lawsuit, but they enjoy public lands adjacent to these parcels. The reasonably foreseeable development of these lease parcels stands to directly alter the natural state of public lands within the lease areas, produce air pollution that is offensive, create noise that disrupts wildlife and recreational enjoyment, and lead to connected development that will further adversely impact nearby public lands, including road construction, truck traffic, and the construction of oil and gas processing facilities needed to sustain the production of oil and gas on the lease parcels that are the subject of this lawsuit.

27.     The development of the oil and gas leases challenged herein will bring not only new industrial activity into undeveloped landscapes, but will also bring noise, destruction of wildlife habitat, surface disturbance, air pollution, and water contamination. These impacts can be far-reaching. For example, air pollution from oil and gas development can create extensive visible emissions that create haze and smog in large regions. Wyoming's Red Desert area (where a number of the leases at issue are located) was nearly pristine 15 years ago but today, on most days, experiences some degree of smog. The increased number of smoggy days corresponds with increased oil and gas development over the last decade in the Red Desert area.

28.     A favorable ruling in this case would redress the harms that Citizen Groups and their members stand to suffer as a result of Federal Defendants' actions. If Federal Defendants properly took into account the climate impacts of their actions, they likely would have rejected offering leases for sale and issuance. This would have eliminated the threat of reasonably foreseeable oil and gas development, preventing the diminishment of the enjoyment of public lands used by Citizen Groups' members. A favorable ruling would ensure that as Citizen Groups' members continue to use and enjoy public lands affected by Federal Defendants' actions, their harms would be reduced, if not eliminated.

29.     Citizen Groups and their members have a procedural interest in Federal Defendants' full compliance with NEPA's planning and decisionmaking processes when authorizing oil and gas development on public lands in the Interior West, including Colorado, Utah, and Wyoming in general, and in and around the lease sale areas in particular, and Federal Defendants' attendant duty to substantiate its decisions in the record for these authorizations.

30.     Defendant SALLY JEWELL is sued in her official capacity as the Secretary of the U.S. Department of the Interior and is responsible for managing the public lands and

resources in the Interior West—and Colorado, Utah, and Wyoming in particular—and, in that official capacity, is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

31.     Defendant NEIL KORNZE is Director of the Bureau of Land Management, an agency within the United States Department of the Interior, and is responsible for managing the public lands, resources, and public mineral estate of the United States, including lands and resources in the Interior West, including Colorado, Utah, and Wyoming. In his official capacity, Director Kornze is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

32.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is an agency within the United States Department of the Interior and is responsible for managing public lands and resources in Colorado, Utah, and Wyoming, including federal onshore oil and gas resources and the leasing program for those resources. In this managerial capacity, BLM is responsible for implementing and complying with federal law, including the federal laws implicated by this action.

## LEGAL BACKGROUND

### I.     National Environmental Policy Act

33.     NEPA is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1(a). It was enacted—recognizing that "each person should enjoy a healthful environment"—to ensure that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to

health or safety, or other undesirable and unintended consequences," among other policies. 42

U.S.C. § 4331(b), (c).

34.     NEPA regulations explain, in 40 C.F.R. §1500.1(c), that:

> Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.

35.     NEPA achieves its purpose through "action forcing procedures. . . requir[ing] that

agencies take a *hard look* at environmental consequences." *Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 350 (1989) (citations omitted) (emphasis added).

36.     "Agencies shall integrate the NEPA process with other planning at the earliest

possible time to insure that planning and decisions reflect environmental values, to avoid delays

later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2.

37.     Federal agencies must comply with NEPA before there are "any irreversible and

irretrievable commitments of resources which would be involved in the proposed action should it

be implemented." 42 U.S.C. § 4332(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a).

38.     NEPA requires Federal Defendants to consider "any adverse environmental

effects which cannot be avoided." 42 U.S.C. § 4332(C)(ii). In so doing, Federal Defendants must

"identify and develop methods and procedures . . . which will insure that presently unquantified

environmental amenities and values may be given appropriate consideration in decisionmaking

along with economic and technical considerations." *Id.* § 4332(B).

39.     To accomplish these purposes, NEPA requires that all federal agencies prepare a

"detailed statement" regarding all "major federal actions significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(C). This statement, known as an Environmental Impact

Statement ("EIS"), must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, indirect, and cumulative environmental impacts, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14 and 1502.16. The scope of the analysis must include "[c]umulative actions," or actions that "when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement," and "[s]imilar actions," or actions that "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together." 40 C.F.R. §§ 1508.25(a)(2), (3).

40.     Direct effects include those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Effects" are synonymous with "impacts." 40 C.F.R. § 1508.8.

41.     These effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative" effects. 40 C.F.R. § 1508.8.

42.     BLM's analysis must do more than merely identify impacts; it must also "evaluate the severity" of effects. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989); 40 C.F.R. § 1502.16(a)-(b) (recognizing that agency must explain the "significance" of effects).

13

43.     An agency may also prepare an EA to determine whether an EIS is necessary. 40

C.F.R. §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the

environmental impacts of the action. 40 C.F.R. § 1508.9.

44.     If an agency decides not to prepare an EIS, an EA must "provide sufficient

evidence" to support a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1508.9(a)(1).

Such evidence must demonstrate that the action "will not have a significant effect on the human

environment." 40 C.F.R. § 1508.13. An assessment of whether or not an impact is "significant"

is based on a consideration of the "context and intensity" of the impact. 40 C.F.R. § 1508.27.

"Context" refers to the scope of the proposed action, including the interests affected. 40 C.F.R. §

1508.27(a). "Intensity" refers to the severity of the impact and must be evaluated with a host of

factors in mind, including but not limited to [u]nique characteristics of the geographic area[,]"

"[t]he degree to which the possible effects on the human environment are highly uncertain or

involve unique or unknown risks[,]" and "[w]hether the action threatens a violation of Federal,

State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. §

1508.27(b).

45.     NEPA allows an agency to "tier" a site-specific environmental analysis for a

project to a broader EIS for a program or plan under which the subsequent project is carried out.

40 C.F.R. § 1508.28. When an agency tiers a site-specific analysis to a broader EIS, "the

subsequent statement or environmental assessment need only summarize the issues discussed in

the broader statement and incorporate discussions from the broader statement by reference and

shall concentrate on the issues specific to the subsequent action." 40 C.F.R. § 1502.20.

46.     The Department of the Interior's NEPA regulations for using tiered documents

specify that site-specific EAs "can be tiered to a programmatic or other broader-scope [EIS]." 43

C.F.R. § 46.140(c). As a general rule, an EA that tiers to another NEPA document "must include a finding that the conditions and environmental effects described in the broader NEPA document are still valid or address any exceptions." 43 C.F.R. § 46.140. If the programmatic EIS analyzes the impacts of the site-specific action, the agency is not required to perform additional analysis of impacts. 43 C.F.R. § 46.140(a). However, if the impacts analysis in the programmatic EIS "is not sufficiently comprehensive or adequate to support further decisions," the agency's EA must explain this and provide additional analysis. 43 C.F.R. § 46.140(b).

## II.   Legal Framework for Federal Oil and Gas Lease Authorizations

### A.   Mineral Leasing Act

47.    Under the Mineral Leasing Act of 1920 ("MLA"), as amended, the Secretary of the Interior is responsible for managing and overseeing mineral development on public lands, not only to ensure safe and fair development of the mineral resource, but also to "safeguard[]…the public welfare." 30 U.S.C. § 187.

48.    The Secretary has discretion, though constrained by the laws at issue in this case, to determine where, when, and under what terms and conditions mineral development should occur. 43 C.F.R. § 3101.1-2. The grant of rights in a federal mineral lease is subject to a number of reservations of authority to the federal government, including reasonable measures concerning the timing, pace, and scale of development. *Id*.

49.    The MLA regulations provide: "Each proper BLM State office shall hold sales at least quarterly if lands are available for competitive leasing" and "[l]ease sales shall be conducted by a competitive oral bidding process." 43 C.F.R. § 3120.1-2.

50.     BLM does not always hold lease sales on a quarterly basis in any given year. For example, with respect to the leasing decisions challenged herein, in 2015 BLM held three lease sales in Colorado and one lease sale in Utah.

51.     Not all of the parcels offered for sale in any given BLM lease sale are awarded through competitive bidding. For example, for fiscal year 2015 BLM reported that of the 1,286 lease parcels offered for sale, only 690 of the parcels received bids.

52.     The MLA also states that "[t]he authorized officer may suspend the offering of a specific parcel while considering a protest or appeal against its inclusion in a Notice of Competitive Lease Sale." 43 C.F.R. § 3120.1-3.

**B.      BLM's Oil and Gas Planning and Management**

53.     BLM manages onshore oil and gas development through a three-phase process. Each phase is distinct, serves distinct purposes, and is subject to distinct rules, policies, and procedures.

54.     In the first phase, BLM prepares a Resource Management Plan ("RMP") in accordance with 43 C.F.R. §§ 1600-1610.8, along with additional guidance found in BLM's Land Use Planning Handbook (H-1601-1) (hereafter, "BLM Handbook"). An RMP envisions present and future use of public lands and their resources by establishing management priorities, as well as guiding and constraining BLM's implementation-stage management. With respect to fluid minerals leasing decisions, in the RMP, BLM determines which public lands containing federal minerals will be open to leasing and under what conditions. The basis for such land designations is the detailed hard look analysis of the direct, indirect, and cumulative impacts to the human environment of predicted implementation-stage development in the RMP's corresponding EIS.

55.     A reasonably foreseeable development scenario ("RFDS") underlies BLM's assumptions regarding the pace and scope of fluid minerals development within the RMP planning area. An RFDS does not include any analysis of environmental impacts and is not a NEPA document.

56.     In the second phase, BLM identifies the boundaries for lands to be offered for lease and proceeds to sell and execute leases for those lands through a lease sale and issuance. Leases are sold in accordance with 43 C.F.R. §§ 3120-3120.7-3, with additional agency guidance outlined in BLM Instruction Memorandum ("IM") No. 2010-117 (hereafter, "Leasing Reforms"). While BLM state offices manage lease sales, the BLM field offices where specific lease parcels are located conduct NEPA review, solicit public comment, and apply appropriate site-specific leasing stipulations.

57.     BLM's Leasing Reforms establish a timeline for public engagement, culminating in the public's opportunity to protest the sale of specific parcels. Although BLM may proceed with a lease sale after a Protest has been filed, BLM must resolve any and all Protests received prior to issuing a lease parcel to a successful bidder.

58.     Prior to the point BLM sells a lease, BLM may refuse to lease public lands, even if public lands were made available for leasing pursuant to the RMP. *Udall v. Tallman*, 85 S.Ct. 792, 795 (1965).

59.     Prior to a BLM lease sale, BLM has the authority to subject leases to terms and conditions, which can serve as "stipulations" to protect the environment. 43 C.F.R. § 3101.1-3. Once BLM issues leases, it may impose conditions of approval ("COAs") that are delimited by the terms and conditions of the lease. 43 C.F.R. § 3101.1-2.

60.     Once sold, the lease purchaser has the right to use as much of the leased land as is necessary to explore and drill oil and gas within the lease boundaries, subject to stipulations attached to the lease. 43 C.F.R. § 3101.1-2.

61.     The Secretary of the Interior has the authority to cancel leases that have been "improperly issued." 43 C.F.R. § 3108.3(d). A lease may be canceled where BLM has not complied with NEPA prior to lease issuance. *Clayton W. Williams, Jr.*, 103 IBLA 192 (1988). For example, in the last year alone, BLM has canceled dozens of leases in Colorado and Montana on the basis of the agency's failure to complete NEPA analysis.

62.     Oil and gas operations are conducted in accordance with BLM regulations at 43 C.F.R. §§ 3160-3165.4.

63.     The third-phase occurs once BLM issues a lease, wherein the lessee is required to submit an application for permit to drill ("APD") to BLM prior to drilling. 43 C.F.R. § 3162.3-1(c). At this stage, BLM may condition the approval of the APD on the lessees' adoption of "reasonable measures" whose scope is delimited by the lease and the lessees' surface use rights. 43 C.F.R. § 3101.1-2.

### C.     Administrative Procedure Act

64.     The Administrative Procedure Act ("APA") provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

65.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). A court must also compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

## FACTUAL BACKGROUND

**I.      Environmental Impacts of Greenhouse Gas Pollution**

66.     Climate change has been intensively studied and acknowledged at the global, national, and regional scales. Climate change is being fueled by the human-caused release of greenhouse gas emissions, in particular carbon dioxide and methane. The Intergovernmental Panel on Climate Change ("IPCC") is a Nobel Prize-winning scientific body within the United Nations that reviews and assesses the most recent scientific, technical, and socio-economic information relevant to our understanding of climate change. In its most recent report to policymakers in 2014, the IPCC provided a summary of our understanding of human-caused climate change. Among other things, the IPCC summarized:[1]

- Human influence on the climate system is clear, and recent anthropogenic emissions of greenhouse gases are the highest in history. Recent climate changes have had widespread impacts on human and natural systems.

- Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen.

- Anthropogenic greenhouse gas emissions have increased since the pre-industrial era, driven largely by economic and population growth, and are now higher than ever. This has led to atmospheric concentrations of carbon dioxide, methane, and nitrous oxide that are unprecedented in at least the last 800,000 years. Their effects, together with those of other anthropogenic drivers, have been detected throughout the climate system and are extremely likely to have been the dominant cause of the observed warming since the mid-20[th] century.

---

[1] IPCC, "Climate Change 2014 Synthesis Report, Summary for Policymakers," available at http://www.ipcc.ch/pdf/assessment-report/ar5/syr/SYR_AR5_FINAL_full_wcover.pdf (last accessed Aug. 23, 2016).

- In recent decades, changes in climate have caused impacts on natural and human systems on all continents and across the oceans. Impacts are due to observed climate change, irrespective of its cause, indicating the sensitivity of natural and human systems to changing climate.

- Continued emission of greenhouse gases will cause further warming and long-lasting changes in all components of the climate system, increasing the likelihood of severe, pervasive, and irreversible impacts for people and ecosystems. Limiting climate change would require substantial and sustained reductions in greenhouse gas emissions which, together with adaptation, can limit climate change risks.

- Surface temperature is projected to rise over the 21st century under all assessed emission scenarios. It is *very likely* that heat waves will occur more often and last longer, and that extreme precipitation events will become more intense and frequent in many regions. The ocean will continue to warm and acidify, and global mean sea level to rise. (emphasis in original)

67.    Carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride are recognized as the key greenhouse gases contributing to climate change. In 2009, the U.S. Environmental Protection Agency ("EPA") found that these "six greenhouse gases taken in combination endanger both the public health and the public welfare of current and future generations." 74 Fed. Reg. 66,496 (Dec. 15, 2009).

68.    The western U.S. is particularly susceptible to the effects of climate change. The West is experiencing increasing temperatures and prolonged droughts. The impacts of these changes are widespread across our forests, wildlife, and human communities, threatening the West's resilience in the face of continued warming. These impacts also have significant importance to local economies that are reliant on consistent precipitation and snowfall for surface and groundwater recharge, agriculture, recreation, and other uses.

69.    At the time of filing, according to the National Oceanic and Atmospheric Administration ("NOAA"), monthly global temperature records have been broken for every one of the last 14 months. The global climate crisis is happening and it may well be accelerating quickly.

II.     **Federal Climate Policy and Initiatives**

70.     The Secretary of the Interior stated, in Secretarial Order 3226, *Evaluating Climate Change Impacts in Management Planning* (January 19, 2001), that "[t]here is a consensus in the international community that global climate change is occurring and that it should be addressed in governmental decision making." Order 3226 established the responsibility of agencies to "consider and analyze potential climate change impacts when undertaking long-range planning exercises, when setting priorities for scientific research and investigations, when developing multi-year management plans, and/or when making major decisions regarding potential utilization of resources under the Department's purview."

71.     The U.S. Governmental Accountability Office ("GAO"), in a 2007 report entitled *Climate Change: Agencies Should Develop Guidance for Addressing the Effects on Federal Land and Water Resources,* concluded that the Department of the Interior had not provided specific guidance to implement Secretarial Order 3226, that officials were not even aware of Secretarial Order 3226, and that Secretarial Order 3226 had effectively been ignored.

72.     Secretarial Order 3289, *Addressing the Impacts of Climate Change on America's Water, Land, and Other Natural and Cultural Resources* (September 14, 2009), reinstated the provisions of Order 3226, and recognized that "the realities of climate change require us to change how we manage the land, water, fish and wildlife, and cultural heritage and tribal lands and resources we oversee," and acknowledged that the Department of the Interior is "responsible for helping protect the nation from the impacts of climate change."

73.     In Executive Order No. 13514, *Federal Leadership in Environmental, Energy, and Economic Performance* (Oct. 5, 2009), President Obama called on all federal agencies to "measure, report, and reduce their greenhouse gas emissions from direct and indirect activities."

74 Fed. Reg. 52,117 (Oct. 8, 2009). This directive was followed up by Executive Order No.

13693, *Planning for Federal Sustainability in the Next Decade* (March 25, 2015), which

reaffirmed the federal government's commitment to reducing GHG emissions. 80 Fed. Reg.

15,871 (March 25, 2015).

     74.    Nevertheless, there remains a fundamental disconnect with regard to how our

public lands are managed for energy production and national policies to limit GHG emissions.

Federal Defendants fail to take informed action to address climate change, as required by Order

3226 and Order 3289, because they fail to take a hard look at the climate impacts of oil and gas

leasing and development on our public lands, including the impacts from leasing the specific

parcels in the leasing authorizations challenged herein. As stated in Order 3289, BLM must

"appl[y] scientific tools to increase understanding of climate change and to coordinate an

effective response to its impacts," and "[m]anagement decisions made in response to climate

change impacts must be informed by [this] science."

     75.    In recognition of the consequences of human-caused climate change, federal

agencies have developed a protocol for assessing the social cost of carbon dioxide emissions.

The social cost of carbon is "an estimate of the monetized damages associated with an

incremental increase in carbon emissions in a given year."[2] Conversely, the social cost of carbon

can represent "the value of damages avoided for a small emission reduction (i.e., the benefit of a

$CO_2$ reductions)." The EPA has explained:

> The [social cost of carbon protocol] is meant to be a comprehensive estimate of climate
> change damages and includes changes in net agricultural productivity, human health,
> property damages from increased flood risk, and changes in energy system costs, such as

---

[2] EPA, "The Social Cost of Carbon" (last updated Aug. 9, 2016), available at
https://www3.epa.gov/climatechange/EPAactivities/economics/scc.html (last accessed Aug. 23,
2016).

reduced costs for heating and increased costs for air conditioning. However, given current modeling and data limitations, it does not include all important damages.[3]

76.     A federal Interagency Working Group ("IWG")—consisting of the EPA, Center for Environmental Quality, Department of Energy, National Economic Council, Office of Management and Budget, Department of Agriculture, Department of Commerce, Department of Transportation, and other agencies—has prepared estimates of the cost that carbon pollution has on society. The IWG prepared their first Social Cost of Carbon" estimates in 2010, which was subsequently updated in 2013 and 2015.[4]

77.     IWG's Social Cost of Carbon estimates vary according to assumed discount rates and presumptions regarding the longevity and damages caused by carbon pollution in the atmosphere, which for 2015 produced a range of between \$11 and \$105 per metric ton of carbon dioxide. Accepted practice typically applies the median value (\$42 per metric ton) to determine the social costs of a given project, although the four values provided by the IWG lends itself to a straightforward alternatives comparison.

78.     In 2009, the Environmental Protection Agency ("EPA") issued a finding that the changes in our climate caused by elevated concentrations of greenhouse gases in the atmosphere are reasonably anticipated to endanger the public health and welfare of current and future generations. 74 Fed. Reg. 66496 (Dec. 15, 2009). In 2015, EPA acknowledged more recent scientific assessments that "highlight the urgency of addressing the rising concentrations of $CO_2$ in the atmosphere." 80 Fed. Reg. 64661 (Oct. 23, 2015).

---

[3] *Id.*
[4] Interagency Working Group, "Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866" at 3 (revised July 2015), available at https://www.whitehouse.gov/sites/default/files/omb/inforeg/scc-tsd-final-july-2015.pdf (last accessed Aug. 23, 2016).

79.     The White House Council on Environmental Quality ("CEQ"), the federal agency tasked with managing the federal government's implementation of NEPA, recognized the unique nature of climate change and the challenges it imposed on NEPA compliance. On August 1, 2016, CEQ released *Final Guidance for Federal Department and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews* (hereafter, "Final Guidance").[5] The Final Guidance applies to all proposed federal agency actions, "including land and resource management actions." Notably, while CEQ's final guidance post-dates the challenged leases (draft guidance was published December 18, 2014), it is intended to "facilitate compliance with existing NEPA requirements." In other words, the Final Guidance is meant to underscore BLM's existing legal obligations to disclose and consider the foreseeable effects that, for example, oil and gas leasing has on climate change.

80.     In its Final Guidance, the CEQ recognized that:

Climate change results from the incremental addition of GHG emissions from millions of individual sources, which collectively have a large impact on a global scale. CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government. Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA. Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact.

---

[5] Available at
https://www.whitehouse.gov/sites/whitehouse/gov/files/documents/nepa_final_ghg_guidance.pdf (last accessed on Aug. 23, 2016).

81.     CEQ's Final Guidance also explains the application of NEPA principals and practices to the analysis of GHG emissions and climate change, including, among others: (1) that agencies quantify a proposed action's projected direct and indirect GHG emissions, taking into account available data and GHG quantification tools; (2) that agencies use projected GHG emissions as a proxy for assessing potential climate change effects when preparing a NEPA analysis; (3) where GHG emission tools, methodologies, or data inputs are not reasonably available, agencies include a qualitative analysis in the NEPA document and explain the basis for determining that quantification is not reasonably available; (4) analyze foreseeable direct, indirect, and cumulative GHG emissions and climate effects; (5) consider reasonable alternatives and the short- and long-term effect and benefits in the alternatives and mitigation analysis; (6) consider alternatives that would make the actions and affected communities more resilient to the effects of a changing climate; and (7) assess the broad-scale effects of GHG emissions and climate change, either to inform programmatic decisions, or at both the programmatic and project-level.

82.     CEQ's Final Guidance also states that "[i]n the context of long-range energy, transportation, and resource management strategies…it would be useful and efficient to provide an aggregate analysis of GHG emissions or climate change effects in a programmatic analysis and then incorporate by reference that analysis into future NEPA reviews." In particular, CEQ identifies "issuing leases for oil and gas drilling" as a "site-specific action[] that may benefit from being able to tier to a programmatic NEPA review."

## III.     Greenhouse Gas Pollution from BLM's Oil and Gas Management Program

83.     NEPA's implementing regulations define a "program" as "a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions

allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.18(b)(3). BLM's oil and gas leasing activities fall within this definition of a program because they are "connected agency decisions allocating agency resources to implement" the MLA for the purpose of exploration or development of oil and natural gas resources. *Id*.

84.     All of the leasing authorizations challenged herein are part of BLM's comprehensive Oil and Gas Leasing Program to implement the Mineral Leasing Act. BLM expressly refers to its oil and gas leasing activities as a program. For example, BLM claims that its "Oil and Gas Management program is one of the most important mineral leasing programs in the Federal government." BLM notes that "[d]omestic production from over 96,000 Federal onshore oil and gas wells accounts for 11 percent of the Nation's natural gas supply and five percent of its oil."[6] BLM also states that "[t]he Oil and Gas program also processes applications for the permits required to develop leased resources. The most common of these is the [APD]."

85.     BLM is responsible for the management of nearly 700 million acres of federal onshore subsurface minerals. The ultimate downstream GHG emissions from fossil fuel extraction from federal lands and waters by private leaseholders accounts for approximately 21% of total U.S. GHG emissions and 24% of all energy-related GHG emissions, based on 2012 figures.[7]

86.     As of 2015, BLM managed lands contained 44,213 individual oil and gas lease parcels, covering over 32 million acres of public lands, on which 94,484 active producible wells

---

[6] BLM, "Oil and Gas" (last updated July 27, 2016), available at
http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas.html%29 (last accessed Aug. 23, 2016)
[7] Stratus Consulting, "Greenhouse Gas Emissions from Fossil Fuel Energy Extracted from Federal Lands and Waters: An Update" at 10. (2014). Available at:
http://wilderness.org/sites/default/files/Stratus-Report.pdf (last accessed Aug. 23, 2016).

are drilled. This is an area larger than the combined acreage of Connecticut, Delaware, Massachusetts, New Hampshire, New Jersey, Rhode Island, Vermont, and the District of Columbia, combined.

87.     BLM's Oil and Gas Leasing Program already contributes vast amounts of GHGs into the atmosphere, posing a threat to climate, the natural environment, and public health. In a single year (using 2012 figures), GHG emissions from oil extracted from federal lands resulted in the release of an estimated 2,999 metric tons of methane ("MTCH$_4$"), 56,346,510 metric tons of carbon dioxide ("MTCO$_2$"), and 2,985 metric tons of nitrous oxide ("MTN$_2$O"), for a total release of 57,311,142 MTCO$_2$e.[8] That same year, GHG emissions from natural gas extracted from federal lands resulted in the release of and estimated 12,358 MTCH$_4$, 144,135,798 MTCO$_2$, and 480 MTN$_2$O, for a total release of 144,587,927 MTCO$_2$e. Accordingly, in a single year BLM's Oil and Gas Leasing Program resulted in the release of an estimated 201,899,069 MTCO$_2$e. This is the equivalent of annual greenhouse gas emissions from over 58 coal-fired power plants.

## IV.     BLM's Oil and Gas Leasing Program and Individual Leasing Decisions Fail to Consider Climate Change

88.     BLM made the leasing decisions challenged herein for three western states— Colorado, Utah, and Wyoming—and included separate administrative processes for each lease sale. The NEPA process for each sale followed the framework of BLM's Leasing Reforms, and included: a scoping period, a comment period on the draft environmental assessment ("EA"), and a protest period before the sale was held. Plaintiff WildEarth Guardians participated in the comment and protest periods of the administrative process for each of the decisions challenged herein.

---

[8] *Id*. at 11.

89.     A list of the challenged site-specific leasing decisions is included in Table A at the end of this Complaint. Deficiencies in BLM's NEPA analysis concerning the direct, indirect, and cumulative GHG emissions resulting from each sale, and the impacts of these emissions on climate change, are common amongst each of the challenged decisions.

90.     BLM has never analyzed the vast contribution of GHG emissions or climate impacts of its Oil and Gas Leasing Program at the programmatic level. Likewise, BLM has not done so in the Resource Management Plans to which the challenged lease authorizations respectively tier. This failure is carried forward to the agency's site-specific leasing decisions, including the decisions challenged herein, which fail to sufficiently quantify or analyze the direct, indirect, or cumulative impacts of foreseeable GHG emissions that will result from BLM's leasing authorizations and the impact of these emissions on the environment, human health, and our climate. Finally, the NEPA analyses performed on subsequent applications for permit to drill under the challenged leases similarly fail to quantify or analyze direct, indirect, or cumulative GHG emissions or climate impacts.

### A.      Direct Impacts of Oil and Gas Leasing.

91.     Although some variation exists among challenged individual leasing EAs, each challenged EA includes the same two fundamental deficiencies regarding BLM's treatment of direct impacts of GHG emissions and resulting oil and gas development: (1) BLM failed to quantify reasonably foreseeable GHG emissions from the lease sale by failing to estimate the total number of projected wells and then applying available per-well GHG emissions estimates to determine the direct, production-level GHG emissions levels that were reasonably foreseeable from each lease sale; and (2) BLM failed to consider the reasonably foreseeable effects of those GHG emissions on resource values in the relevant planning area.

92.     In the challenged leasing EAs, BLM limits its discussion of direct GHG emissions to disclosing the $CO_2$ and methane emissions from a *single* well, even though each sale includes multiple individual lease parcels upon which multiple individual wells could be drilled.

93.     In its leasing EAs, BLM asserts that it is not possible to estimate production-level GHG emissions at the leasing stage or analyze the effects of these emissions until lessees submit parcel-specific development plans at the subsequent permitting stage. This is incorrect. Each BLM field office has available a reasonably foreseeable development scenario, which is applied at the resource management planning stage, that projects reasonably foreseeable oil and gas well development across the planning area. In other words, the relevant data is available to project reasonably foreseeable well development from each lease sale. BLM has simply refused to apply that information and disclose the resulting effects to the public.

94.     In many of its leasing EAs, BLM admits: "future development of these leases will result in emissions of . . . GHG pollutants." BLM also recognizes that "leasing is considered to be an irretrievable commitment of resources." After foregoing climate analysis at the programmatic level and deferring site-specific climate analysis at the RMP stage, BLM again postpones estimating and analyzing the scale of these GHG emissions until the permitting stage when it receives an application to drill. Critically, at this final stage, BLM's authority is limited to imposing mitigation measures consistent with the terms of the lease, and BLM can no longer prevent development altogether. Thus, BLM's shell-game approach condemns the public to certain GHG emissions and resulting effects without ever analyzing, or considering alternatives to, this development of public lands across the Interior West, as required by NEPA.

B.     **Indirect Impacts of Oil and Gas Leasing.**

95.     None of the EAs for the challenged decisions analyzes the reasonably foreseeable downstream GHG emissions and climate impacts resulting from oil and gas leasing and subsequent development. In one or more of the EAs, BLM admits that its EA "does not account for the ultimate use or consumption of any produced minerals."

96.     In all of the leasing EAs, BLM dismisses estimating and analyzing GHG emissions from use and consumption of leased oil and gas by claiming such an analysis would be "highly speculative." This approach ignores reasonably foreseeable development and effectively assumes *zero* downstream GHG emissions resulting from the challenged decisions. This assumption is not supported by the reality of oil and gas development. Transmission, processing, and combustion of oil and gas produced from the 397 leases challenged herein inevitably result in GHG emissions. As recognized by CEQ's Final Guidance, "the end-use of the fossil fuel being extracted would be the reasonably foreseeable combustion of that [resource]."

97.     Because downstream impacts caused by the oil and gas extracted from the leases are reasonably foreseeable, NEPA requires BLM to analyze the impacts of downstream GHG emissions resulting from its leasing decisions. BLM's failure to do so here violates NEPA.

C.     **Cumulative Impacts of Oil and Gas Leasing.**

98.     The issuance of 473 leases resulting from the ten lease authorizations challenged herein will result in new oil and gas development on 463,553 acres of public lands across three states in the Interior West. BLM must consider the cumulative impacts of these new leases in the context of ongoing oil and gas production across our public lands, as necessary to understand both the contribution the GHG emissions from these leasing decisions, as well as the

contribution of BLM's Oil and Gas Leasing Program to state, national, and global GHG emissions and their associated effects.

99.     BLM data for fiscal year 2015 shows almost 14 million acres (of the 32.1 million total acres) of public lands already leased for oil and gas development are in Colorado, Utah, and Wyoming. More than 6.6 million of these leased acres on public lands in Colorado, Utah, and Wyoming were actively producing oil and gas in fiscal year 2015.

100.    Although BLM provides a generalized discussion of anticipated climate impacts within the region encompassing a given lease sale, none of the leasing EAs estimated the contribution of GHG emissions from lease authorizations to cumulative GHG emissions from past, present, and reasonably foreseeable GHG-emitting oil and gas activities on public lands. Nor did BLM analyze the climate impacts of cumulative GHG emissions from these activities. Instead, in all of the leasing EAs, BLM declined to analyze cumulative impacts of GHG emissions at the leasing stage on the basis that "it is not currently possible to associate any of these particular actions [referring to GHG-emitting activities] with the creation of any specific climate-related environmental effects."

101.    In its leasing EAs, BLM consistently cites state, national, and global emission levels to conclude emissions from a particular lease sale represent only a small fraction of these emissions, and are therefore insignificant. Notably, BLM makes this assertion without actually estimating resulting emissions. In so doing, however, BLM is defining the cumulative impacts area with respect to GHG emissions at a state, national, and global scale. Using this baseline, then the appropriate scope of the agency's cumulative analysis must similarly be at this scale, which would include disclosing and considering the cumulative emissions from BLM's Oil and Gas Leasing Program—including emissions from all active producible wells managed by

BLM—and the incremental contribution to these emissions from a challenged lease sale. BLM must not only disclose and quantify these emissions, but also consider the effect that these emissions will have to resource values and communities across the planning areas, and to our nation as a whole.

102.    BLM's estimates in its leasing EAs of direct GHG emissions from a single well do not provide the decisionmaker or the public with a context for understanding the effects to climate from BLM's leasing authorizations either individually or in the aggregate. Climate data and GHG quantification tools and methodologies, such as the Social Cost of Carbon, are readily available to BLM, easy to apply, and are already in widespread use throughout the Federal and private sectors, state and local governments, and globally. The Social Cost of Carbon estimates the cost to society of each additional ton of GHG pollution emitted into the atmosphere, thereby providing a fairly comprehensive estimate of climate change damage resulting from a project's GHG emissions.

103.    None of the lease authorizations challenged herein employ a Social Cost of Carbon protocol, or any other economic or scientific tools, for assessing the potential impacts of leasing decisions on climate. Yet, in several EAs, BLM provides extensive descriptions of project benefits of its leasing decisions, stating: "the social and economic environment of [the local county] would be positively affected by the proposed project." BLM's focus on the economic benefits of leasing coupled with the agency's failure to address the climate costs of leasing and subsequent development undermines NEPA's purpose of informed decisionmaking "based on [an] understanding of environmental consequences." 40 C.F.R. § 1500.1(c).

V.      **Background on Specific Leasing Decisions**

A.      **Colorado Lease Sales.**

104.    In February, May, and November 2015, and May 2016 BLM held oil and gas lease sales in Colorado. Pursuant to these sales, BLM sold and issued 24 parcels in the February 12, 2015 sale; 45 parcels in the May 14, 2015 sale; 77 parcels in the November 12, 2015 sale; and six parcels in the May 2016 sale—for a combined total of 152 oil and gas leases encompassing 110,841.71 acres of federal minerals across six counties in Colorado.

105.    Plaintiff WildEarth Guardians commented on each consecutive Leasing EA on the following dates: September 5, 2014; December 15, 2014; June 8, 2015; December 18, 2015. Guardians commented on the Forest Service EIS on October 14, 2014, and filed an Objection to the Draft Record of Decision and Final EIS on January 20, 2015.

106.    On December 15, 2014, Plaintiff WildEarth Guardians filed a timely protest of BLM's February 12, 2015, oil and gas lease sale. On February 11, 2015, BLM denied Guardians' protest of the February lease sale. BLM held the lease sale the day after it denied Guardians' protest, and issued sold leases to Lessees on March 5, 2015.

107.    On March 16, 2015, Plaintiff WildEarth Guardians filed a timely protest of BLM's May 14, 2015, oil and gas lease sale. On May 13, 2015, BLM denied Guardians' protest of the May lease sale. BLM held the lease sale the same day it issued its denial of Guardians' protest, and issued sold leases to Lessees on July 1, 2015.

108.    On September 11, 2015, Plaintiff WildEarth Guardians filed a timely protest of BLM's November 12, 2015, oil and gas lease sale. On November 12, 2015, BLM denied Guardians' protest of the November lease sale. BLM held the lease sale the same day it issued its denial of Guardians' protest, and issued sold leases to Lessees on December 15, 2015.

109.    On March 14, 2016, Plaintiff WildEarth Guardians filed a timely protest of BLM's May 12, 2016, oil and gas lease sale. On May 11, 2016, BLM denied Guardians' protest of the May lease sale. BLM held the lease sale the day after it issued its denial of Guardians' protest, and issued sold leases to Lessees on June 1, 2016.

**B.    <u>Utah Lease Sales.</u>**

110.    On May 19, 2015, and February 16, 2016, BLM held oil and gas lease sales for federal minerals in Utah. Pursuant to these sales, BLM sold and issued 11 leases in the Richfield Field Office; three leases in the Cedar City Field Office; three leases in the Vernal Field Office; seven leases in the Fillmore Field Office; five leases in the Moab Field Office; and eight leases in the Price Field Office—for a combined total of 37 oil and gas leases encompassing 45,933.5 acres of federal minerals across Utah.

111.    Guardians commented on the various Leasing EAs on the following dates: January 23, 2015; April 27, 2015; July 9, 2015; and October 19, 2015.

112.    On March 16, 2015, Guardians filed a timely protest of BLM's May 19, 2015, oil and gas lease sale. On July 30, 2015, BLM issued two decisions denying Guardians' protest of the May lease sale. BLM issued the sold leases on August 3, 2015—four days after it denied Guardians' Protest.

113.    On January 11, 2016, Guardians filed a timely protest of BLM's February 16, 2016, oil and gas lease sale. On February 12, 2016, BLM denied Guardians' protest of the February lease sale. BLM sold the leases on February 16, 2016—four days after it denied Guardians' Protest. BLM issued the sold leases to lessees between April 15-19, 2016.

C.     **Wyoming Lease Sales.**

114.    BLM held five oil and gas lease sales in Wyoming between May 2015 and August

2016. Pursuant to these sales, BLM sold and issued 30 parcels in the May 5, 2015 sale; 60

parcels in the August 4, 2015 sale; 38 parcels in the November 3, 2015 sale; 74 parcels in the

May 3, 2016 sale, and 76 parcels in the August 2, 2016 sale—for a combined total of 282 oil and

gas leases encompassing 302,827.2 acres of federal minerals across 16 counties in Wyoming.

115.    Guardians commented on the various Leasing EAs on the following dates:

November 19, 2014; February 23, 2015; May 22, 2015; August 19, 2015; December 2, 2015, and

February 22, 2016.

116.    On March 4, 2015, Guardians filed a timely protest of BLM's May 5, 2015, oil

and gas lease sale. On May 4, 2015, BLM denied Guardians' protest of the May lease sale. BLM

held the lease sale the day after it denied Guardians' protest, and issued the sold leases to Lessees

on June 24, 2015.

117.    On June 5, 2015, Guardians filed a timely protest of BLM's August 4, 2015, oil

and gas lease sale. On July 29, 2015, BLM denied Guardians' protest of the August lease sale.

BLM held the lease sale on August 4, 2015, and issued the sold leases to Lessees on September

16, 2015.

118.    On September 4, 2015, Guardians filed a timely protest of BLM's November 3,

2015, oil and gas lease sale. On November 2, 2015, BLM denied Guardians' protest of the

November lease sale. BLM held the lease sale on the same day that it denied Guardians Protest,

and issued the sold leases to Lessees on December 15, 2015.

119.    On March 4, 2016, Citizen Groups filed a timely protest of BLM's May 3, 2016,

oil and gas lease sale. On May 2, 2016, BLM denied Citizen Groups' protest of the May lease

sale. BLM held the lease sale the day after it dismissed Citizen Groups' Protest and issued the

sold leases to Lessees on June 24, 2016.

120.    On June 3, 2016, Guardians filed a timely protest of BLM's August 2, 2016, oil

and gas lease sale. On July 29, 2016, BLM denied Guardians' protest of the August lease sale.

BLM held the lease sale the day after it denied Guardians' protest, and issued the sold leases to

Lessees on September 15, 2016.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Failure to Take a Hard Look at the Severity of Direct, Indirect, and Cumulative
Impacts of Greenhouse Gas Pollution
(Violation of NEPA)**

121.    Citizen Groups incorporate by reference all preceding paragraphs and Table A

below.

122.    Pursuant to NEPA and NEPA's implementing regulations, Federal Defendants

must take a hard look at the direct, indirect, and cumulative environmental consequences of their

proposed actions. 42 U.S.C. §§ 4332(2)(C)(i)-(v); 40 C.F.R. §§ 1502.14(a), 1502.16, 1508.7,

1508.8, and 1508.14.

123.    For all of the leasing authorizations identified in Table A, BLM failed to take the

required hard look at the direct, indirect, and cumulative GHG emissions and the impacts of

those emissions on climate change. BLM failed to sufficiently quantify and account for direct

GHG emissions, and failed to analyze the effect of those emissions on other resource values.

BLM failed to address the foreseeable indirect impacts from downstream combustion of oil and

gas resources leased and developed from the challenged lease authorizations. BLM also failed to

discuss the cumulative effects of these emissions across federal public lands managed through

BLM's Oil and Gas Leasing Program.

36

124.    For all of the leasing authorizations identified in Table A, BLM also failed to

analyze the similar environmental effects of the leasing authorizations challenged herein, even

though the lease authorizations are similar in terms of their climate impacts, timing, and

geography. 40 C.F.R. § 1508.25(a)(3).

125.    To comply with NEPA, BLM was required to take a hard look at the direct,

indirect, and cumulative GHG emissions and the severity of the impacts of those emissions on

climate change for the leasing authorizations identified in Table A. BLM has never taken a

comprehensive hard look at the climate impacts of its Oil and Gas Leasing Program at the

programmatic level, therefore BLM's leasing EAs cannot tier to a broader programmatic analysis

in lieu of doing a comprehensive analysis of climate impacts at the leasing stage. BLM is

required to provide a hard look analysis of these impacts before there are "any irreversible and

irretrievable commitments of resources which would be involved in the proposed action should it

be implemented." 42 U.S.C. § 4332(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a).

126.    Combined, it is reasonably foreseeable that the lease sales could result in

thousands of new wells across public lands in the Interior West, adding significant levels of

GHG emissions to the atmosphere and further endangering the Earth's climate.

127.    Where information relevant to foreseeable adverse impacts is unavailable,

agencies must nonetheless evaluate "such impacts based upon theoretical approaches or research

methods generally accepted in the scientific community." 40 C.F.R. § 1502.22(b)(4).

128.    One generally accepted approach to evaluating the impact of GHG emissions is to

estimate the costs of those emissions to society. The federal Interagency Working Group on the

Social Cost of Carbon has developed estimates of the present value of the future costs of carbon

dioxide emissions as a proxy for the magnitude and severity of those impacts.

129.    BLM failed to take a hard look at the direct, indirect, and cumulative impacts to the climate from GHG emissions, and failed to discuss the severity of these impacts, when authorizing hundreds of new oil and gas leases through the challenged leasing decisions. More broadly, BLM has demonstrated a systemic failure to account for these impacts in the agency's Oil and Gas Leasing Program affecting federal lands across the Interior West. Federal Defendants' systemic and site-specific failures are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA, 42 U.S.C.§ 4332(C)(ii), its implementing regulations at 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, 1508.27, and the APA at 5 U.S.C. § 706(2)(A).

### SECOND CLAIM FOR RELIEF
#### Failure to Prepare an EIS (Violation of NEPA)

130.    Citizen Groups incorporate by reference all preceding paragraphs.

131.    Federal Defendants' authorizations and issuance of the leases sold through the leasing authorizations challenged herein constitute major federal actions under NEPA.

132.    Federal Defendants do not have to prepare an EIS where they have demonstrated that the proposed action "will not have a significant effect on the human environment." 40 C.F.R. § 1508.13. To assess whether or not an impact is significant, Federal Defendants must consider the "context and intensity" of the impact. 40 C.F.R. § 1508.27.

133.    Federal Defendants failed to evaluate the context and intensity of the environmental impacts resulting from its leasing authorizations challenged herein, and in particular effects to climate change, as required by NEPA. Federal Defendants also failed to provide convincing statements of reasons justifying their decisions to forgo an EIS analyzing the impacts of the leasing authorizations challenged herein, as required by NEPA.

134.    Federal Defendants' leasing authorizations will result in high levels of GHG emissions that could significantly impact climate. NEPA requires Federal Defendants to identify such impacts and assess their context and intensity, and to support their decisions to forego an EIS, which BLM failed to do.

135.    Federal Defendants' assertion, in all of the leasing EAs, that they will estimate GHG emissions and analyze the significance of those emissions at the subsequent drilling stage does not forego the obligation to consider the significance of those emissions at the *leasing* stage, the point at which Federal Defendants make an irretrievable commitment of federal resources.

136.    Federal Defendants violated NEPA by failing to prepare an EIS before approving the leasing authorizations challenged herein. Federal Defendants' failure was arbitrary, capricious, an abuse of discretion, in excess of statutory authority and limitations, short of statutory right, and not in accordance with the law and procedures required by law. 5 U.S.C. §§ 706(2)(A), (C), (D).

## RELIEF REQUESTED

WHEREFORE, Plaintiff Citizen Groups respectfully request that this Court:

A.      Declare that Federal Defendants' leasing authorizations challenged herein violate NEPA and its implementing regulations;

B.      Vacate Federal Defendants' leasing authorizations and void the issued leases challenged herein;

C.      Enjoin Federal Defendants from approving or otherwise taking action on any applications for permits to drill on the leases included in the lease sales challenged herein until Federal Defendants have fully complied with NEPA and its implementing regulations, and prepared an EIS analyzing the direct, indirect, and cumulative effects of the leasing

authorizations challenged herein and of the agency's Oil and Gas Leasing Program;

     **D**.      Retain continuing jurisdiction of this matter until Federal Defendants fully remedy the violations of law complained of herein, in particular to ensure Federal Defendants take a meaningful hard look at the direct, indirect, and cumulative impacts of climate change relative to BLM's Oil and Gas Leasing Program;

     **E.**      Award the Citizen Groups their fees, costs, and other expenses as provided by applicable law;

     **F.**      Issue such relief as Citizen Groups subsequently request or that this Court may deem just, proper, and equitable.


Respectfully submitted on the 23rd day of November 2016,

/s/ Samantha Ruscavage-Barz           /s/ Kyle Tisdel
Bar No. CO0053                     CO Bar No. 42098
WildEarth Guardians                  Western Environmental Law Center
516 Alto Street                       208 Paseo del Pueblo Sur, Ste. 602
Santa Fe, NM 87501                 Taos, NM 87571
(505) 401-4180                       (575) 613-8050
sruscavagebarz@wildearthguardians.org    tisdel@westernlaw.org
                                        (admitted *Pro Hac Vice*)

*Attorneys for Plaintiffs*

Table A of challenged agency actions on next page.

Table A. List of Agency Actions Challenged Herein.

## Colorado Leases

| Lease Parcel | EA No. | Lease Parcel | EA No. |
|---|---|---|---|
| COC 076792 | CO-N010-2014-0031-EA | COC 076971 | CO-F020-2014-049-EA |
| COC 076795 | CO-N010-2014-0031-EA | COC 076973 | CO-F020-2014-049-EA |
| COC 076796 | CO-N010-2014-0031-EA | COC 076974 | CO-F020-2014-049-EA |
| COC 076797 | CO-N010-2014-0031-EA | COC 076975 | CO-F020-2014-049-EA |
| COC 076798 | CO-N010-2014-0031-EA | COC 076976 | CO-F020-2014-049-EA |
| COC 076799 | CO-N010-2014-0031-EA | COC 076978 | CO-F020-2014-049-EA |
| COC 076801 | CO-N010-2014-0031-EA | COC 076979 | CO-F020-2014-049-EA |
| COC 076802 | CO-N010-2014-0031-EA | COC 076982 | CO-F020-2014-049-EA |
| COC 076803 | CO-N010-2014-0031-EA | COC 076983 | CO-F020-2014-049-EA |
| COC 076804 | CO-N010-2014-0031-EA | COC 076984 | CO-F020-2014-049-EA |
| COC 076805 | CO-N010-2014-0031-EA | COC 076985 | CO-F020-2014-049-EA |
| COC 076806 | CO-N010-2014-0031-EA | COC 076986 | CO-F020-2014-049-EA |
| COC 076807 | CO-N010-2014-0031-EA | COC 076987 | CO-F020-2014-049-EA |
| COC 076809 | CO-N010-2014-0031-EA | COC 076988 | CO-F020-2014-049-EA |
| COC 076810 | CO-N010-2014-0031-EA | COC 076989 | CO-F020-2014-049-EA |
| COC 076811 | CO-N010-2014-0031-EA | COC 076990 | CO-F020-2014-049-EA |
| COC 076812 | CO-N010-2014-0031-EA | COC 076991 | CO-F020-2014-049-EA |
| COC 076814 | CO-N010-2014-0031-EA | COC 076992 | CO-F020-2014-049-EA |
| COC 076815 | CO-N010-2014-0031-EA | COC 076993 | CO-F020-2014-049-EA |
| COC 076816 | CO-N010-2014-0031-EA | COC 076994 | CO-F020-2014-049-EA |
| COC 076817 | CO-N010-2014-0031-EA | COC 076995 | CO-F020-2014-049-EA |
| COC 076818 | CO-N010-2014-0031-EA | COC 076996 | CO-F020-2014-049-EA |
| COC 076819 | CO-N010-2014-0031-EA | COC 076997 | CO-F020-2014-049-EA |
| COC 076821 | CO-N010-2014-0031-EA | COC 077027 | CO-F020-2014-049-EA |
| COC 076920 | CO-F020-2014-049-EA | COC 077250 | CO-F020-2015-0021-EA |
| COC 076921 | CO-F020-2014-049-EA | COC 077251 | CO-F020-2015-0021-EA |
| COC 076923 | CO-F020-2014-049-EA | COC 077252 | CO-F020-2015-0021-EA |
| COC 076924 | CO-F020-2014-049-EA | COC 077253 | CO-F020-2015-0021-EA |
| COC 076935 | CO-F020-2014-049-EA | COC 077255 | CO-F020-2015-0021-EA |
| COC 076936 | CO-F020-2014-049-EA | COC 077256 | CO-F020-2015-0021-EA |
| COC 076937 | CO-F020-2014-049-EA | COC 077257 | CO-F020-2015-0021-EA |
| COC 076939 | CO-F020-2014-049-EA | COC 077258 | CO-F020-2015-0021-EA |
| COC 076940 | CO-F020-2014-049-EA | COC 077260 | CO-F020-2015-0021-EA |
| COC 076944 | CO-F020-2014-049-EA | COC 077261 | CO-F020-2015-0021-EA |
| COC 076955 | CO-F020-2014-049-EA | COC 077262 | CO-F020-2015-0021-EA |
| COC 076956 | CO-F020-2014-049-EA | COC 077264 | CO-F020-2015-0021-EA |
| COC 076957 | CO-F020-2014-049-EA | COC 077265 | CO-F020-2015-0021-EA |
| COC 076958 | CO-F020-2014-049-EA | COC 077266 | CO-F020-2015-0021-EA |
| COC 076959 | CO-F020-2014-049-EA | COC 077267 | CO-F020-2015-0021-EA |
| COC 076961 | CO-F020-2014-049-EA | COC 077268 | CO-F020-2015-0021-EA |
| COC 076962 | CO-F020-2014-049-EA | COC 077270 | CO-F020-2015-0021-EA |

41

**Colorado Leases (cont.)**

| | | | | | |
|---|---|---|---|---|---|
| COC | 076963 | CO-F020-2014-049-EA | COC | 077271 | CO-F020-2015-0021-EA |
| COC | 076966 | CO-F020-2014-049-EA | COC | 077273 | CO-F020-2015-0021-EA |
| COC | 076967 | CO-F020-2014-049-EA | COC | 077274 | CO-F020-2015-0021-EA |
| COC | 076968 | CO-F020-2014-049-EA | COC | 077275 | CO-F020-2015-0021-EA |
| COC | 077276 | CO-F020-2015-0021-EA | COC | 077350 | CO-F020-2015-0021-EA |
| COC | 077281 | CO-F020-2015-0021-EA | COC | 077354 | CO-F020-2015-0021-EA |
| COC | 077282 | CO-F020-2015-0021-EA | COC | 077361 | CO-F020-2015-0021-EA |
| COC | 077283 | CO-F020-2015-0021-EA | COC | 077362 | CO-F020-2015-0021-EA |
| COC | 077284 | CO-F020-2015-0021-EA | COC | 077363 | CO-F020-2015-0021-EA |
| COC | 077285 | CO-F020-2015-0021-EA | COC | 077676 | CO-N050-2015-0092-EA |
| COC | 077287 | CO-F020-2015-0021-EA | COC | 077677 | CO-N050-2015-0092-EA |
| COC | 077288 | CO-F020-2015-0021-EA | COC | 077678 | CO-S010-2016-0012-DNA |
| COC | 077294 | CO-F020-2015-0021-EA | COC | 077679 | CO-S010-2016-0012-DNA |
| COC | 077297 | CO-F020-2015-0021-EA | COC | 077680 | CO-S010-2016-0012-DNA |
| COC | 077298 | CO-F020-2015-0021-EA | COC | 077681 | CO-S010-2016-0012-DNA |
| COC | 077299 | CO-F020-2015-0021-EA | COC | 077247 | CO-F020-2015-0061DN |
| COC | 077303 | CO-F020-2015-0021-EA | COC | 077249 | CO-F020-2015-0061DN |
| COC | 077304 | CO-F020-2015-0021-EA | COC | 077263 | CO-F020-2015-0061DN |
| COC | 077305 | CO-F020-2015-0021-EA | COC | 077352 | CO-F020-2015-0061DN |
| COC | 077306 | CO-F020-2015-0021-EA | COC | 077359 | CO-F020-2015-0021-EA |
| COC | 077307 | CO-F020-2015-0021-EA | COC | 077344 | CO-F020-2015-0021-EA |
| COC | 077308 | CO-F020-2015-0021-EA | COC | 077345 | CO-F020-2015-0021-EA |
| COC | 077309 | CO-F020-2015-0021-EA | COC | 077346 | CO-F020-2015-0021-EA |
| COC | 077310 | CO-F020-2015-0021-EA | COC | 077342 | CO-F020-2015-0021-EA |
| COC | 077311 | CO-F020-2015-0021-EA | COC | 077343 | CO-F020-2015-0021-EA |
| COC | 077312 | CO-F020-2015-0021-EA | | | |
| COC | 077315 | CO-F020-2015-0021-EA | | | |
| COC | 077320 | CO-F020-2015-0021-EA | | | |
| COC | 077321 | CO-F020-2015-0021-EA | | | |
| COC | 077322 | CO-F020-2015-0021-EA | | | |
| COC | 077324 | CO-F020-2015-0021-EA | | | |
| COC | 077325 | CO-F020-2015-0021-EA | | | |
| COC | 077326 | CO-F020-2015-0021-EA | | | |
| COC | 077327 | CO-F020-2015-0021-EA | | | |
| COC | 077328 | CO-F020-2015-0021-EA | | | |
| COC | 077329 | CO-F020-2015-0021-EA | | | |
| COC | 077330 | CO-F020-2015-0021-EA | | | |
| COC | 077333 | CO-F020-2015-0021-EA | | | |
| COC | 077334 | CO-F020-2015-0021-EA | | | |
| COC | 077335 | CO-F020-2015-0021-EA | | | |
| COC | 077336 | CO-F020-2015-0021-EA | | | |
| COC | 077338 | CO-F020-2015-0021-EA | | | |
| COC | 077339 | CO-F020-2015-0021-EA | | | |
| COC | 077340 | CO-F020-2015-0021-EA | | | |
| COC | 077341 | CO-F020-2015-0021-EA | | | |

## Utah Leases

| Lease Parcel | | EA No. |
|---|---|---|
| UTU | 091055 | UT-C020-2014-036-EA |
| UTU | 091056 | UT-C020-2014-036-EA |
| UTU | 091057 | UT-C020-2014-036-EA |
| UTU | 091058 | UT-C020-2014-036-EA |
| UTU | 091059 | UT-C020-2014-036-EA |
| UTU | 091060 | UT-C020-2014-036-EA |
| UTU | 091064 | UT-C020-2015-0009-EA |
| UTU | 091065 | UT-C020-2014-036-EA |
| UTU | 091066 | UT-C020-2014-036-EA |
| UTU | 091067 | UT-C020-2014-036-EA |
| UTU | 091068 | UT-G010-2014-093-EA |
| UTU | 091197 | UT-C020-2015-0009-EA |
| UTU | 091199 | UT-C020-2015-0009-EA |
| UTU | 091267 | UT-W020-2015-0004-EA |
| UTU | 091268 | UT-W020-2015-0004-EA |
| UTU | 091269 | UT-W020-2015-0004-EA |
| UTU | 091270 | UT-W020-2015-0004-EA |
| UTU | 091271 | UT-W020-2015-0004-EA |
| UTU | 091272 | UT-W020-2015-0004-EA |
| UTU | 091273 | UT-W020-2015-0004-EA |
| UTU | 091310 | UT-G010-2015-089-EA |
| UTU | 091311 | UT-G010-2015-089-EA |
| UTU | 091479 | UT-G010-2015-089-EA |
| UTU | 091302 | UT-G021-2015-0031-EA |
| UTU | 091303 | UT-G021-2015-0031-EA |
| UTU | 091304 | UT-G021-2015-0031-EA |
| UTU | 091305 | UT-G021-2015-0031-EA |
| UTU | 091306 | UT-G021-2015-0031-EA |
| UTU | 091308 | UT-G021-2015-0031-EA |
| UTU | 091334 | UT-G021-2015-0031-EA |
| UTU | 091340 | UT-G021-2015-0031-EA |
| UTU | 091344 | BLM Adopted Fishlake National Forest EIS in ROD |
| UTU | 091346 | BLM Adopted Fishlake National Forest EIS in ROD |
| UTU | 091342 | UT-G010-2015-089-EA |
| UTU | 091343 | UT-G010-2015-089-EA |
| UTU | 091540 | UT-C020-2016-0002-EA |
| UTU | 091541 | UT-C020-2016-0002-EA |
| UTU | 091593 | UT-G010-2015-089-EA |
| UTU | 091594 | UT-G010-2015-089-EA |

## Wyoming Leases

| Lease Parcel | | EA No. | Lease Parcel | | EA No. |
|---|---|---|---|---|---|
| WYW | 184215 | WY-040-EA14-141 | WYW | 184358 | WY-070-EA15-30 |
| WYW | 184216 | WY-040-EA14-141 | WYW | 184359 | WY-070-EA15-30 |
| WYW | 184217 | WY-040-EA14-141 | WYW | 184360 | WY-070-EA15-30 |
| WYW | 184218 | WY-040-EA14-141 | WYW | 184361 | WY-070-EA15-30 |
| WYW | 184219 | WY-040-EA14-141 | WYW | 184362 | WY-070-EA15-30 |
| WYW | 184220 | WY-040-EA14-141 | WYW | 184363 | WY-070-EA15-30 |
| WYW | 184221 | WY-040-EA14-141 | WYW | 184364 | WY-070-EA15-30 |
| WYW | 184222 | WY-040-EA14-141 | WYW | 184365 | WY-070-EA15-30 |
| WYW | 184223 | WY-040-EA14-141 | WYW | 184366 | WY-070-EA15-30 |
| WYW | 184224 | WY-040-EA14-141 | WYW | 184367 | WY-070-EA15-30 |
| WYW | 184225 | WY-040-EA14-141 | WYW | 184368 | WY-070-EA15-30 |
| WYW | 184226 | WY-040-EA14-141 | WYW | 184369 | WY-070-EA15-30 |
| WYW | 184227 | WY-040-EA14-141 | WYW | 184370 | WY-070-EA15-30 |
| WYW | 184228 | WY-040-EA14-141 | WYW | 184371 | WY-070-EA15-30 |
| WYW | 184229 | WY-040-EA14-141 | WYW | 184372 | WY-070-EA15-30 |
| WYW | 184230 | WY-040-EA14-141 | WYW | 184373 | WY-070-EA15-30 |
| WYW | 184231 | WY-040-EA14-141 | WYW | 184374 | WY-070-EA15-30 |
| WYW | 184232 | WY-040-EA14-141 | WYW | 184375 | WY-070-EA15-30 |
| WYW | 184233 | WY-040-EA14-141 | WYW | 184376 | WY-070-EA15-30 |
| WYW | 184234 | WY-040-EA14-141 | WYW | 184377 | WY-070-EA15-30 |
| WYW | 184235 | WY-040-EA14-141 | WYW | 184378 | WY-070-EA15-30 |
| WYW | 184236 | WY-040-EA14-141 | WYW | 184379 | WY-070-EA15-30 |
| WYW | 184237 | WY-040-EA14-141 | WYW | 184380 | WY-070-EA15-30 |
| WYW | 184238 | WY-040-EA14-141 | WYW | 184381 | WY-070-EA15-30 |
| WYW | 184239 | WY-040-EA14-141 | WYW | 184382 | WY-070-EA15-30 |
| WYW | 184240 | WY-040-EA14-141 | WYW | 184383 | WY-070-EA15-30 |
| WYW | 184241 | WY-040-EA14-141 | WYW | 184384 | WY-070-EA15-30 |
| WYW | 184242 | WY-040-EA14-141 | WYW | 184385 | WY-070-EA15-30 |
| WYW | 184243 | WY-040-EA14-141 | WYW | 184386 | WY-R000-2015-0001-EA |
| WYW | 184244 | WY-040-EA14-141 | WYW | 184387 | WY-R000-2015-0001-EA |
| WYW | 184245 | WY-040-EA14-141 | WYW | 184388 | WY-R000-2015-0001-EA |
| WYW | 184246 | WY-070-EA15-30 | WYW | 184389 | WY-R000-2015-0001-EA |
| WYW | 184345 | WY-070-EA15-30 | WYW | 184390 | WY-R000-2015-0001-EA |
| WYW | 184346 | WY-070-EA15-30 | WYW | 184391 | WY-R000-2015-0001-EA |
| WYW | 184347 | WY-070-EA15-30 | WYW | 184392 | WY-R000-2015-0001-EA |
| WYW | 184348 | WY-070-EA15-30 | WYW | 184393 | WY-R000-2015-0001-EA |
| WYW | 184349 | WY-070-EA15-30 | WYW | 184394 | WY-R000-2015-0001-EA |
| WYW | 184350 | WY-070-EA15-30 | WYW | 184395 | WY-R000-2015-0001-EA |
| WYW | 184351 | WY-070-EA15-30 | WYW | 184396 | WY-R000-2015-0001-EA |
| WYW | 184352 | WY-070-EA15-30 | WYW | 184397 | WY-R000-2015-0001-EA |
| WYW | 184353 | WY-070-EA15-30 | WYW | 184398 | WY-R000-2015-0001-EA |
| WYW | 184354 | WY-070-EA15-30 | WYW | 184399 | WY-R000-2015-0001-EA |
| WYW | 184355 | WY-070-EA15-30 | WYW | 184400 | WY-R000-2015-0001-EA |
| WYW | 184356 | WY-070-EA15-30 | WYW | 184401 | WY-070-EA15-30 |

## Wyoming Leases (cont.)

| Lease Parcel | | EA No. | Lease Parcel | | EA No. |
|---|---|---|---|---|---|
| WYW | 184357 | WY-070-EA15-30 | WYW | 184402 | WY-070-EA15-30 |
| WYW | 184403 | WY-070-EA15-30 | WYW | 185122 | WY-070-EA15-225 |
| WYW | 184404 | WY-070-EA15-30 | WYW | 185129 | WY-070-EA15-225 |
| WYW | 184247 | WY-040-EA15-70 | WYW | 185130 | WY-070-EA15-225 |
| WYW | 184532 | WY-040-EA15-70 | WYW | 185298 | WY-040-EA15-130 |
| WYW | 184533 | WY-040-EA15-70 | WYW | 185299 | WY-040-EA15-130 |
| WYW | 184534 | WY-040-EA15-70 | WYW | 185300 | WY-040-EA15-130 |
| WYW | 184535 | WY-040-EA15-70 | WYW | 185301 | WY-040-EA15-130 |
| WYW | 184536 | WY-040-EA15-70 | WYW | 185302 | WY-040-EA15-130 |
| WYW | 184537 | WY-040-EA15-70 | WYW | 185303 | WY-040-EA15-130 |
| WYW | 184538 | WY-040-EA15-70 | WYW | 185135 | WY-R000-2015-0002-EA |
| WYW | 184539 | WY-040-EA15-70 | WYW | 185136 | WY-R000-2015-0002-EA |
| WYW | 184540 | WY-040-EA15-70 | WYW | 185137 | WY-R000-2015-0002-EA |
| WYW | 184541 | WY-040-EA15-70 | WYW | 185138 | WY-R000-2015-0002-EA |
| WYW | 184542 | WY-040-EA15-70 | WYW | 185139 | WY-R000-2015-0002-EA |
| WYW | 184543 | WY-040-EA15-70 | WYW | 185140 | WY-R000-2015-0002-EA |
| WYW | 184544 | WY-040-EA15-70 | WYW | 185141 | WY-R000-2015-0002-EA |
| WYW | 184545 | WY-040-EA15-70 | WYW | 185142 | WY-R000-2015-0002-EA |
| WYW | 184546 | WY-040-EA15-70 | WYW | 185143 | WY-R000-2015-0002-EA |
| WYW | 184547 | WY-040-EA15-70 | WYW | 185144 | WY-R000-2015-0002-EA |
| WYW | 184548 | WY-040-EA15-70 | WYW | 185145 | WY-R000-2015-0002-EA |
| WYW | 184549 | WY-040-EA15-70 | WYW | 185147 | WY-R000-2015-0002-EA |
| WYW | 184550 | WY-040-EA15-70 | WYW | 185148 | WY-R000-2015-0002-EA |
| WYW | 184551 | WY-040-EA15-70 | WYW | 185098 | WY-070-EA15-225 |
| WYW | 184552 | WY-040-EA15-70 | WYW | 185099 | WY-070-EA15-225 |
| WYW | 184553 | WY-040-EA15-70 | WYW | 185100 | WY-070-EA15-225 |
| WYW | 184554 | WY-040-EA15-70 | WYW | 185101 | WY-070-EA15-225 |
| WYW | 184555 | WY-040-EA15-70 | WYW | 185102 | WY-070-EA15-225 |
| WYW | 184556 | WY-040-EA15-70 | WYW | 185103 | WY-070-EA15-225 |
| WYW | 184557 | WY-040-EA15-70 | WYW | 185104 | WY-070-EA15-225 |
| WYW | 184558 | WY-040-EA15-70 | WYW | 185105 | WY-070-EA15-225 |
| WYW | 184559 | WY-040-EA15-70 | WYW | 185106 | WY-070-EA15-225 |
| WYW | 184560 | WY-040-EA15-70 | WYW | 185107 | WY-070-EA15-225 |
| WYW | 184561 | WY-040-EA15-70 | WYW | 185108 | WY-070-EA15-225 |
| WYW | 184562 | WY-040-EA15-70 | WYW | 185110 | WY-070-EA15-225 |
| WYW | 184563 | WY-040-EA15-70 | WYW | 185111 | WY-070-EA15-225 |
| WYW | 184564 | WY-040-EA15-70 | WYW | 185112 | WY-070-EA15-225 |
| WYW | 184565 | WY-040-EA15-70 | WYW | 185113 | WY-070-EA15-225 |
| WYW | 184566 | WY-040-EA15-70 | WYW | 185114 | WY-070-EA15-225 |
| WYW | 184567 | WY-040-EA15-70 | WYW | 185115 | WY-070-EA15-225 |
| WYW | 184568 | WY-040-EA15-70 | WYW | 185116 | WY-070-EA15-225 |
| WYW | 184569 | WY-040-EA15-70 | WYW | 185117 | WY-070-EA15-225 |
| WYW | 185132 | WY-070-EA15-225 | WYW | 185118 | WY-070-EA15-225 |
| WYW | 185109 | WY-070-EA15-225 | WYW | 185119 | WY-070-EA15-225 |

**Wyoming Leases (cont.)**

| Lease Parcel | | EA No. | Lease Parcel*[9] | | EA No. |
|---|---|---|---|---|---|
| WYW | 185120 | WY-070-EA15-225 | WYW | 185181 | WY-070-EA16-66 |
| WYW | 185121 | WY-070-EA15-225 | WYW | 185182 | WY-070-EA16-66 |
| WYW | 185123 | WY-070-EA15-225 | WYW | 185185 | WY-R000-2016-0001-EA |
| WYW | 185124 | WY-070-EA15-225 | WYW | 185186 | WY-R000-2016-0001-EA |
| WYW | 185126 | WY-070-EA15-225 | WYW | 185187 | WY-R000-2016-0001-EA |
| WYW | 185127 | WY-070-EA15-225 | WYW | 185189 | WY-R000-2016-0001-EA |
| WYW | 185296 | WY-040-EA15-130 | WYW | 185195 | WY-R000-2016-0001-EA |
| WYW | 185297 | WY-040-EA15-130 | WYW | 185402 | WY-070-EA16-66 |
| WYW | 185275 | WY-040-EA15-130 | WYW | 185403 | WY-070-EA16-66 |
| WYW | 185276 | WY-040-EA15-130 | WYW | 185404 | WY-070-EA16-66 |
| WYW | 185277 | WY-040-EA15-130 | WYW | 185405 | WY-070-EA16-66 |
| WYW | 185278 | WY-040-EA15-130 | WYW | 185406 | WY-070-EA16-66 |
| WYW | 185279 | WY-040-EA15-130 | WYW | 185407 | WY-070-EA16-66 |
| WYW | 185280 | WY-040-EA15-130 | WYW | 185408 | WY-070-EA16-66 |
| WYW | 185281 | WY-040-EA15-130 | WYW | 185409 | WY-070-EA16-66 |
| WYW | 185282 | WY-040-EA15-130 | WYW | 185410 | WY-070-EA16-66 |
| WYW | 185283 | WY-040-EA15-130 | WYW | 185411 | WY-070-EA16-66 |
| WYW | 185287 | WY-040-EA15-130 | WYW | 185412 | WY-070-EA16-66 |
| WYW | 185284 | WY-040-EA15-130 | WYW | 185413 | WY-070-EA16-66 |
| WYW | 185285 | WY-040-EA15-130 | WYW | 185414 | WY-070-EA16-66 |
| WYW | 185286 | WY-040-EA15-130 | WYW | 185415 | WY-070-EA16-66 |
| WYW | 185287 | WY-040-EA15-130 | WYW | 185416 | WY-070-EA16-66 |
| WYW | 185288 | WY-040-EA15-130 | WYW | 185417 | WY-070-EA16-66 |
| WYW | 185289 | WY-040-EA15-130 | WYW | 185418 | WY-070-EA16-66 |
| WYW | 185290 | WY-040-EA15-130 | WYW | 185419 | WY-070-EA16-66 |
| WYW | 185291 | WY-040-EA15-130 | WYW | 185420 | WY-070-EA16-66 |
| WYW | 185292 | WY-040-EA15-130 | WYW | 185421 | WY-070-EA16-66 |
| WYW | 185293 | WY-040-EA15-130 | WYW | 185422 | WY-070-EA16-66 |
| WYW | 185294 | WY-040-EA15-130 | WYW | 185423 | WY-070-EA16-66 |
| WYW | 185295 | WY-040-EA15-130 | WYW | 185424 | WY-070-EA16-66 |
| | | | WYW | 185425 | WY-070-EA16-66 |
| | | | WYW | 185426 | WY-070-EA16-66 |
| | | | WYW | 185427 | WY-070-EA16-66 |
| | | | WYW | 185428 | WY-070-EA16-66 |
| | | | WYW | 185429 | WY-070-EA16-66 |
| | | | WYW | 185430 | WY-070-EA16-66 |
| | | | WYW | 185431 | WY-070-EA16-66 |
| | | | WYW | 185432 | WY-070-EA16-66 |
| | | | WYW | 185433 | WY-070-EA16-66 |
| | | | WYW | 185434 | WY-070-EA16-66 |
| | | | WYW | 185435 | WY-R000-2016-0001-EA |
| | | | WYW | 185436 | WY-R000-2016-0001-EA |
| | | | WYW | 185437 | WY-R000-2016-0001-EA |

---

[9] * indicates leases sold in the August 2, 2016 lease sale in Wyoming and added to this Supplemented Complaint.

**Wyoming Leases (cont.)**

| Lease Parcel*[10] | | EA No. |
|---|---|---|
| WYW | 185438 | WY-R000-2016-0001-EA |
| WYW | 185439 | WY-R000-2016-0001-EA |
| WYW | 185440 | WY-R000-2016-0001-EA |
| WYW | 185441 | WY-R000-2016-0001-EA |
| WYW | 185442 | WY-R000-2016-0001-EA |
| WYW | 185443 | WY-R000-2016-0001-EA |
| WYW | 185444 | WY-R000-2016-0001-EA |
| WYW | 185445 | WY-R000-2016-0001-EA |
| WYW | 185446 | WY-R000-2016-0001-EA |
| WYW | 185447 | WY-R000-2016-0001-EA |
| WYW | 185448 | WY-R000-2016-0001-EA |
| WYW | 185449 | WY-R000-2016-0001-EA |
| WYW | 185450 | WY-R000-2016-0001-EA |
| WYW | 185451 | WY-R000-2016-0001-EA |
| WYW | 185452 | WY-R000-2016-0001-EA |
| WYW | 185453 | WY-R000-2016-0001-EA |
| WYW | 185454 | WY-R000-2016-0001-EA |
| WYW | 185455 | WY-R000-2016-0001-EA |
| WYW | 185456 | WY-R000-2016-0001-EA |
| WYW | 185457 | WY-R000-2016-0001-EA |
| WYW | 185458 | WY-R000-2016-0001-EA |
| WYW | 185459 | WY-R000-2016-0001-EA |
| WYW | 185460 | WY-R000-2016-0001-EA |
| WYW | 185461 | WY-R000-2016-0001-EA |
| WYW | 185462 | WY-R000-2016-0001-EA |
| WYW | 185463 | WY-R000-2016-0001-EA |
| WYW | 185464 | WY-R000-2016-0001-EA |
| WYW | 185465 | WY-R000-2016-0001-EA |
| WYW | 185466 | WY-R000-2016-0001-EA |
| WYW | 185467 | WY-R000-2016-0001-EA |
| WYW | 185468 | WY-R000-2016-0001-EA |
| WYW | 185469 | WY-R000-2016-0001-EA |
| WYW | 185470 | WY-R000-2016-0001-EA |

---

[10] * indicates leases sold in the August 2, 2016 lease sale in Wyoming and added to this Supplemented Complaint.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2016 I electronically filed the foregoing SUPPLEMENTED COMPLAINT with the Clerk of the Court via the CM/ECF system, which will send notification of such filing to all counsel of record.


/s/ Samantha Ruscavage-Barz
Attorney for Plaintiffs

48