**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILDEARTH GUARDIANS; and PHYSICIANS FOR SOCIAL RESPONSIBILITY, | |
| Plaintiffs, | No. 1:16-cv-01724-RC |
| v. | |
| RYAN ZINKE, Secretary, U.S. Department of the Interior; MICHAEL NEDD, Acting Director, U.S. Bureau of Land Management; and U.S. BUREAU OF LAND MANAGEMENT, | |
| Defendants, | |
| WESTERN ENERGY ALLIANCE; PETROLEUM ASSOCIATION OF WYOMING; AMERICAN PETROLEUM INSTITUTE; STATE OF WYOMING; STATE OF COLORADO; STATE OF UTAH, | |
| Intervenor-Defendants. | |

**SUPPLEMENTAL BRIEF OF THE AMERICAN PETROLEUM INSTITUTE**

Stacy Linden
Ben Norris
AMERICAN PETROLEUM INSTITUTE
1220 L St., N.W.
Washington, D.C. 20005
Phone:  (202) 682-8000
Fax:  (202) 682-8033
norrisb@api.org

Steven J. Rosenbaum
Bradley K. Ervin
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

*Counsel for Intervenor-Defendant American Petroleum Institute*

Plaintiffs claim that the Bureau of Land Management's ("BLM") decisions to conduct six oil and gas lease sales in Wyoming violated the National Environmental Policy Act ("NEPA") because BLM allegedly did not adequately quantify the greenhouse gas ("GHG") emissions associated with the potential future development of any leases issued during the sales. The Federal Defendants' and Defendant-Intervenors' summary judgment briefs demonstrated, among other things, that (1) NEPA does not require quantification, (2) the Environmental Assessments ("EA") analyzing each lease sale explained the uncertainties—including the locations of any issued leases, the type and extent of development on any issued lease, and the geologic characteristics of future drilling in diverse conditions across a wide swath of Wyoming—that impeded GHG quantification in these specific instances, and (3) the lease sale EAs adequately disclosed the impacts, including climate change impacts, of potential future GHG emissions through qualitative discussion supplemented by the best quantification possible given the uncertainties present at the lease sale stage. *See*, *e.g.*, API Cross-Motion (Dkt. 60) at 5–21, 26–33.

For their part, Plaintiffs contend that such uncertainties should be ignored because, in their view, NEPA categorically requires site-specific (*e.g.*, parcel-by-parcel) quantification of GHG emissions at the lease sale stage because the issuance of leases confers unhindered rights to develop the lease. *See* Pls. Reply (Dkt. 77) at 3–5 (citing 43 C.F.R. § 3101.1-2). The Federal Defendants and Defendant-Intervenors have disputed both Plaintiffs' legal position and their characterization of the consequences of lease issuance. *See*, *e.g.*, API Reply (Dkt. 81) at 4–8 (citing 43 C.F.R. § 3162.3-1(c)). In this context, the Court ordered the parties to submit supplemental briefs addressing "whether, after the leasing stage, BLM may institute a blanket ban on drilling across all the leases at issue here, based on policy considerations." Order (Dkt.

88) at 3.  As detailed below, Congress has not granted BLM the authority, before or after a lease sale, to impose a policy-based permanent ban on development.  However, Congress has authorized BLM to impose reasonable conditions, consistent with the terms of the lease, upon lease development in order to protect environmental quality.

The Mineral Leasing Act ("MLA") directs that the Nation's oil and gas deposits "shall be subject to disposition" by leasing.  30 U.S.C. § 181.  "The purpose of the [MLA] was to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise."  *Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967) (quotation omitted).  *See also*, *e.g.*, *Conway v. Watt*, 717 F.2d 512, 514 (10th Cir. 1983) ("The purpose behind enactment of the [MLA] . . . was the development of western portions of the country[.]" (citation omitted)); *California Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961) ("The Act was intended to promote wise development of these natural resources and to obtain for the public a reasonable financial return[.]").  To that end, Congress has directed that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary."  30 U.S.C. § 226(a)–(b)(1)(A).

Post-leasing, BLM's authorized officer must "regulate all surface-disturbing activities conducted pursuant to any lease . . . in the interest of conservation of surface resources."  30 U.S.C. § 226(g).  In order to conduct operations on a lease, the leaseholder or operator first "shall submit to the authorized officer for approval an Application for Permit to Drill for each well."  43 C.F.R. § 3162.3-1(c).  "No drilling operations, nor surface disturbance preliminary thereto, may be commenced prior to the authorized officer's approval of the permit."  *Id.  See also* 43 C.F.R. § 3162.3-2(a) ("A proposal for further well operations shall be submitted . . . for approval

by the authorized officer prior to commencing operations . . . ."); 43 C.F.R. § 3162.3-3 ("Prior to commencing any operation . . . which will result in additional surface disturbance . . ., the operator shall submit a proposal . . . to the authorized officer for approval.").

BLM's authorized officer is tasked to "approve and monitor . . . operator proposals for drilling, development or production of oil and gas . . . and to require that all operations be conducted in a manner which protects other natural resources and the environmental quality" while also ensuring "the maximum ultimate recovery of oil and gas[.]"  43 C.F.R. § 3161.2. "Before approving operations on [a] leasehold, the authorized officer shall determine," *inter alia*, "that the proposed plan of operations is sound both from a technical and environmental standpoint."  *Id.*

No permit can issue until NEPA requirements have been satisfied.  *See* 30 U.S.C. § 226(p)(2)(A) (authorizing agency to "issue the permit, if the requirements under the [NEPA] and other applicable law have been completed"); *id.* § 226(p)(3) (allowing deferral of decision on permit pending NEPA completion).  Indeed, the authorized officer must first "prepare an environmental record of review or an environmental assessment, as appropriate."  43 C.F.R. § 3162.5-1(a).  "These environmental documents will be used in determining whether or not an environmental impact statement is required and in determining any appropriate terms and conditions of approval of the submitted plan."  *Id.*[1]  "To the extent consistent with lease rights," the authorized officer may impose "reasonable measures deemed necessary" by the authorized

---

[1] The leaseholder has a separate obligation to "conduct operations in a manner which protects the mineral resources, other natural resources, and environmental quality."  43 C.F.R. § 3162.5-1(a).

officer to "minimize[] adverse impacts to the land, air, and water."  BLM Lease Form 3100-11, § 6.[2]

BLM's authority to impose restrictions is thus necessarily permit-by-permit and lease-by-lease, and provides no authority for a blanket prohibition on development based on policy considerations rather than environmental concerns raised by an individual permit.  In an unusual case in which a specific lease's unique environmental setting presented insurmountable development challenges, BLM would likely have the power to deny a development permit.[3]  But Congress has not granted BLM authority to impose a blanket ban on development of oil and gas leases at any stage.  To the contrary, the MLA mandates issuance of leases for the purposes of oil and gas development with corollary completion of NEPA procedures, which may inform "reasonable" conditions or restrictions on proposed development on a lease-by-lease basis.[4]

"NEPA itself does not mandate particular results, but simply prescribes the necessary process."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  In other words, NEPA "does not command the agency to favor an environmentally preferable course of action," it "simply mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences."  *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992).  "Other statutes may impose substantive

---

[2] U.S. Dep't of the Interior, BLM, *Offer to Lease and Lease for Oil and Gas* (Form 3100-11), https://www.blm.gov/sites/blm.gov/files/uploads/Services_National-Operations-Center_Eforms_Fluid-and-Solid-Minerals_3100-011.pdf (last visited Nov. 28, 2018).

[3] In some circumstances, BLM retains authority to "deny[] a lessee the use of the leased property" if required by another substantive law such as the Endangered Species Act. *Wyoming Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 92 (D.D.C. 2003) (quotation omitted).  A lessee's rights to compensation in such circumstances are beyond the scope of this brief.

[4] Congress may, of course, delegate additional authority to BLM regarding oil and gas lease issuance and development, subject to the contractual rights of existing oil and gas leaseholders.

environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351.

NEPA's procedural requirements thus do not expand BLM's substantive authority over oil and gas leasing or leases. "NEPA was not intended to repeal by implication any other statute." *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 694 (1973) (noting that "[t]he policies and goals set forth in (NEPA) are supplementary to those set forth in existing authorizations of Federal agencies" (quoting 42 U.S.C. § 4335)).

Viewed as a whole, NEPA requires consideration and disclosure of environmental impacts consistent with the MLA's development directive. In that context, BLM fully fulfilled its NEPA obligations when it considered and disclosed the GHG emission and climate change impacts of the required lease sales within the "rule of reason." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004).

Respectfully submitted,

Stacy Linden
Ben Norris
AMERICAN PETROLEUM INSTITUTE
1220 L St., N.W.
Washington, D.C. 20005
Phone:  (202) 682-8000
Fax:  (202) 682-8033
norrisb@api.org

*/s/  Steven J. Rosenbaum*
Steven J. Rosenbaum
Bradley K. Ervin
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

*Counsel for Intervenor-Defendant American Petroleum Institute*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of November, 2018, I caused a true and correct copy of the foregoing to be filed with the Court electronically via the CM/ECF system, which will serve the foregoing by electronic means on all counsel of record in this case.

*/s/  Steven J. Rosenbaum*
Steven J. Rosenbaum
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

1