# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILDEARTH GUARDIANS, *et al.* | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| RYAN ZINKE, in his official capacity as Secretary of the Interior, *et al.* | ) Case No. 1:16-cv-1724-RC<br>) The Honorable Rudolph Contreras<br>) |
| Federal Defendants, | )<br>) |
| and | )<br>) |
| WESTERN ENERGY ALLIANCE, *et al.* | )<br>) |
| Intervenor Defendants. | )<br>)<br>)<br>) |

**SUPPLEMENTAL BRIEF ON THE MERITS**

**INRODUCTION**

Federal Defendants file this supplemental brief in response to the Court's October 22, 2018 Order, ECF No. 88, which posed the question "whether, after the leasing stage [in the oil and gas management process], BLM may institute a blanket ban on drilling across the leases at issue here, based on policy considerations." *Id*. at 3. The short answer is no – a blanket ban on development of the leases challenged in this case would be inconsistent with the rights conveyed by those leases. But the Bureau of Land Management ("BLM") does have considerable authority, following lease issuance, to regulate how development will proceed, as well as to suspend or cancel leases in appropriate circumstances.

**DISCUSSION**

Section 102 of the National Environmental Policy Act ("NEPA") provides that an agency, when proposing "major Federal action[] significantly affecting the quality of the human environment," shall prepare a "detailed statement" on "the environmental impacts of the proposed action" and, among other things, "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C). In construing the latter phrase, the D.C. Circuit made clear in *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983), that issuance of an oil and gas lease marks the point at which an irreversible and irretrievable commitment of natural resources has occurred. *Id*. at 1414; *see also Conner v. Burford*, 848 F.2d 1441, 1448 (9th Cir. 1988) (reaching same conclusion based on the government's "right to regulate, *rather than preclude*, surface-disturbing activities" after lease issuance (emphasis added)). Here, BLM satisfied NEPA by preparing EISs for the governing resource management plans and by preparing environmental assessments for the leasing decisions that tiered to those EISs. *See* 40 C.F.R. §§ 1501.3, 1502.20.

While an oil and gas lease conveys various rights to development, including the "right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold," 43 C.F.R. § 3101.1-2, those rights are subject to certain limitations. *Id.*; *see also* 30 U.S.C. § 226(g) ("The Secretary of the Interior . . . shall regulate all surface-disturbing activities conducted pursuant to any lease issued under this chapter, and shall determine reclamation and other actions as required in the interest of conservation of surface resources"). BLM's ongoing regulatory role – what the Ninth Circuit referred to in *Conner* as the "right to regulate" – is asserted in various ways, including in BLM's exercise of control over the timing, location, design, and pace of development. Such controls are most commonly effected through stipulations attached to leases or by standard lease terms. For example, BLM may attach "no surface occupancy" ("NSO") stipulations, which prohibit surface disturbance on a portion, or all of, a leased parcel. *See Sierra Club*, 717 F.2d at 1411 (discussing NSO stipulations); *see also* AR 53661 (advising of application of NSO stipulation for steep slopes in BLM's Notice of Competitive Oil and Gas Lease Sale for the August 2016 sale) ("August 2016 Sale Notice"). In addition, BLM may attach stipulations for "controlled surface use" ("CSU") which afford protection to important resources such as priority habitat for Greater Sage-grouse. *Id.* (August 2016 Sale Notice, advising of application of CSU stipulation). BLM may also impose "timing limitations" on development operations, for the protection of, for example, migratory birds, big game, or threatened or endangered species, based on those species' biological or habitat needs. *See* AR 53661 (August 2016 Sale Notice, advising of application of timing limitations for various species).

In addition, standard lease terms promote resource protection by requiring the lessee to "conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to

cultural, biological, visual, and other resources, and to other land uses or users" and to "take reasonable measures deemed necessary by lessor to accomplish the intent of this section." *See* Section 6 of standard lease form at*:* https://www.blm.gov/sites/blm.gov/ files/uploads/Services_National-Operations-Center_Eforms_Fluid-and-Solid-Minerals_3100- 011.pdf  (last checked Nov. 28, 2018).

Leases also are subject to the requirements of nondiscretionary statutes, such as the Endangered Species Act ("ESA").  *See* 43 C.F.R. § 3101.1-2 (referring to "restrictions deriving from specific, non-discretionary statutes").  Thus, when considering a post-leasing application for a permit to drill ("APD"), BLM is required to disapprove proposed development that would result in jeopardy to the continued existence of a species listed under the ESA, or destruction or adverse modification of ESA-designated critical habitat.[1]

Following lease issuance, Mineral Leasing Act regulations authorize BLM to impose "such reasonable measures as may be required by the authorized officer to minimize adverse impacts to other resource values, land uses or users not addressed in the lease stipulations at the time operations are proposed." 43 C.F.R. § 3101.1-2.[2]  In other words, BLM may impose protective conditions, if supported by sufficient NEPA analysis and a rational basis.  *Yates Petroleum Corp.*, 176 IBLA 144, 156-57 (2008).  Examples include requiring consolidated drilling from multi-well pads, consolidated liquids gathering infrastructure, use of improved

---

[1] In some cases, Interior's Fish and Wildlife Service may identify "reasonable and prudent alternatives" that would allow the activity to proceed, based on avoidance of the likelihood of jeopardizing the continued existence of listed species or the destruction or adverse modification of critical habitat.  *See* 50 C.F.R. § 402.02.

[2] The regulation further provides that, at a minimum, "measures shall be deemed consistent with lease rights granted provided that they do not: require relocation of proposed operations by more than 200 meters; require that operations be sited off the leasehold; or prohibit new surface disturbing operations for a period in excess of 60 days in any lease year."

engine technology, monitoring for methane leaks, and capture of fugitive gas emissions.  *See* AR 78047-48.

BLM may also suspend or cancel leases in appropriate circumstances.  For example, the MLA and its implementing regulations authorize BLM to cancel a lease for post-issuance default on the lessee's part.  30 U.S.C. §§ 184(h), 188; 43 C.F.R. § 3108.3.  BLM may also cancel a lease based on pre-lease factors, including issuance of the lease in error or in violation of law.  *See Boesche v. Udall*, 373 U.S. 472 (1963); *see also* 43 C.F.R. § 3108.3(d).  In addition to these cancellation authorities, BLM may mandate the suspension of lease development "in the interest of conservation of natural resources" or, as another example, where the lessee is prevented from operating on or producing from a lease by reason of *force majeure*.  30 U.S.C. §§ 209, 226(i); 43 C.F.R. § 3103.4-4(a).  Notably, under standard lease terms (*see* section 4 at hyperlink above), the government has "reserve[d] [the] right to specify rates of development and production in the public interest . . . ."

Thus, BLM has many opportunities for resource protection at the APD stage.  But BLM may not impose a blanket ban on lease development based solely on a policy decision "to reduce or eliminate the exploitation of fossil fuels in order to reduce greenhouse gas emissions."  ECF No. 88 at 3.  To reiterate, however, the scope of BLM's analysis of future impacts in its EISs and EAs was determined based on the extent of foreseeability of those impacts.  While in some circumstances, the contours of BLM's regulatory authority post-leasing may bear on what is required at the leasing stage, but here, the impacts of concern were unforeseeable and this fact forecloses Plaintiffs' claim of error.  Leasing represents an intermediate step in oil and gas management.  It follows land use planning and precedes permitting.  It occurs at a point in the process when it is unknown which parcels will be sold and which will be developed, and on what

timetable and under what operational conditions.   NEPA only requires agencies to consider effects of proposed actions that are reasonably foreseeable.  *See Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 193 (D.C. Cir. 2017) (noting the agency's obligation to consider "indirect" environmental effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.") (quoting 40 C.F.R. § 1508.8).  BLM has met these requirements here.  Federal Defendants respectfully submit that if the Court determines that the record supports the agency's conclusion that the effects of downstream combustion and greenhouse gas emissions for the challenged lease sales could not be meaningfully ascertained, it need not consider what authority the agency has to preclude all future development activity.

      Respectfully submitted this 28th day of November, 2018.

> JEAN E. WILLIAMS
> Deputy Assistant Attorney General
> United States Department of Justice
> Environment and Natural Resources Div.
>
> */s/ John S. Most*
> JOHN S. MOST, Trial Attorney
> Natural Resources Section
> Virginia Bar No. 27176
> P.O. Box 7611
> Washington, D.C. 20044
> Tel: (202) 616-3353
> Email: john.most@usdoj.gov
>
> *Counsel for Federal Defendants*

**Of Counsel**

Danielle DiMauro
Office of the Solicitor,
Rocky Mountain Region,
U.S. Department of the Interior
Denver, Colorado

Wendy S. Dorman
Office of the Solicitor,

Division of Mineral Resources,
U.S. Department of the Interior
Washington, D.C.

## CERTIFICATE OF SERVICE

    I hereby certify that on November 28, 2018, a copy of the foregoing notice was served by electronic means on all counsel of record by the Court's CM/ECF system.

/s/ *John S. Most*
JOHN S. MOST