IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WILDEARTH GUARDIANS**, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>**ZINKE,** *et al.*,<br><br>    Federal Defendants,<br><br>and<br><br>**WESTERN ENERGY ALLIANCE, PETROLEUM ASSOCIATION OF WYOMING,** *et al.*<br><br>    Defendant-Intervenors. | Case No. 1:16-cv-01724-RC |

**WESTERN ENERGY ALLIANCE AND PETROLEUM ASSOCIATION OF WYOMING'S RESPONSE TO COURT'S REQUEST FOR SUPPLEMENTAL BRIEFING**

On October 22, 2018, this Court requested supplemental briefing on "whether, after the leasing stage, BLM may institute a blanket ban on drilling across the leases at issue here, based on policy considerations." Doc. 88. The short answer to the Court's question is no. This question, however, highlights the importance of the subsequent environmental analysis and approval process required by BLM after leasing and before any construction, development, or drilling activity may occur on a federal lease, as well as BLM's authority to impose additional restrictions and conditions of approval on future development activities.

Western Energy Alliance and Petroleum Association of Wyoming (collectively, the Alliance) do not argue that BLM's analysis was appropriate because BLM has the ability to cancel leases after issuance—BLM does not. Rather, BLM's analysis was wholly appropriate because it analyzed the reasonably foreseeable impacts of BLM's decision to lease the parcels at

the time BLM conducted its analysis. Moreover, an irretrievable commitment of resources through leasing does not mean that there is a *per se* irretrievable significant impact at either the leasing stage or subsequent development stage. After leasing, at the development stage, BLM retains the authority to impose restrictions and conditions of approval to mitigate impacts. The scope of BLM's leasing analysis was wholly appropriate under NEPA because it analyzed the reasonably foreseeable impacts of BLM's proposed action to offer parcels for competitive lease at the time BLM conducted its analysis.

## I. BLM's Statutory Authority

### a. Statutory Authority Granted to BLM under FLPMA and the MLA

Congress granted authority to the Secretary of the Interior (Secretary) to manage and oversee federal mineral development under the Mineral Leasing Act of 1920 (MLA). 30 U.S.C. § 187. The MLA granted BLM broad authority to impose "exacting restrictions and continuing supervision" over companies developing oil and gas, and to issue "rules and regulations governing in minute detail all facets of the working of the land." *Boesche v. Udall*, 373 U.S. 472 at 477-78 (1963) (citing, *inter alia*, 30 U.S.C. §§ 187, 189, and 209).

Congress enacted the Federal Land Policy and Management Act of 1976 (FLPMA) under its plenary authority under the Property Clause of the Constitution to establish standards and requirements for the use and management of public lands and minerals. *See* U.S. Const. art. IV, § 3, cl. 2. FLPMA identifies "mineral exploration and production" as one of the "principal or major uses" of public lands. 43 U.S.C. § 1702(l).

### b. BLM's Authority to Impose Restrictions on Development Post-Lease Sale

While leasing irretrievably commits federal minerals (oil and gas) to potential future development, leasing does not automatically and irretrievably commit environmental resources to significant impact by that future development. A federal lessee cannot construct, drill or

develop its lease until completion of subsequent BLM review, analysis, approval, and issuance of additional permits. 43 C.F.R. § 3162.5-1(a) ("Before approving any [APD] submitted pursuant to § 3162.3-1 of this title . . . the [BLM] shall prepare an environmental record of review or an environmental assessment, as appropriate. These environmental documents will be used in determining . . . any appropriate terms and conditions of approval of the submitted plan."); *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151-52 (10th Cir. 2004).

After site-specific NEPA analysis of a site-specific development proposal, the MLA and FLPMA grant BLM the discretion to impose additional development restrictions, mitigation measures, or conditions of approval at the Application for Permit to Drill (APD) stage to minimize potential impacts to resources of concern. 30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-l(h)(l) (authorizing the BLM to "[a]pprove the application as submitted or with appropriate modifications or conditions"); 43 C.F.R. § 3162.5-1(a). Additional mitigation measures—such as lease stipulations or conditions of approval—may be imposed by BLM if these are: (a) reasonable; and (b) based on site-specific NEPA analysis. BLM rules confirm that additional environmental review will be conducted at the APD stage, and *require* the agency to incorporate any mitigation requirements identified as conditions of approval for the APD. BLM Onshore Order No. 1, 72 Fed. Reg. 10308, 10334 (Mar. 7, 2007).

For example, in *Yates Petroleum*, the Interior Board of Land Appeals (IBLA) upheld BLM's decision to expand an existing seasonal no surface occupancy (NSO) restriction in a lease under 43 C.F.R. § 3101.1-2 because site-specific NEPA analysis supported the additional protections for the resource at issue. 176 IBLA at 147; *see also Biodiversity Conservation Alliance*, 174 IBLA 1 (2008) (analyzing BLM's authority to require site-specific analysis for project-level determinations); *William E. Love*, 151 IBLA 309 (2000) (same).

Here, BLM analyzed the potential direct, indirect, and cumulative effects of offering leases for sale, including the potential for increases in GHG emissions and resulting impacts to climate change. Consistent with those analyses, BLM decided to offer lease parcels for sale with certain stipulations to mitigate impacts for various environmental resources. After lease issuance, if a lessee files an APD to develop its lease, BLM is required to conduct a site-specific analysis based on the proposed APD to inform its decision making. At this point, BLM can impose additional conditions of approval on a drilling permit prior to the start of any surface-disturbing activities.

    c.    **Limitations on BLM's Statutory Authorities under the MLA and FLPMA**

Although BLM can impose reasonable conditions of approval and mitigation measures based upon subsequent site-specific environmental analysis, BLM is not authorized to prohibit development of a lease in its entirety. This power is reserved solely to Congress because Congress exercised its plenary authority under the Property Clause of the U.S. Constitution to authorize the Department of the Interior to manage federal lands and to lease federal minerals. *W. Colo. Cong.*, 130 IBLA 224, 248 (1994) (citing *Union Oil Co. of California v. Morton*, 512 F.2d 743, 750-51 (9th Cir. 1975)). Thus, in direct response to the Court's question, absent a Congressional directive through legislation, BLM would be prohibited from issuing a "blanket" ban on drilling for already issued leases.

**II.    Whether BLM has the Authority to Impose a "Blanket Ban" on Development After Leasing is Not Dispositive of the Issue**

BLM unequivocally lacks the power to institute a "blanket ban" after the leasing stage. Significantly, however, this is **not** dispositive of the issue of whether NEPA required BLM to conduct an additional site-specific and quantitative GHG analysis at the leasing stage for future development activities that lessees have not yet proposed.

Under NEPA, BLM is only required to perform a reasonably foreseeable analysis of GHG for the proposed action: to offer lease parcels for sale. BLM is not required, as Plaintiffs assert, to engage in analysis of unknown future development impacts where reasonably foreseeable impacts for such development are entirely speculative. Doc. 61-1 at 19-20.

As explained in BLM's Lease Sale EAs, it would be impossible for BLM to conduct a quantitative analysis of all impacts potentially stemming from future development emissions at the leasing stage when the lessee has not yet submitted a development proposal. AR00055245. Potential GHG emissions from development are entirely speculative at the leasing stage and NEPA does not require BLM to engage in speculative analysis. *See generally N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006) ("[Oil and gas] projects generally entail separate stages of leasing, exploration and development. At the earliest stage [leasing] . . . there is no way of knowing what plans for development, if any, may eventually materialize."). Any attempt to model future development level impacts from GHG emissions without knowing key development variables would be speculative at best, and in any case would do little to inform BLM's decision making on whether to offer parcels for competitive sale.

As discussed above, once a lessee submits a proposal to BLM to develop its lease and permit application, BLM has the authority and discretion to impose additional restrictions or conditions of approval on future development through the APD process. 43 C.F.R. § 3162.5-1(a).

BLM complied with NEPA by considering and disclosing the reasonably foreseeable environmental impacts at a level of analysis appropriate for leasing decision making. *See* Doc. 63 at 20-21. BLM then appropriately decided to offer the leases for competitive sale. That BLM cannot institute a blanket ban on development after the leasing stage is not dispositive of the question of whether—at the leasing stage—BLM conducted the appropriate level of analysis.

## **CONCLUSION**

BLM complied fully with NEPA for the Lease Sale EAs at issue. Plaintiffs' challenge should be rejected, and BLM's decisions affirmed.

Respectfully submitted this 28th day of November, 2018.

>   */s/ Bret Sumner*
>   Bret Sumner (DC Bar # 464494)
>   bsumner@bwenergylaw.com
>   Jim Martin, *Pro Hac Vice*
>   jmartin@bwenergylaw.com
>   Michael Cross, *Pro Hac Vice*
>   mcross@bwenergylaw.com
>   BEATTY & WOZNIAK, P.C.
>   216 Sixteenth St., Suite 1100
>   Denver, CO 80202-5115
>   Telephone: 303-407-4499
>   Fax: 800-886-6566
>
>   *Attorneys for Defendant-Intervenors*
>   *Western Energy Alliance and Petroleum*
>   *Association of Wyoming*

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of November, 2018, I caused a true and correct copy of the foregoing to be filed with the Court electronically through the CM/ECF system, which will serve the foregoing by electronic means on all counsel of record in this case.

*/s/ Bret Sumner*