**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| WILDEARTH GUARDIANS; and PHYSICIANS FOR SOCIAL RESPONSIBILITY, | |
| Plaintiffs, | No. 1:16-cv-01724-RC |
| v. | |
| DAVID BERNHARDT; WILLIAM PERRY PENDLEY; and U.S. BUREAU OF LAND MANAGEMENT, | |
| Defendants, | |
| WESTERN ENERGY ALLIANCE; PETROLEUM ASSOCIATION OF WYOMING; AMERICAN PETROLEUM INSTITUTE; STATE OF WYOMING; STATE OF UTAH, | |
| Intervenor-Defendants. | |

**MEMORANDUM OF THE AMERICAN PETROLEUM INSTITUTE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

Paul G. Afonso
Ben Norris
AMERICAN PETROLEUM INSTITUTE
1220 L St., N.W.
Washington, D.C. 20005
Phone:  (202) 682-8000
Fax:  (202) 682-8033
norrisb@api.org

Steven J. Rosenbaum
Bradley K. Ervin
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

*Counsel for Intervenor-Defendant American Petroleum Institute*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... i

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

    A.    BLM's Management of Oil and Gas Leasing. ....................................... 2

    B.    The Court's Initial Review Of The Challenged Wyoming Lease Sales. ................ 3

    C.    BLM's Supplemental EA Analyzing The GHG Emissions And Climate Change Impacts Of The Challenged Wyoming Lease Sales. ................................. 8

ARGUMENT ...................................................................................................... 17

I.    BLM'S LEASING DECISIONS COMPLIED WITH NEPA. ........................................ 19

    A.    This Court's Review Of BLM's Supplemental EA Is Narrow, And BLM's Scientific And NEPA Decisions Are Owed Extreme Deference......................... 19

    B.    BLM Properly Considered The Challenged Lease Sales' GHG Emissions. ........ 21

        1.    *BLM Properly Considered GHG Emissions From Development Operations On The Proposed Wyoming Leases.* ...................................... 22

        2.    *BLM Properly Considered The Downstream Consumption Of Oil And Gas Potentially Produced From The Proposed Lease Parcels.* ........ 26

        3.    *BLM Properly Analyzed Cumulative Lease Sale Emissions In Comparison To State, Regional, And National GHG Emissions.* .............. 28

II.    THE LEASES SHOULD NOT BE VACATED UNDER ANY CIRCUMSTANCES. ....................................................................................... 31

    A.    Plaintiffs Fail To Establish An Entitlement To Relief......................... 33

        1.    *Existing Development And Mitigation Undercut Plaintiffs' Speculative Environmental Harm.* ............................................. 33

        2.    *Harms To The Public Interest Outweigh Plaintiffs' Alleged Harm.* ......... 34

        3.    *Harms To Business And Government Economic Interests Outweigh Plaintiffs' Alleged Harm.* .......................................................... 35

B.    At Most, Remand Of The Lease Sale Decision Without Vacatur Of The Issued Leases Would Be Appropriate. ................................................................. 37

CONCLUSION ........................................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Savage*,
   375 F. Supp. 3d 1152 (D. Mont. 2019) ................................................................ 39

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) .......................................................................... 37

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987) ................................................................................... 33, 36

*Apache Corp. v. FERC*,
   627 F.3d 1220 (D.C. Cir. 2010) ....................................................................... 38

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) ......................................................................................... 20

*Banks v. Warner*,
   No. 94-56732, 1995 WL 465773 (9th Cir. Aug. 7, 1995) ................................. 35

*Bauer v. DeVos*,
   332 F. Supp. 3d 181 (D.D.C. 2018) .................................................................. 39

*Black Oak Energy, LLC v. FERC*,
   725 F.3d 230 (D.C. Cir. 2014) ................................................................... 38, 39

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
   781 F.3d 1271 (11th Cir. 2015) ....................................................................... 37

*Cal. Communities Against Toxics v. EPA*,
   688 F.3d 989 (9th Cir. 2012) .......................................................................... 37

*Cent. & S.W. Servs., Inc. v. EPA*,
   220 F.3d 683 (5th Cir. 2000) .......................................................................... 37

*Cent. Maine Power Co. v. FERC*,
   252 F.3d 34 (1st Cir. 2001) ............................................................................. 37

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ....................................................................................... 20

*Citizens' Committee to Save Our Canyons v. Krueger*,
   513 F.3d 1169 (10th Cir. 2008) ....................................................................... 18

*City of Auburn v. United States*,
   154 F.3d 1025 (9th Cir. 1998) ......................................................................... 21

*City of Olmsted Falls, OH v. FAA*,
   292 F.3d 261 (D.C. Cir. 2002) ........................................................................... 1

*Colo. Envtl. Coal. v. Dombeck*,
   185 F.3d 1162 (10th Cir. 1999) ....................................................................... 31

*Conway v. Watt*,
   717 F.2d 512 (10th Cir. 1983) ........................................................................... 2

*Defs. of Wildlife v. BOEMRE,*
   871 F. Supp. 2d 1312 (S.D. Ala. 2012).................................................................................1

*Del. Dep't of Nat. Res. & Env't'l Control v. U.S. Army Corps of Eng'rs,*
   681 F. Supp. 2d 546 (D. Del. 2010)....................................................................................35

*Delta Air Lines, Inc. v. Export-Import Bank of the U.S.,*
   718 F.3d 974 (D.C. Cir. 2013)............................................................................................38

*Dep't of Transp. v. Pub. Citizen,*
   541 U.S. 752 (2004)...................................................................................19, 21, 22, 31

*Diné Citizens Against Ruining Our Env't v. Jewell,*
   No. 15-cv-0209, 2015 WL 4997207 (D.N.M. Aug. 14, 2015)...........................................34

*Diné Citizens Against Ruining Our Environment v. Bernhardt,*
   923 F.3d 831 (10th Cir. 2019)............................................................................................29

*Diné Citizens Against Ruining Our Environment v. U.S. Office of Surface Mining Reclamation
& Enforcement,*
   82 F. Supp. 3d 1201 (D. Colo. 2015).................................................................................23

*Drakes Bay Oyster Co. v. Jewell,*
   747 F.3d 1073 (9th Cir. 2014)............................................................................................25

*Duncan's Point Lot Owners Ass'n v. FERC,*
   522 F.3d 371 (D.C. Cir. 2008)............................................................................................30

*EarthLink, Inc. v. FCC,*
   462 F.3d 1 (D.C. Cir. 2006)................................................................................................20

*eBay Inc. v. MercExchange, LLC,*
   547 U.S. 388 (2006)............................................................................................................32

*Eco Tour Adventures, Inc. v. Zinke,*
   249 F. Supp. 3d 360 (D.D.C. 2017)...................................................................................35

*Fox Television Stations, Inc. v. FCC,*
   280 F.3d 1027 (D.C. Cir. 2002)..........................................................................................39

*Habitat for Horses v. Salazar,*
   745 F. Supp. 2d 438 (S.D.N.Y. 2010)................................................................................36

*Holland Am. Ins. Co. v. Succession of Roy,*
   777 F.2d 992 (5th Cir. 1985)..............................................................................................34

*Idaho ex rel. Idaho Pub. Util. Comm'n v. ICC,*
   35 F.3d 585 (D.C. Cir. 1994)..............................................................................................37

*Idaho Power Co. v. FERC,*
   312 F.3d 454 (D.C. Cir. 2002)............................................................................................36

*In Def. of Animals v. U.S. Dep't of the Interior,*
   737 F. Supp. 2d 1125 (E.D. Cal. 2010)..............................................................................34

*Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.,*
   476 F.3d 946 (D.C. Cir. 2007)............................................................................................24

*La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*,
   336 F.3d 1075 (D.C. Cir. 2003) ............................................................. 39

*Larry Grant Constr. v. Mills*,
   956 F. Supp. 2d 93 (D.D.C. 2013) ......................................................... 25

*Lee v. U.S. Air Force*,
   354 F.3d 1229 (10th Cir. 2004) ............................................................. 19

*McDonald's Corp. v. Robertson*,
   147 F.3d 1301 (11th Cir. 1998) ............................................................. 33

*Miami-Dade Cnty. v. U.S. EPA*,
   529 F.3d 1049 (11th Cir. 2008) ............................................................. 20

*Mobil Oil Expl. & Producing Se., Inc. v. United States*,
   530 U.S. 604 (2000) ............................................................................... 36

*Morris v. U.S. Nuclear Regulatory Comm'n*,
   598 F.3d 677 (10th Cir. 2010) ............................................................... 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto., Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................. 19

*N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*,
   854 F.3d 1236 (10th Cir. 2017) ............................................................. 34

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) ............................................................................... 25

*Nat'l Comm. for the New River, Inc. v. FERC*,
   373 F.3d 1323 (D.C. Cir. 2004) ...................................................... 20, 26

*Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*,
   260 F.3d 1365 (Fed. Cir. 2001) ............................................................. 37

*Nat'l Wildlife Fed'n v. Espy*,
   45 F.3d 1337 (9th Cir. 1995) ................................................................. 37

*Native Ecosystems Council v. Weldon*,
   697 F.3d 1043 (9th Cir. 2012) ............................................................... 25

*Native Vill. of Point Hope v. Salazar*,
   730 F. Supp. 2d 1009 (D. Alaska 2010) ................................................ 37

*Natural Res. Defense Council v. U.S. EPA*,
   808 F.3d 556 (2nd Cir. 2015) ................................................................ 37

*\*Nevada v. Dep't of Energy*,
   457 F.3d 78 (D.C. Cir. 2006) .................................................. 19, 25, 27

*Partners in Forestry Coop. v. U.S. Forest Serv.*,
   638 F. App'x 456 (6th Cir. 2015) .......................................................... 19

*PDK Labs., Inc. v. U.S. DEA*,
   362 F.3d 786 (D.C. Cir. 2004) .............................................................. 25

*PGBA, LLC v. United States,*
389 F.3d 1219 (Fed. Cir. 2004)...................................................................... 31

*Pub. Emps. for Envtl. Responsibility v. U.S. Dep't of the Interior,*
832 F. Supp. 2d 5 (D.D.C. 2011) ............................................................. 21, 26

*Radio-Television News Dirs. Ass'n v. FCC,*
184 F.3d 872 (D.C. Cir. 1999)...................................................................... 38

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989)...................................................................................... 18

*Samuels v. Mackell,*
401 U.S. 66 (1971)........................................................................................ 32

*Shinseki v. Sanders,*
556 U.S. 396 (2009)...................................................................................... 25

*Sierra Club v. FERC,*
672 F. App'x 38 (D.C. Cir. 2016).................................................................. 29

*Sierra Club v. FERC,*
827 F.3d 36 (D.C. Cir. 2016)........................................................................ 29

*Sierra Club v. U.S. Dep't of Agric.,*
841 F. Supp. 2d 349 (D.D.C. 2012)............................................................. 37

*Sierra Club v. Van Antwerp,*
526 F.3d 1353 (11th Cir. 2008) .............................................................. 27, 31

*Sierra Club, Inc. v. Bostick,*
539 F. App'x. 885 (10th Cir. 2013) .............................................................. 36

*Sierra Forest Legacy v. Sherman,*
951 F. Supp. 2d 1100 (E.D. Cal. 2013)........................................................ 40

*South Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of the Interior,*
588 F.3d 718 (9th Cir. 2009) ........................................................................ 24

*Stand Up for California! v. U.S. Dep't of Interior,*
879 F.3d 1177 (D.C. Cir. 2018)..................................................................... 38

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
282 F. Supp. 3d 91 (D.D.C. 2017)...................................................... 37, 38, 39

*Sugar Cane Growers Coop. of Fla. v. Veneman,*
289 F.3d 89 (D.C. Cir. 2002)........................................................................ 39

*Susquehanna Int'l Grp., LLP v. SEC,*
866 F.3d 442 (D.C. Cir. 2017)...................................................................... 38

*Swindol v. Aurora Flight Scis. Corp.,*
805 F.3d 516 (5th Cir. 2015) ........................................................................ 35

*Theodore Roosevelt Conservation P'ship v. Salazar,*
616 F.3d 497 (D.C. Cir. 2010) ............................................................. 3, 18, 21

*Tinicum Tp., Pa. v. U.S. Dep't of Transp.*,
    685 F.3d 288 (3rd Cir. 2012) ........................................................... 29

*Tulare Cnty. v. Bush*,
    306 F.3d 1138 (D.C. Cir. 2002) ....................................................... 38

*Union Oil Co. of Cal. v. Morton*,
    512 F.2d 743 (9th Cir. 1975) ........................................................... 36

*Utah Shared Access Alliance v. U.S. Forest Serv.*,
    288 F.3d 1205 (10th Cir. 2002) ................................................. 19, 25

*Virgin Islands Tel. Corp. v. FCC*,
    444 F.3d 666 (D.C. Cir. 2006) ......................................................... 32

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ................................................................... 32, 33

*Weiss v. Kempthorne*,
    580 F. Supp. 2d 184 (D.D.C. 2008) ................................................ 20

\*WildEarth Guardians v. BLM*,
    8 F. Supp. 3d 17 (D.D.C. 2014) ......................................... 7, 18, 31

*WildEarth Guardians v. BLM*,
    870 F.3d 1222 (10th Cir. 2017) ................................................. 31, 37

*WildEarth Guardians v. Conner*,
    920 F.3d 1245 (10th Cir. 2019) ........................................... 18, 20, 30

\*WildEarth Guardians v. Zinke*,
    368 F. Supp. 3d 41 (D.D.C. 2019) ............... 1, 2, 4, 5, 6, 7, 8, 18, 22, 23, 26, 27, 28, 31, 32, 39

\*Winter v. Natural Resources Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................ 19, 32, 33, 34, 36

*Wyoming v. U.S. Dep't of Agric.*,
    661 F.3d 1209 (10th Cir. 2011) ....................................................... 18

## **Statutes**

5 U.S.C. § 702 ........................................................................................ 37

5 U.S.C. § 706(2)(A) ............................................................................. 37

30 U.S.C. § 181 ................................................................................. 2, 34

30 U.S.C. § 226(b)(1)(A) .................................................................. 2, 34

30 U.S.C. § 226(g) .................................................................................. 3

30 U.S.C. § 226(p)(2)(A) ........................................................................ 3

30 U.S.C. § 352 ....................................................................................... 2

42 U.S.C. § 4332(2)(C) ......................................................................... 21

42 U.S.C. §§ 4321, *et seq.* ..................................................................... 1

43 U.S.C. § 1702(I) ........................................................................................................ 3

43 U.S.C. § 1732(a) ....................................................................................................... 3

**<u>Regulations</u>**

40 C.F.R. § 1508.25(c) ................................................................................................. 22

40 C.F.R. § 1508.28 ..................................................................................................... 21

40 C.F.R. § 1508.9 .................................................................................................. 21, 31

43 C.F.R. § 1601.0-6 ..................................................................................................... 3

43 C.F.R. § 1610.5 ......................................................................................................... 3

43 C.F.R. § 3120.1-2(b) ................................................................................................ 2

43 C.F.R. § 3120.5-3 ..................................................................................................... 2

43 C.F.R. § 3161.2 ......................................................................................................... 2

43 C.F.R. § 3162.3-1(c) ............................................................................................. 2, 3

43 C.F.R. § 3162.5-1(a) ................................................................................................ 3

## INTRODUCTION

This lawsuit challenges the Bureau of Land Management's ("BLM") determination on remand to affirm prior decisions to conduct six oil and gas lease sales in Wyoming based upon a Supplemental Environmental Assessment ("Supplemental EA") and Finding of No Significant Impact ("FONSI").   Plaintiffs WildEarth Guardians and Physicians for Social Responsibility (collectively, "Plaintiffs") claim that the Supplemental EA fails adequately to quantify the amount of greenhouse gas ("GHG") emissions associated with the potential future exploration and development of the leases issued during the sales, in purported violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and this Court's March 19, 2019 decision holding BLM's original decisions to conduct the lease sales contrary to NEPA. *See WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019) (*WildEarth*).

In considering Plaintiffs' NEPA claims, "this Court's inquiry is not whether it agrees with [BLM's] actions, or whether it would have proceeded differently had it been standing in [BLM's] shoes," but whether Plaintiffs have met their burden of showing that BLM's decision to affirm the lease sales was arbitrary or capricious.  *Defs. of Wildlife v. BOEMRE*, 871 F. Supp. 2d 1312, 1321–22 (S.D. Ala. 2012).  *See also*, *e.g.*, *City of Olmsted Falls, OH v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) ("The party challenging an agency's action as arbitrary and capricious bears the burden of proof." (quotation and alteration omitted)).  Plaintiffs have not met their burden here.

Consistent with NEPA and this Court's prior decision, BLM conducted extensive quantification of GHG emissions connected to future development of the lease parcels issued in the challenged lease sales, and the combustion of any oil and gas eventually produced from the leases.  BLM further offered a data-driven comparison of these forecasted emissions to other GHG emissions—including from other oil and gas development—across the State, the regions

1

surrounding Wyoming, and the Nation as a whole.  BLM's methodologies and forecasts, to which the judiciary owes considerable deference, fully satisfied the agency's obligations. Viewed on the full record of BLM's environmental review, Plaintiffs' legal challenges amount to little more than flyspecking based on, among other things, mischaracterizations of the Supplemental EA and the Court's prior decision.[1]

## BACKGROUND

### A.    BLM's Management of Oil and Gas Leasing.

To make the United States' public lands oil and gas deposits available for development, *see* 30 U.S.C. § 181; *id*. § 352, Congress has mandated that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly," *id*. § 226(b)(1)(A).  *See also Conway v. Watt*, 717 F.2d 512, 514 (10th Cir. 1983) ("The purpose behind enactment of the Mineral Leasing Act . . . was the development of western portions of the country[.]" (citation omitted)); *WildEarth*, 368 F. Supp. 3d at 52 ("[W]hile oil and gas leasing is mandatory, the Secretary has discretion to determine where, when, and under what terms and conditions oil and gas development should occur.").

Lease sales are conducted through a competitive bidding process.  *See* 43 C.F.R. § 3120.1-2(b); *id*. § 3120.5-3.  After a lease is issued, operations are subject to the authority and monitoring of an authorized BLM officer.  *See id*. § 3161.2.  Prior to any drilling activity, the lease "operator shall submit to the authorized officer for approval an Application for Permit to Drill [("APD")] for each well."  *Id*. § 3162.3-1(c).

---

[1] Intervenor-Defendant American Petroleum Institute ("API") hereby incorporates by reference the arguments advanced in the summary judgment pleadings of the Federal Defendants as well as Intervenor-Defendants Western Energy Alliance, Petroleum Association of Wyoming, State of Wyoming, and State of Utah.

"No drilling operations, nor surface disturbance preliminary thereto, may be commenced prior to the authorized officer's approval of the permit." *Id*. *See also* 30 U.S.C. § 226(g) (BLM "regulate[s] all surface-disturbing activities conducted pursuant to any lease…in the interest of conservation of surface resources"). NEPA requirements must be satisfied before BLM can issue a permit. *Id*. § 226(p)(2)(A). That NEPA review is "used in determining whether or not an [EIS] is required and in determining any appropriate . . . conditions of approval of the submitted plan." 43 C.F.R. § 3162.5-1(a).

BLM also "manage[s] the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). Among the "principal or major uses" of public land is "mineral exploration and production." *Id*. § 1702(I). BLM "uses a multi-step planning and decisionmaking process to fulfill [its] mandate." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 504 (D.C. Cir. 2010). BLM "begins by creating" a resource management plan ("RMP"), which "describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." *Id*. (quotation omitted). After the RMP is approved, "[s]pecific projects are reviewed and approved separately, but must conform to the relevant RMP." *Id*. BLM prepares an EIS when preparing an RMP. *See* 43 C.F.R. § 1610.5; *id*. § 1601.0-6.

**B.     The Court's Initial Review Of The Challenged Wyoming Lease Sales.**

On August 25, 2016, Plaintiffs filed suit challenging a series of oil and gas lease sales conducted by BLM offices in Wyoming, Utah, and Colorado. *See* Compl. (Dkt. No. 1), ¶¶ 104–19.[2]  To facilitate resolution of this broad challenge, the parties agreed to litigate Plaintiffs'

---

[2] Plaintiffs subsequently expanded their claims to challenge additional lease sales in Wyoming. *See* Suppl. Compl. (Dkt. No. 22), ¶ 114.

claims on a state-by-state basis, beginning with the challenged Wyoming lease sales.  *See* Joint Proposed Case Management Plan (Dkt. No. 20), at 2; Case Management Order (Dkt. No. 24), at 1.

BLM conducted the challenged Wyoming lease sales in 2015 and 2016.  For each lease sale, the BLM Wyoming district offices conducting the sale issued a draft EA and FONSI, received and responded to public comments and protests—including comments and protests submitted by WildEarth—and issued a final EA and FONSI.  *See*, *e.g.*, API Mem. In Opp. to Pls.' Mot. for Summ. J., and In Support of API Cross-Motion for Summ. J. (Dkt. No. 59) ("API Mem."), at 5–21.

Plaintiffs alleged that BLM's leasing decisions violated NEPA "by not sufficiently considering climate change . . . ."  *WildEarth*, 368 F. Supp. 3d at 51.  Among other things, Plaintiffs argued that NEPA required BLM to: (1) conduct a site-specific analysis of the environmental impacts of future development on individual lease parcels, *see* Pls.' Mem. in Support of Mot. for Summ. J. (Dkt. No. 55), at 15; (2) quantify the GHG emissions from future oil and gas drilling operations on the parcels proposed for lease, *see id.* at 16–20; (3) quantify the GHG emissions of future downstream combustion of any oil and gas produced from the proposed leases, *see id.* at 20–21; (4) assess the cumulative impacts of the proposed lease sales by comparing the sales' anticipated GHG emissions to other BLM leasing decisions, *see id.* at 23–25, and (5) quantify the alleged climate change impact of GHG emissions from the proposed leases using the Social Cost of Carbon ("SCC") or global carbon budget methodologies, *see id.* at 26–34.  To remedy these alleged procedural errors, Plaintiffs asked the Court to vacate the leases issued to the high bidders in each lease sale.  *Id.* at 38.

After extensive briefing on the parties' cross-motions for summary judgment, the Court granted Plaintiffs' motion for summary judgment in part, and denied Plaintiffs' motion in part. First, the Court rejected Plaintiffs' claim that NEPA requires a site-specific analysis of environmental impacts at the lease sale stage because "[a]t the leasing stage, BLM could not reasonably foresee the projects to be undertaken on specific leased parcels, nor could it evaluate the impacts of those projects on a parcel-by-parcel basis." *WildEarth*, 368 F. Supp. 3d at 66. *See also id*. ("NEPA does not require an agency to issue these types of wholly speculative assessments at the leasing stage, even assuming an irretrievable commitment of resources.").

The Court accordingly addressed the adequacy of BLM's analysis of each lease sale as a whole. *See id*. at 67 ("While BLM could not, at the leasing stage, reasonably foresee the environmental impacts of specific drilling projects, it could reasonably foresee and forecast the impacts of oil and gas drilling ***across the leased parcels as a whole***." (emphasis added)). While BLM's EAs for each lease sale "discuss[ed] climate change on a conceptual level," the Court explained that "they do not attempt to quantify and project the GHG emissions likely to result from a given lease sale." *Id*. at 56.

Although the Court concluded "that BLM's leasing stage analyses of GHG emissions were inadequate" overall, it made clear that it did "not hold that those analyses required the degree of detail demanded by Plaintiffs." *Id*. at 63.  At bottom, the Court explained that "BLM was required to assess the reasonably foreseeable impacts" of its decisions to conduct lease sales. *E.g.*, *id*. at 64 (considering the impacts of drilling operations).

With respect to future oil and gas drilling operations, the Court concluded that "BLM could have reasonably quantified and forecasted . . . [GHG] emissions." *Id*. at 67.  Indeed, the Court explained that the administrative record was "replete with information on oil and gas

development and GHG emissions" as well as "studies quantifying and categorizing GHG emission more generally" that BLM reasonably could use to forecast future emissions on the proposed leases as a whole. *Id.* at 68. *See also id.* at 69 (noting "the volume of information available to BLM"). Specifically, "BLM had at its disposal estimates of (1) the number of wells to be developed; (2) the GHG emissions produced by each well; (3) the GHG emissions produced by all wells overseen by certain field offices; and (4) the GHG emissions produced by all wells in the state." *Id.* "With this data, BLM could have reasonably forecasted, by multiple methods, the GHG emissions to be produced by wells on the leased parcels" in the aggregate. *Id.*

Moving on to GHG emissions from downstream combustion of future oil and gas produced from the proposed lease parcels, the Court similarly concluded that "BLM was required to consider those emissions as indirect effects of oil and gas leasing." *Id.* at 73. The Court, however, rejected Plaintiffs' assertion that "BLM should have quantified and forecasted downstream emissions in the same manner that it should have quantified and forecasted emissions from drilling itself." *Id.* at 74. Rather, the Court settled on a "middle" position under which "BLM must strengthen its discussions of the environmental effects of downstream oil and gas use" and "consider whether quantifying GHG emissions from that use is reasonably possible . . . ." *Id.* at 75. *See also id.* ("[T]he Court will not ***require*** that BLM quantify downstream emissions." (emphasis original)).

Having failed to quantify GHG emissions from development of the proposed leases, the Court concluded that BLM's assessment of the cumulative impacts of the challenged lease sales was inadequate. *See id.* at 76. The Court explained that NEPA "require[s] that BLM quantify the emissions from each leasing decision—past, present, or reasonably foreseeable—and compare those emissions to regional and national emissions, setting forth with reasonable

specificity the cumulative effect of the leasing decision at issue." *Id*. at 77.  And if BLM subsequently quantifies downstream GHG emissions, it must likewise "place those emissions in the context of local and regional oil and gas consumption." *Id*.  Still, "BLM may determine that each lease sale individually has a de minimis impact on climate change"; BLM need only "consider the cumulative impact of GHG emissions generated by past, present, or reasonably foreseeable BLM lease sales in the region and nation." *Id*.

Finally, the Court rejected Plaintiffs' demand that BLM's cumulative impacts analysis "quantify the climate change impact of GHG emissions from the leased parcels . . . utilizing the [SCC] and 'global carbon budget'" protocols.  *Id*. at 77–78.  Instead, "BLM . . . provided reasoned explanations for why it declined to use the" SCC, and the Court deferred to BLM's choice to use a cumulative impact methodology other than the global carbon budget.  *Id*. at 79. "Because current climate science is uncertain (and does not allow for specific linkage between particular GHG emissions and particular climate impacts) . . . evaluating GHG emissions as a percentage of state-wide and nation-wide emissions . . . is a permissible and adequate approach." *Id*. (quoting *WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17, 35 (D.D.C. 2014)) (alteration omitted).

Based on the inadequacies it found in BLM's NEPA review, the Court remanded the Wyoming lease sales to "BLM so that BLM may satisfy its NEPA obligations in the manner described" by the Court's decision.  *Id*. at 85.  But the Court refused Plaintiffs' request to vacate the leases issued to the high bidders in the challenged lease sales because "Plaintiffs challenge only one aspect of nine lease sales that otherwise complied with NEPA," and the agency's "NEPA violation consists merely of a failure fully to discuss the environmental effects of those lease sales; nothing in the record indicates that on remand the agency will necessarily fail to

7

justify its decisions . . . ."  *Id.* at 84.  Nevertheless, "[t]o guard against the possibility that BLM did not choose correctly the first time around, the Court enjoin[ed] BLM from issuing APDs for the Wyoming Leases while the agency works to substantiate its EAs and FONSIs."  *Id.* at 85.

### C.  BLM's Supplemental EA Analyzing The GHG Emissions And Climate Change Impacts Of The Challenged Wyoming Lease Sales.

BLM promptly responded to the Court's decision.  In April 2019, BLM published for public comment a draft Supplemental EA analyzing the GHG emissions and climate change impacts of the Wyoming lease sales.  *See* Wyo Ph-2 0010503–69.[3]

Plaintiffs submitted extensive comments on the draft Supplemental EA.  Among other things, Plaintiffs argued to the BLM—as they do to this Court—that the agency's GHG emissions calculations do not comport with the Court's prior decision, fail to account for reasonably foreseeable emissions in Wyoming and the region, and include a series of mathematical errors.  *See* Wyo PH-2 0012943–59.  Plaintiffs also insisted again that BLM employ a carbon budget or the SCC to assess the challenged Wyoming lease sales, *see* Wyo Ph-2 0012964–74, notwithstanding this Court's explicit ruling that BLM need not do so.

BLM thereafter issued a final Supplemental EA "to comply with the court's decision" by "supplementing the discussion of GHG emissions" for the challenged Wyoming lease sales, Wyo Ph-2 0000033, and "decid[ing], based on this analysis, whether to affirm BLM Wyoming's previous . . . decisions to offer the subject parcels for competitive lease," Wyo Ph-2 0000034.[4]

---

[3] At the same time, BLM further analyzed the challenged lease sales in Colorado and Utah.  *See*, *e.g.*, Fed. Defs.' Mot. for Voluntary Remand (Dkt. No. 107), at 1.

[4] BLM reiterated that "[t]he offering and subsequent issuance of oil and gas leases, in and of itself, does not cause or directly result in any surface disturbance" through development of the leases.  Wyo Ph-2 0000033.  Indeed, "BLM cannot determine, prior to conducting a lease sale, whether a proposed parcel actually will be leased, or if it is subsequently leased, whether the lease will be explored or developed."  Wyo Ph-2 0000033.  Once a lease is issued and the lessee (continued…)

Because "[t]he court's directive found error with BLM's analysis of climate change and [GHG] emissions-related impacts . . ., the analysis in th[e] EA is limited to a discussion of Climate Change and Greenhouse Gas Emissions."  Wyo Ph-2 0000036.

As a baseline for that discussion, BLM described both the existing climate covered by the challenged Wyoming lease parcels as well as global climate change, including "the recent and ongoing rise in global average temperature near Earth's surface" that "is caused mostly by increasing concentrations of greenhouse gases in the atmosphere."  Wyo Ph-2 0000038. Looking forward, models "remain imprecise in being able to predict how, where and when . . . [climate change] effects may manifest at multiple scales."  Wyo Ph-2 0000039.  Still, BLM explained that temperatures in Wyoming and surrounding states "are expected to increase" due to climate change, Wyo Ph-2 0000040; *see also* Wyo Ph-2 0000041 (figures projecting changes in temperature and precipitation), and "[e]xtreme temperatures in the contiguous United States are projected to increase even more than average temperatures," Wyo Ph-2 0000042 (quotation omitted).

For a particular action, "[i]n order to assess the potential for climate change, and the resultant effects of climate change, the standard approach is to measure and predict emissions of GHGs."  Wyo Ph-2 0000042.  "The primary GHGs . . . include carbon dioxide ($CO_2$), methane ($CH_4$), nitrous oxide ($N_2O$), and fluorinated gases . . . ."  Wyo Ph-2 0000042.  For purposes of analysis, "GHGs are often presented using the unit of metric tons of $CO_2$ equivalent (mt $CO_2$e) or Million Metric Tons (MMT $CO_2$e), a metric to express the impact of each different

proposes development operations for BLM approval through an APD, "BLM can subject development . . . to reasonable conditions to minimize impacts to other resources . . . ."  Wyo Ph-2 0000033.

9

greenhouse gas in terms of the amount of $CO_2$[,] making it possible to express greenhouse gases in a single number." Wyo Ph-2 0000043. These units are based on the relative "intensity of each GHG['s] heat trapping effect and its longevity in the atmosphere." Wyo Ph-2 0000043.

To project the GHG emissions from the challenged lease sales, BLM turned to the "Reasonably Foreseeable Development (RFD) projections" for each BLM field office in which the sales took place. Wyo Ph-2 0000043.[5] "The RFD is the result of a technical analysis that projects the total number of wells that could be developed in a field office, based upon known geologic and economic conditions, current development technology, and industry-provided data about future planned development." Wyo Ph-2 0000043. In practice, however, "[d]evelopment density . . . and number of wells installed annually depend on a number of variables including market trends, technology available . . ., the geology of the hydrocarbon-bearing zone, and the application of . . . [lease] stipulations." Wyo Ph-2 0000044. "As a result, the number of wells in these field offices that could potentially be put into production under a full-field development scenario for the leases is highly uncertain." Wyo Ph-2 0000044.

As a check on the RFD projections, BLM development data shows that "approximately 47% of all [federal] leases" in Wyoming are in production. Wyo Ph-2 0000044. Moreover, "[a]cross the state, approximately 50% of the Federal [APDs] that are approved are actually started." Wyo Ph-2 0000046. As a result, "an average of 745 wells were completed annually statewide," Wyo Ph-2 0000045, and "[b]ased on the average wells per year projected under the

---

[5] *See, e.g.*, Wyo Ph-2 0002560 (Bighorn Basin Planning Area RFD); Wyo Ph-2 0002740 (Buffalo Field Office Planning Area RFD); Wyo Ph-2 0000303 (Casper Field Office RFD); Wyo Ph-2 0000699 (Kemmerer Field Office RFD); Wyo Ph-2 0001320 (Lander Field Office RFD); Wyo Ph-2 0000238 (Rawlins Field Office RFD); Wyo Ph-2 0002989 (Rock Springs Field Office RFD).

planning area RFDs, well completion rates are well within the current RFD projection (998 wells per year)." Wyo Ph-2 0000046. Based on these actual development statistics, BLM concluded that "the RFD is a valid estimate of future well development for Federal lands in Wyoming." Wyo Ph-2 0000047.

Having provided a baseline for development activities, BLM then disclosed existing data on GHG emissions in Wyoming and across the United States. For Wyoming, BLM relied on a Center for Climate Strategies ("CCS") GHG inventory report forecasting "all Federal and Non-Federal emission-generating activities in Wyoming" from 1990 to 2020. Wyo Ph-2 0000047. "The CCS inventory report explains that all GHG-emission generating and consumptive activities in Wyoming accounted for approximately 56 MMT $CO_2e$ emissions in 2005, an amount equal to 0.8% of total U.S. gross GHG emissions." Wyo Ph-2 0000047. Looking forward to potential future sources of GHG emissions, the U.S. Energy Information Administration ("EIA") "estimates that current recoverable reserves [in Wyoming], as of December 31, 2017, are 22,352 billion cubic feet of wet gas, and 1,119 million barrels of crude oil plus lease condensate." Wyo Ph-2 0000048.[6]

More broadly, BLM relied on a 2018 Scientific Investigations Report ("SIR") prepared by the U.S. Geological Survey setting out "gross GHG emission estimates for all Federal mineral estates in the U.S., and each of the states which contain Federal minerals . . . ." Wyo Ph-2 0000050. Among other things, the SIR reported that, as of 2014, "[t]he $CO_2$ emissions attributed

---

[6] The EIA also includes regional projections of recoverable oil and gas reserves. Wyoming is included in the EIA's "Rocky Mountain Region, which also includes Colorado, Utah, Idaho, Nevada, Arizona, and portions of New Mexico." Wyo Ph-2 0000048. "Wyoming also borders Montana, which is part of the Northern Great Plains Region" that "also includes North and South Dakota." Wyo Ph-2 0000048.

to Federal lands in Wyoming are 57 percent of the total from Federal lands in all States and offshore areas combined." Wyo Ph-2 0000050 (quotation omitted). Then, "[u]sing 2014 production information . . ., BLM calculated that total estimated indirect $CO_2e$ emissions from all . . . oil and gas production in the state was approximately . . . 140.1 MMT $CO_2e$," which amounts to "approximately 11% of the total" emissions described in the SIR. Wyo Ph-2 0000051.

Nationally, BLM relied on EPA's *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2017*. Wyo Ph-2 0000051. "In 2017, total gross U.S. greenhouse gas emissions were 6,456.7 MMT" $CO_2e$. Wyo Ph-2 0000051 (quotation omitted). Notably, "net emissions in 2017 were 13.0 percent below 2005 levels" and the "decrease in total greenhouse gas emissions between 2016 and 2017 was driven in large part by a decrease in $CO_2$ emissions from fossil fuel combustion." Wyo Ph-2 0000051 (quotation omitted). Among other things, decreased combustion emissions resulted from the "continued shift from coal to natural gas and increased use of renewable energy in the electric power sector . . . ." Wyo Ph-2 0000051 (quotation omitted).

With this leasing and emissions background, BLM began its quantification of the potential GHG emissions from the challenged Wyoming lease sales. To assess GHG emissions from development of the leases, "due to the statewide distribution of the leases . . ., and the varying types, levels and potential for development across all lands in Wyoming," BLM "calculated estimates of GHG emissions associated with the . . . [challenged lease sales] based on existing planning area RFD well total estimates and the projected RMP direct emission estimates ($CO_2e$) and expected annual production." Wyo Ph-2 0000056.[7] BLM "prorated the expected

---

[7] The RMP EISs include "emissions inventories for all existing sources in the planning area," including "specific well emission factors" for oil and gas wells. Wyo Ph-2 0000054. "The (continued…)

emissions from the RFDs by the acreage of the . . . [challenged] leases . . . in consideration of the variability in well types, depths, specific drilling technology, and the rate of well development in Wyoming."   Wyo Ph-2 0000056.   *See also* Wyo Ph-2 0000057 ("This approach therefore accounts for any type of well that may be drilled, as well as the increasing horizontal drilling activity . . . ."). In BLM's determination, "[t]his step-down, planning-area based analysis provides greater consistency and continuity . . . and utilizes existing data" from the RFDs, which "represent the best available data about the potential future oil and gas activity on BLM administered mineral estates in Wyoming."  Wyo Ph-2 0000056.

BLM's resulting calculations provide "the per-acre direct $CO_2e$ emission factor applied to the . . . [challenged] lease acreage and the resultant total projected annual direct $CO_2e$ . . . if developed consistent with the RMP RFD."  Wyo Ph-2 0000057.  *See also* Wyo Ph-2 0000057 (Table 7 setting out emission factors for each planning area).  BLM also "calculated, using the same approach . . ., direct emissions for each individual sale . . . ."  Wyo Ph-2 0000057.  *See also* Wyo Ph-2 0000095.  Based on these calculations, development operations on the challenged leases would "represent approximately 0.98% of the total BLM Wyoming planning documents projected annual direct $CO_2e$" and roughly 0.62% of the SIR GHG estimate.  Wyo Ph-2 0000057.

Moving on to the GHG emissions from downstream combustion of oil and gas potentially produced from the challenged leases in the future, BLM used the production data developed for each planning unit's RMP.  For each RMP, "BLM developed total annual oil and gas production

---

emissions inventories, and the resultant emission factors, were then used to prepare an emissions estimate for the projected RFD (which included drilling, completing and placing the wells in production)."   Wyo Ph-2 0000054.   "BLM then calculated total oil-and-gas related annual emissions for the field office . . . ."  Wyo Ph-2 0000054.

estimates" based on "the number of wells drilled annually . . ., the percent of oil wells versus gas wells, the percent of wells completed, production decline curves for oil and gas wells, and estimates of cross-production from both oil and gas wells."  Wyo Ph-2 0000058.  BLM thus set out the total anticipated production of both oil and gas in each planning unit and then used "[t]he EPA GHG Equivalences Calculator . . . to calculate the total $CO_2$e, assuming 100% combustion of the produced oil and gas."  Wyo Ph-2 0000058.  As with the anticipated GHG emissions from drilling operations, BLM calculated both "the per-acre indirect $CO_2$e emission rate for the various planning areas," and "the per sale emissions,"  Wyo Ph-2 0000058–59.  *See also* Wyo Ph-2 0000096.  Taken together, "BLM would expect the annual emission rate to average approximately 797,495.9 mt/year if all wells under the current RFDs were drilled and put on production, and if all subsequent production was combusted at some point in the future."  Wyo Ph-2 0000059.

Despite these detailed calculations, BLM was careful to identify the many uncertainties impacting actual future GHG emissions.  While BLM was able to prepare "[a] rough estimate . . . using full field constrained potential well development estimates" from the RFDs, in practice, "GHG emission estimates involve significant uncertainty due to unknown factors including actual production, how produced substances are used, [and] the form of regulation . . . ."  Wyo Ph-2 0000060.  "Ultimately, while estimates in th[e] EA are based on the best available data . . ., these estimates are subject to many conditions that are largely beyond BLM's control," such as "[u]nforeseen changes in factors such as geologic conditions, drilling technology, economics, demand, and federal, state, and local laws and policies . . . ."  Wyo Ph-2 0000060.  Likewise, the downstream use of produced oil and gas is subject to considerable uncertainty because the oil and gas could be refined for use as combustible fuel, "used in the chemical industry, for the

manufacture of medicines and everyday household items, plastics, military defense and for the manufacture of synthetic materials." Wyo Ph-2 0000061. Indeed, "in 2017 about 13% of total petroleum products consumed in the United States were for non-combustion use." Wyo Ph-2 0000061. Still, the Supplemental EA estimated "potential GHG emissions by conservatively assuming that all produced oil and gas would eventually be combusted." Wyo Ph-2 0000061.

BLM concluded the Supplemental EA with a discussion of potential GHG-related cumulative impacts of the challenged Wyoming lease sales.

For GHG emissions from development operations on the leases, BLM included a comparison to "total direct statewide, regional and nationwide emission levels." Wyo Ph-2 0000065. First, BLM calculated "the total cumulative direct $CO_2e$ emissions from Federal lands in Wyoming," including "all existing and reasonably foreseeable Federal lease projects in Wyoming." Wyo Ph-2 0000065–67. In comparison, the GHG emissions that BLM calculated for development of the challenged leases "represent 3.8% of the existing [statewide] total direct $CO_2e$." Wyo Ph-2 0000068.

On a regional level, BLM calculated "existing annual direct $CO_2$ emissions from the Rocky Mountain and Northern Great Plains Regions" based on the U.S. Geological Survey's SIR emissions information and oil and gas producing acreage in those regions. Wyo Ph-2 0000068–69. Forecasted annual GHG emissions from development of the challenged leases "is approximately 1.08% of the" five-year annual average emissions for the Rocky Mountain Region, and roughly 1.05% of the Rocky Mountain and Great Plains regions combined. Wyo Ph-2 0000069.

"Nationally, the BLM had 38,556 leases in effect in 2017, and of these, 23,991 were in producing status (62%) according to BLM summary statistics." Wyo Ph-2 0000070. Looking to

EPA's emissions data, "total 2017 U.S. GHG emissions . . . from reporting oil and gas systems was 94 MMT . . . $CO_2e$." Wyo Ph-2 0000071. As BLM explained, Wyoming's cumulative emissions from lease development "is approximately 1.9%" of this national total. Wyo Ph-2 0000071.

For downstream combustion of oil and gas produced from the challenged leases, BLM considered "total statewide and regional consumption estimates." Wyo Ph-2 0000065. BLM first calculated the total Federal indirect GHG emissions from "BLM Wyoming's planning documents" and "the statewide average per-acre estimate of 2.63 $CO_2e$/acre." Wyo Ph-2 0000073. Understanding that "only 50% of the existing leases at the end of fiscal year 2018 were in producing status," BLM then calculated the reasonably likely additional GHG emissions from downstream combustion of oil and gas produced from the challenged leases and three planned upcoming Wyoming lease sales. Wyo Ph-2 0000073. The challenged lease sales represent only "approximately 0.99%" of the total forecasted emissions from all existing and planned BLM leasing in Wyoming. Wyo Ph-2 0000073.

On a regional level, BLM again relied on the U.S. Geological Survey's SIR to calculate the percentage of Rocky Mountain and Great Plains regional emissions represented by emissions attributable to the challenged Wyoming lease sales. Wyo Ph-2 0000074. In view of the anticipated indirect emissions in the Rocky Mountain and Great Plains regions, the projected downstream GHG emissions from the leases issued in the challenged sales "equate to approximately 0.498% of the average annual total" emissions for the two regions combined. Wyo Ph-2 0000074.

Nationally, BLM then compared the forecasted downstream combustion emissions for the challenged Wyoming leases to EPA's inventory of "total 2017 U.S. indirect GHG emissions

from reporting combustion-related sources." Wyo Ph-2 0000074. Projected downstream emissions for the challenged lease sales again only "represent[] approximately 0.016% of the EPA" estimate. Wyo Ph-2 0000074.

Finally, BLM combined projected development and combustion GHG emissions to calculate emissions from federal leases in Wyoming. Wyo PH-2 0000075. BLM then identified Wyoming's contribution to "total gross GHG emissions in the U.S. in 2017" and "the Global Carbon Project's projected 2018 total of 4.0 Gt for both oil and gas . . . ." Wyo Ph-2 0000075. Total cumulative emissions for all federal lands in the State of Wyoming accounts for "approximately 0.66%" of the Carbon Project's projections. Wyo Ph-2 0000075.

Based on the analysis in the Supplemental EA, BLM issued a Decision Record "to affirm BLM's previous decisions to offer and issue leases" in the challenged Wyoming lease sales. Wyo Ph-2 0000002. Along with its final decision, BLM issued responses to the public comments on the EA, including detailed responses to Plaintiffs' contentions that the Supplemental EA analysis violated the Court's decision and included material mathematical errors. *See* Wyo Ph-2 0000005–21.

On September 27, 2019, Plaintiffs filed an amended complaint challenging the Supplemental EA. *See* Amend. And Supplemented Compl. (Dkt. No. 126).

## ARGUMENT

This Court remanded the challenged Wyoming lease sales to BLM to address narrow issues identified by the Court regarding BLM's original assessment of the development, downstream combustion, and cumulative GHG emissions associated with the lease parcels. BLM has fulfilled this Court's mandate. Plaintiffs' claims of continuing NEPA violations fail on the merits.

NEPA "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). *See also Roosevelt P'ship*, 616 F.3d at 503 (NEPA is "meant to ensure a fully informed and well-considered decision, not necessarily the best" (quotation omitted)). Nor does it "compel agencies to elevate environmental concerns over other appropriate considerations." *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1251 (10th Cir. 2019) (quotation omitted). Rather, NEPA requires a federal agency simply to "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1236–37 (10th Cir. 2011) (quotation omitted).

In conducting the Supplemental EA to address the NEPA deficiencies previously identified by the Court, "[a] presumption of validity attaches to the agency action and the burden of proof rests with the" Plaintiffs challenging that action. *Citizens' Committee to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quotation omitted)). Plaintiffs have not met their burden here. Instead, Plaintiffs seek to impose additional obligations upon BLM without a basis in NEPA or the Court's decision, and based upon a mischaracterization of the record of BLM's review. Plaintiffs' argument, "at bottom, is that BLM did not analyze certain issues in the manner or level of detail plaintiffs would have preferred . . . ." *WildEarth Guardians*, 8 F. Supp. 3d at 31. "Unfortunately for plaintiffs, the applicable standard of review neither contemplates nor countenances that type of judicial second-guessing of agency decisionmaking . . . ." *Id*. Indeed, the Court has already recognized that NEPA does not require the level of detail that Plaintiffs demand. *See WildEarth*, 368 F. Supp. 3d at 63.

Even assuming that Plaintiffs could demonstrate a statutory violation, Plaintiffs have not demonstrated an entitlement to the "extraordinary" injunctive relief they seek, *Winter v. Natural*

*Resources Def. Council, Inc.*, 555 U.S. 7, 22 (2008), in asking this Court to vacate BLM's lease sale decisions and the issued leases.  At most, BLM's purported statutory violations would justify a remand to the agency without vacating the issued leases.

## I.   BLM'S LEASING DECISIONS COMPLIED WITH NEPA.

### A.   This Court's Review Of BLM's Supplemental EA Is Narrow, And BLM's Scientific And NEPA Decisions Are Owed Extreme Deference.

"[I]nherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that ***agencies*** determine" the level of environmental review to conduct "based on the usefulness of any new potential information to the decisionmaking process." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (emphasis added).  *See also*, *e.g.*, *Lee v. U.S. Air Force*, 354 F.3d 1229, 1237 (10th Cir. 2004) (NEPA's "rule of reason" is "essentially an abuse of discretion standard").  Because NEPA does not provide a private right of action, review of BLM's determinations proceeds under the APA.

"[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto., Ins. Co.*, 463 U.S. 29, 43 (1983).  A court's review under this standard is highly deferential, and "[i]t is well settled that the court will not 'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor," *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006).  "Once . . . [the Court is] satisfied that an agency's exercise of discretion is truly informed, [it] must defer to that informed discretion." *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002).

Faced with a claimed NEPA violation, "[a] reviewing court does not consider whether the agency correctly assessed the proposal's environmental impacts." *Partners in Forestry Coop. v. U.S. Forest Serv.*, 638 F. App'x 456, 459 (6th Cir. 2015) (quotation omitted).  Rather, in the

NEPA context, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97–98 (1983); *see also id.* at 105 ("Our only task is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made.").  And the agency's decision is "entitled to a presumption of regularity," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also, e.g., Weiss v. Kempthorne*, 580 F. Supp. 2d 184, 188 (D.D.C. 2008), including with respect to the agency's compliance with NEPA, *see WildEarth Guardians*, 920 F.3d at 1260 ("NEPA creates no exception" to the presumption that "government agencies comply with the law").

Moreover, "[w]hen an agency is evaluating scientific data within its technical expertise, an extreme degree of deference to the agency is warranted."  *Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (quotation omitted).  *See also, e.g., Baltimore Gas*, 462 U.S. at 103; *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 691 (10th Cir. 2010) (deference "is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise" (quotation omitted)); *Miami-Dade Cnty. v. U.S. EPA*, 529 F.3d 1049, 1065 (11th Cir. 2008) (court "must look at the agency's decision not as the chemist, biologist, or statistician that it is qualified neither by training nor experience to be, but as a reviewing court exercising certain minimal standards of rationality" (quotation and alterations omitted)).  Likewise, "particularly deferential review" applies where an agency decision involves "predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable."  *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) (quotation omitted).  That deference extends to an agency's choice of

methodology, to which a court "must defer . . . so long as it bears a rational relationship between the method and that to which it is applied." *Pub. Emps. for Envtl. Responsibility v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 26 (D.D.C. 2011) (quotation and alteration omitted).

### B.   BLM Properly Considered The Challenged Lease Sales' GHG Emissions.

At bottom, Plaintiffs contend that NEPA requires BLM to prepare an EIS considering GHG emissions before approving (or reaffirming) the challenged Wyoming lease sales. *See*, *e.g.*, Pls.' Mem. in Supp. of Mot. for Summ. J. After Remand (Dkt. No. 143) ("Pls.' Mem."), at 43. "Not every [agency] decision requires an EIS, however." *Roosevelt P'ship*, 616 F.3d at 503. NEPA and its implementing regulations expressly provide BLM with broad discretion to evaluate a proposed action in less detailed form. *See City of Auburn v. United States*, 154 F.3d 1025, 1032 (9th Cir. 1998) ("[g]reat" deference is owed "an agency determination regarding NEPA requirements").

An agency may prepare an EA to determine whether a proposal under consideration constitutes a "major Federal action[] significantly affecting the quality of the human environment," in which case an EIS is necessary. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9. An EA "is to be a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement." *Pub. Citizen*, 541 U.S. at 757 (quoting 40 C.F.R. § 1508.9(a)).[8] "If, pursuant to the EA, an agency determines that an EIS is not required . . ., it must issue a  . . . FONSI[], which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment."

---

[8] Where an EIS has been prepared encompassing the proposed action, it is "appropriate" for an agency to "tier[]" "subsequent narrower statements or environmental analyses," "such as regional . . . or ultimately site-specific statements," to the broader discussions in an EIS. 40 C.F.R. § 1508.28.

*Pub. Citizen*, 541 U.S. at 757–58.  With the issuance of a FONSI supported by an EA, an agency's NEPA obligations are at an end, and an EIS is not required.  *Id*.

Here, BLM engaged in significant quantitative and qualitative analysis of the potential GHG emissions and climate change impacts from the challenged Wyoming lease sales, including potential (1) direct, (2) indirect, and (3) cumulative environmental impacts.  That is all NEPA requires.  *See* 40 C.F.R. § 1508.25(c).  Although thus fully authorized by NEPA, Plaintiffs contend that the Supplemental EA was prepared in "haste" and is inadequate under NEPA.  Pls.' Mem. at 15.  The law and the record are to the contrary.  Indeed, BLM was able expeditiously to respond to the Court's prior directive to quantify GHG emissions because, as the Court recognized, the agency already had readily available the necessary "information on oil and gas development and GHG emissions" as well as "studies quantifying and categorizing GHG emissions more generally."  *WildEarth*, 368 F. Supp. 3d at 68.  Having now marshalled and analyzed the available information, BLM has fulfilled its statutory obligations.

### 1. *BLM Properly Considered GHG Emissions From Development Operations On The Proposed Wyoming Leases.*

In its decision addressing BLM's original NEPA reviews of the challenged Wyoming lease sales, the Court concluded that NEPA required BLM to "quantif[y] and forecast[] . . . [GHG] emissions" from future oil and gas development operations because, as the Court explained, the agency had readily available information to support such quantification.  *WildEarth*, 368 F. Supp. 3d at 68.  In the Supplemental EA, BLM used such existing "information on oil and gas development and GHG emissions"—including the planning area RFDs—as well as "studies quantifying and categorizing GHG emissions more generally"—including the CCS GHG emissions inventory for Wyoming, the broader U.S. Geological Survey's SIR, and the EPA's national inventory of GHG emissions—to forecast future emissions

on the proposed leases as a whole.  *Id.  See also supra* pp. 8–17.  By employing the detailed development and emissions projections in the RFDs in tandem with a series of GHG inventories covering Wyoming, its surrounding region, and the nation as a whole, *see id.*, BLM thus fulfilled NEPA's mandate.

Yet Plaintiffs seek to impose additional obligations.  Plaintiffs argue that BLM: (1) failed to calculate total GHG emissions for development over the life of each lease, and instead considered only annual emissions, *see* Pls.' Mem. at 17, 20–24; and (2) underestimated GHG emissions through "sleight of hand" by assuming that "emission rates are equivalent across leased and unleased lands," *id.* at 17, 24–26.  Because Plaintiffs' arguments lack support in NEPA or other legal authority, and the Supplemental EA's method of analysis is supported by the record and BLM's expertise in oil and gas development, Plaintiffs' arguments fail.

At the outset, Plaintiffs' purported legal authorities requiring total, rather than annual, emission rates, *see* Pls.' Mem. at 21, are inapt.  *Diné Citizens Against Ruining Our Environment v. United States Office of Surface Mining Reclamation & Enforcement*, 82 F. Supp. 3d 1201 (D. Colo. 2015), involved plans to expand an existing coal mining operation that existed "for the sole purpose of supplying coal" to a particular power plant.  *Diné Citizens*, 82 F. Supp. 3d at 1206.[9] Far from holding that total combustion of the expanded operation's mined coal—rather than the rate of combustion—had to be quantified, the court simply rejected the agency's claim that no EIS was required for the mine expansion because the status quo—combusting a longstanding, set amount of coal at the power plant—would not change.  *See id.* at 1214–15.  *South Fork Band*

---

[9] Because the mine and power plant were "unusually interconnected," the court explained that "there is no uncertainty as to the location, the method, or the timing" of combustion of coal produced from the mine and therefore "it is possible to predict with certainty the combustion-related environmental impacts."  *Diné Citizens*, 82 F. Supp. 3d at 1212, 1213.

*Council of Western Shoshone of Nevada v. United States Department of the Interior*, 588 F.3d 718 (9th Cir. 2009), likewise involved the proposed expansion of an existing mining project.  *See id*. at 722.   Again, while the Court rejected the agency's NEPA analysis, it did so not—as Plaintiffs suggest—because the annual rate of ore transportation was irrelevant, but because the agency did not consider that the rate would continue for additional years because of the mine expansion.  *Id*. at 725–26.   At any rate, the agency had not even considered the environmental impacts of the existing annual rate of ore transportation.  *See id*. at 726.

Here, by contrast, BLM calculated annual GHG emissions for each lease sale (and for the lease sales as a whole) in the first instance as a reasonable proxy "to assess the potential for climate change, and the resultant effects of climate change . . . ."  Wyo Ph-2 0000042.  *See also supra* pp. 9–10, 12–13; Wyo Ph-2 0000056–57; Wyo Ph-2 0000095.[10]  BLM's calculations are based on annual GHG emissions information and projections from the RFDs, which "include assumptions about the pace and timing of mineral activities," WYO Ph-2 0000056, because the bulk of development-related GHG emissions occur when the well is initially completed and neither completion operations nor related emissions continue at the same rate thereafter.   By annualizing GHG emissions per acre, BLM accounted for real-world variability in both the timing of well development emissions and the "types, levels and potential for development" for leases spread across the entire State of Wyoming.    WYO Ph-2 0000056.   Indeed, because production of oil and gas—not well drilling operations—continue on a lease for years, BLM did (as Plaintiffs concede, *see* Pls.' Mem. at 22), project GHG emissions from **downstream**

---

[10] An agency may rely on such reasonable proxies in making decisions.  *See*, *e.g.*, *Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954, 956 (D.C. Cir. 2007) ("the arbitrary and capricious test [requires] only reasonableness, not perfection").

**combustion** of hydrocarbons produced on the leases over the typical 40-year lifetime of an oil and gas well. *See* Wyo Ph-2 0000059.[11] Taken together, BLM's analysis "was hardly superficial." *Utah Shared Access*, 288 F.3d at 1213.

Plaintiffs' further argument that BLM underestimated GHG emissions by calculating a per-acre emission factor based on all lands eligible for lease—rather than simply those leases proposed in the challenged lease sales—fares no better. "The mere fact that [Plaintiffs] disagree[] with the methodology" relied upon by the agency "does not constitute a NEPA violation." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012). Because BLM holds unquestionable expertise in oil and gas leasing and development, its technical and methodological judgments are entitled to "an extreme degree of deference." *New River*, 373

---

[11] To the extent that Plaintiffs claim a mathematical error in this calculation based on BLM's alleged inclusion of EPA's data for coal combustion emissions along with the oil and gas emissions, *see* Pls.' Mem. 22–23, that error is harmless. *See*, *e.g.*, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659–60 (2007) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule." (quotation omitted)); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1090–91 (9th Cir. 2014) ("Relief is available under the APA only for 'prejudicial error.'"); *Nevada*, 457 F.3d at 88 ("We have applied the prejudicial error rule in the NEPA context where the proposing agency engaged in significant environmental analysis before reaching a decision but failed to comply precisely with NEPA procedures."). Coal emissions were only a fraction of the oil and gas emissions tracked by EPA. *See* Wyo Ph-2 0009955. Moreover, substituting the oil and gas emissions identified by Plaintiffs results in the challenged Wyoming leases accounting for 0.87%—rather than 0.65%—of EPA's 2019 annual U.S. oil and gas emission total. *Cf. PDK Labs., Inc. v. U.S. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration."). Plaintiffs have made no effort to explain how this, at most, minor computational error caused them harm. *See Shinseki v. Sanders*, 556 U.S. 396, 410 (2009) (explaining that party challenging agency determination "normally must explain why the erroneous ruling caused harm"). *Compare Larry Grant Constr. v. Mills*, 956 F. Supp. 2d 93, 97–98 (D.D.C. 2013) (holding agency decision arbitrary and capricious where mathematical error changed the statutory designation of small business). Nor is it clear that Plaintiffs raised this alleged error—as it did with other alleged mathematical errors—in their comments on the Supplemental EA. *See*, *e.g.*, *Nevada*, 457 F.3d at 88 (party "waived [its] argument by failing to raise it at the administrative level").

F.3d at 1327 (quotation omitted); *see also supra* pp. 20–21.  So long as its decisions "bear[] a rational relationship" to the analysis at issue, *Pub. Emps. for Envtl. Responsibility*, 832 F. Supp. 2d at 26 (quotation and alteration omitted), the method of analysis is a matter for the agency, *e.g.*, *WildEarth*, 368 F. Supp. 3d at 68 (explaining that BLM could "by multiple methods" forecast GHG emissions from existing data).

BLM's per-acre analysis of GHG emissions readily bears this rational relationship.  As directed by the Court, BLM employed detailed existing data on well development emissions from the RFDs and RMPs.  *See* Wyo Ph-2 0000056.  Those planning level documents, in turn, derived emission data from assumed full-field development *of all lands eligible for lease* within the planning area or field office under consideration.  *See* Wyo Ph-2 0000056.  By seeking to attribute all projected planning level emissions to only a portion of the eligible lands—the specific lease parcels offered in the challenged lease sales—that were used to project those emissions, Plaintiffs' proposed approach would create a significant and misleading overestimation of the GHG emission contribution of the challenged lease sales.  By contrast, the per-acre analysis used by the BLM provides an apples-to-apples comparison of emission rates.  In short, because all eligible lands contributed to the emissions estimate, BLM's calculation of per-acre emissions factors across all eligible lands in a planning area, *see* Wyo Ph-2 0000057[,] is reasonable and entitled to considerable deference.

### 2. BLM Properly Considered The Downstream Consumption Of Oil And Gas Potentially Produced From The Proposed Lease Parcels.

BLM similarly met its NEPA obligations in considering downstream consumption of any oil and gas eventually produced from the leases proposed in the challenged Wyoming sales. Contrary to BLM's NEPA analyses conducted at the time of the lease sales, the Court concluded that "BLM was required to consider those emissions as indirect effects of oil and gas leasing."

*WildEarth*, 368 F. Supp. 3d at 73.   The Court also directed BLM to "consider whether quantifying GHG emissions from that use is reasonably possible . . . ."   *Id.* at 75.   *See also id.* ("[T]he Court will not ***require*** that BLM quantify downstream emissions." (emphasis original)).

BLM did not merely carry out the required "consider[ation]," but quantified potential downstream GHG emissions based on BLM's technical projections of oil and gas anticipated to be developed in the planning area RFDs and RMPs, *see* Wyo Ph-2 0000058, and the EPA "emissions calculator suggested by Plaintiffs," *WildEarth*, 368 F. Supp. 3d at 75.   *See also* Wyo Ph-2 0000058; *supra* pp. 13–14.   The resulting detailed projection of future combustion-related GHG emissions provided a conservative assessment for consideration.   *Compare* Wyo Ph-2 0000058 (calculating GHG emissions "assuming 100% combustion of the produced oil and gas) *with* Wyo Ph-2 0000061 (noting that "in 2017 about 13% of total petroleum products consumed in the United States were for non-combustion use").

Aside from Plaintiffs' legally and factually unsupportable demand that BLM calculate "total" emissions, *see supra* pp. 23–25, Plaintiffs engage in little more than "flyspecking" of BLM's analysis with purported deficiencies that are either "minor," *Nevada*, 457 F.3d at 93; *see supra* n.11, or contrived.   For example, Plaintiffs argue that BLM "erroneously describ[ed]," Pls.' Mem. at 23, its summation of development and downstream GHG emissions.   But BLM made clear that it meant the resulting "total" emissions calculation—summing the projected "annual" development emissions from Table 7, *see* Wyo Ph-2 0000057, with the projected "annual" downstream emissions from Table 9, *see* Wyo Ph-2 0000059—to demonstrate simply the total ***annual*** development and downstream emissions.   That BLM clearly used the term "total" differently than Plaintiffs would prefer does not render the Supplemental EA arbitrary or capricious.   *Cf. Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008) ("substantial

deference [owed] to the agency, not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue").

### 3.    *BLM Properly Analyzed Cumulative Lease Sale Emissions In Comparison To State, Regional, And National GHG Emissions.*

Finally, the Court's prior decision concluded that NEPA "require[s] that BLM quantify the emissions from each leasing decision—past, present, or reasonably foreseeable—and compare those emissions to regional and national emissions, setting forth with reasonable specificity the cumulative effect of the leasing decision at issue." *WildEarth*, 368 F. Supp. 3d at 77.   BLM proceeded accordingly.   Having calculated annual GHG emissions rates for the proposed leases, the Supplemental EA compared the lease sale emissions to: (1) cumulative direct $CO_2e$ emissions from "all existing and reasonably foreseeable Federal lease projects in Wyoming," Wyo Ph-2 0000065–67; (2) "existing annual direct $CO_2$ emissions from the Rocky Mountain and Northern Great Plains Regions" in the U.S. Geological Survey's SIR, Wyo Ph-2 0000068–69; and (3) EPA's data on all national oil and gas emissions in 2017, *see* Wyo Ph-2 0000071.   *See also* Wyo Ph-2 0000073–74 (comparing projected downstream combustion emissions to regional and national emissions).   With this "data-driven comparison of GHG emissions from the leased parcels to regional and national GHG emissions," *WildEarth*, 368 F. Supp. 3d at 77, BLM thus fulfilled its statutory obligations.

Plaintiffs' arguments to the contrary cannot withstand scrutiny.   First, Plaintiffs contend that BLM's cumulative impacts analysis ignored "other reasonably foreseeable BLM lease sales" in the region and the nation.   Pls.' Mem. at 26.   But NEPA's mandate is not so broad; "[a] NEPA cumulative-impacts analysis need only consider the effect of the current project[s] along with

any other past, present or likely future actions *in the same geographic area* as the project[s] under review." *Sierra Club v. FERC*, 672 F. App'x 38, 38 (D.C. Cir. 2016) (quoting *Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016)) (emphasis original).  Here, BLM expressly considered the next three Wyoming lease sales planned for shortly before and after issuance of the Supplemental EA because "BLM Wyoming considers all lease sales currently undergoing internal review to be reasonably foreseeable."  Wyo Ph-2 0000065.  *See also* Wyo Ph-2 0000067.

To the extent that Plaintiffs argue that BLM violated NEPA by failing to consider every potential lease contained in every planning office RFD in Wyoming, surrounding states, or the nation as a whole, *see* Pls.' Mem. at 26–27, that claim is legally and factually untenable.  Far from requiring BLM to consider all future oil and gas development projected in the RFDs of surrounding field offices and states, *Diné Citizens Against Ruining Our Environment v. Bernhardt*, 923 F.3d 831 (10th Cir. 2019), merely directed BLM to consider the cumulative impact of all projected wells in the RFDs for the field office approving the APDs challenged in that case. *Id*. at 850.

At any rate, here, BLM's GHG emission projections were: (1) derived from RFD data based on all wells necessary in the future to develop the oil and gas resources underlying lands eligible for lease in each planning area, *see* Wyo Ph-2 0000043; and (2) compared to all GHG emissions on the federal mineral estate from the U.S. Geological Survey's SIR, *see* Wyo Ph-2 0000050.  In other words, BLM used existing data to compare emissions across both time and a broader geographic area.  Drawing the line short of Plaintiffs' expansive demands is well within the agency's discretion.  *See Tinicum Tp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 296 (3rd Cir. 2012) (rejecting NEPA challenge based on details allegedly left out of air quality analysis

because "[w]hile data might enable a more detailed environmental analysis, NEPA does not require maximum detail"); *Duncan's Point Lot Owners Ass'n v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008) ("The NEPA process involves an almost endless series of judgment calls, and the line-drawing decisions necessitated by the NEPA process are vested in the agencies, not the courts." (quotation omitted)).

Plaintiffs also again misread the Supplemental EA to suggest ambiguity that is not present.  Contrary to Plaintiffs' suggestions that BLM's discussion of future emissions does not accurately portray "current[] conditions," *see* Pls.' Mem. at 28–29, BLM made clear that the U.S. Geological Survey's SIR estimates for emissions in 2014, which forms the basis of BLM's projections, "is the best available information at this time."  Wyo Ph-2 0000068.[12]  Whether Plaintiffs believe that an alternative source of emissions information would be preferable, the agency need only "support its conclusions with studies that ***the agency deems reliable*** . . . ." *WildEarth Guardians*, 920 F.3d at 1260 (quotation omitted) (emphasis added).  Plaintiffs' argument thus misses the mark.

Plaintiffs likewise challenge BLM's discussion of the global carbon budget as "inconsistent" and contrary to Plaintiffs' view of an appropriate methodology.  Pls.' Mem. at 31–33.  But BLM's consideration of the global carbon budget is relatively straightforward—the agency introduced and discussed the concept, *see* Wyo Ph-2 0000038–39, described assessments of the budget from other federal agencies, *see* Wyo Ph-2 0000077, and compared the Supplemental EA's calculated total federal cumulative GHG emissions estimates for Wyoming

---

[12] Plaintiffs' somewhat contradictory assertion that BLM's discussion also "shows" increasing emissions over the 2014 estimates, *see* Pls.' Mem. at 28–29, apparently ignores that BLM's projections of five-year average emissions were themselves derived from the 2014 estimates. *See* Wyo PH-2 0000068.  Moreover, the SIR reported "decreases in emissions for all three [primary] greenhouse gases" over the preceding decade.  Wyo Ph-2 0000050.

leases to the Global Carbon Project's "projected 2018 total of 4.0 Gt for both oil and gas . . . ." Wyo Ph-2 0000075.  BLM need not include any further discussion in the Supplemental EA's "concise" discussion of environmental impacts, *Pub. Citizen*, 541 U.S. at 757 (quoting 40 C.F.R. § 1508.9(a)).  *See also Sierra Club*, 526 F.3d at 1361 ("substantial deference [owed] to the agency . . . when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue"); *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999) (court's "job is not to question the wisdom of the [agency's] ultimate decision or its conclusion concerning the magnitude of indirect cumulative impacts").

*     *     *

Taken together, BLM directly addressed the GHG emission shortcomings identified by the Court's original review of the challenged Wyoming lease sales.  While Plaintiffs nevertheless "suggest that BLM could have considered" additional  GHG and climate change measures, "such a complaint is a far cry from showing that the agency failed to consider [these issues] at all, and under the 'rule of reason' standard, such detailed second-guessing of an agency's choices is not the proper role of [a] Court."  *WildEarth Guardians*, 8 F. Supp. 3d at 33 (upholding BLM decision to analyze nitrogen oxide emissions rather than proposed measures for predicting ozone concentrations).  As before, BLM's GHG emissions analyses simply do not "require[] the degree of detail demanded by Plaintiffs."  *WildEarth*, 368 F. Supp. 3d at 63.

## II.     THE LEASES SHOULD NOT BE VACATED UNDER ANY CIRCUMSTANCES.

Plaintiffs' request to "vacate, and set aside . . . the challenged leases," Pls.' Mem. at 43, constitutes a request for permanent injunctive relief.  *See WildEarth Guardians v. BLM*, 870 F.3d 1222, 1239 (10th Cir. 2017) ("Vacatur of agency action" is a "form of injunctive relief."); *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed. Cir. 2004) ("[A]n order setting aside the

[decision] . . . is tantamount to a request for injunctive relief."); *Virgin Islands Tel. Corp. v. FCC*, 444 F.3d 666, 671–72 (D.C. Cir. 2006) ("set aside" and "vacate" are synonymous) *Cf. Samuels v. Mackell*, 401 U.S. 66, 71–73 (1971) (when "the practical effect of the two forms of relief will be virtually identical," the propriety of the relief "should be judged by essentially the same standards").

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. As the Supreme Court has made clear, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Because "[a]n injunction is a matter of equitable discretion[,] it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 31–33 (injunction inappropriate even assuming NEPA violation). Instead, "a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

Even assuming *arguendo* that BLM's leasing decisions violated NEPA, Plaintiffs have failed to show an entitlement to injunctive relief. At most, a remand to BLM to further analyze the challenged lease sales, without vacatur of the issued leases, would be appropriate. Indeed, this Court previously concluded that a remand was appropriate to remedy a NEPA "violation [that] consists merely of a failure to fully discuss the environmental effects . . . ." *WildEarth*, 368 F. Supp. 3d at 84. As before, "nothing in the record indicates that on remand the agency will necessarily fail to justify its decisions . . . ." *Id.* To the contrary, the analytical progress made by the Supplemental EA indicates BLM's ability to timely augment its analyses.

### A.      Plaintiffs Fail To Establish An Entitlement To Relief.

"[A] court must balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).  In addition, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312.  *See also Winter*, 555 U.S. at 32 ("[T]he balance of equities and consideration of the public interest . . . are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent.").

Plaintiffs have failed to carry their burden of establishing that the balance of hardships or public interest support injunctive relief.  *See*, *e.g.*, *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (plaintiff bears burden on all factors); *Winter*, 555 U.S. at 22–32 & n.5 (relief inappropriate "even if plaintiffs are correct on the underlying merits" of their NEPA claim, upon examining "balance of equities and . . . the public interest").

### 1.      *Existing Development And Mitigation Undercut Plaintiffs' Speculative Environmental Harm.*

As Plaintiffs' members' allegations that the region already includes extensive "impacts of oil and gas development," make clear, Nichols Decl. (Dkt. No. 143-1), ¶¶ 18; Molvar Decl. (Dkt. No. 143-2), ¶¶ 10–12, the challenged lease sales must be considered in the overall context of Wyoming oil and gas development.  The challenged leases do not represent an expansion into new areas.  Instead, "[a]t the end of fiscal year 2018, BLM Wyoming has 12,780 leases in effect, covering approximately 8.08 million acres.  Of this total, 4,076,711 acres are in production . . . ." Wyo Ph-2 0000044.

Under these circumstances, the incremental environmental impacts of the potential future development of the challenged leases are both relatively limited, and at the leasing stage, wholly

speculative.  *E.g.*, *Winter*, 555 U.S. at 21–23 (injunction may not issue on mere "possibility" of harm, especially when "this is not a case in which the defendant is conducting a new type of activity with completely unknown effects on the environment"); *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1253 (10th Cir. 2017) ("speculative assertions are insufficient to carry the [plaintiff's] burden" of making a "clear showing" of irreparable harm); *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient [to make out a clear showing of irreparable harm]; there must be more than an unfounded fear on the part of the applicant.").

Nor are Plaintiffs' alleged increased concerns for health and safety sufficient to make the requisite "clear showing" of irreparable harm.  *Winter*, 555 U.S. at 22.  Extensive federal and state regulations guard against significant air quality impacts.  *See* Wyo Ph-2 0000055 (noting that operations must comply with Clean Air Act regulations); Wyo Ph-2 0000062–63 (describing federal and state mitigation measures and best practices designed to reduce emissions).  These measures further diminish Plaintiffs' attempted showing of harm.  *See*, *e.g.*, *In Def. of Animals v. U.S. Dep't of the Interior*, 737 F. Supp. 2d 1125, 1138 (E.D. Cal. 2010) (mitigation measures undercut claim of irreparable injury); *cf. Winter*, 555 U.S. at 22–23 (criticizing lower courts for failure to consider mitigation measures).

### 2.    *Harms To The Public Interest Outweigh Plaintiffs' Alleged Harm.*

The national and local public interests also tip strongly against injunctive relief.  By directing BLM to make oil and gas deposits available for private lease at regular intervals, *see* 30 U.S.C. § 181; *id.* § 226(b)(1)(A), Congress has, in effect, announced a strong public interest in oil and gas development.  *See Diné Citizens Against Ruining Our Env't v. Jewell*, No. 15-cv-0209, 2015 WL 4997207, at *50 n.25 (D.N.M. Aug. 14, 2015) (Congress's directive to conduct

sales "already determined that the economic benefits of [oil and gas] drilling outweigh its environmental costs").

The State of Wyoming also has a significant interest in leasing and development. Much of Wyoming is dependent upon resource development as a base for its economy. *See* API Mem. at 43. Moreover, leasing mineral rights for the development of Federal minerals generates public revenue through the bonus bids paid at lease auctions and annual rents collected on leased parcels. *See id.* Roughly half of these proceeds inure to the Federal Government, and the remainder is distributed to the Wyoming State and local governments. *See id.* Federal disbursements to State and local government funds numerous educational and infrastructure projects in Wyoming.[13]

Plaintiffs' legal challenge will, at best, delay and, at worst, eliminate this economic value. Such localized economic injury weighs heavily against injunctive relief. *See Del. Dep't of Nat. Res. & Envt'l Control v. U.S. Army Corps of Eng'rs*, 681 F. Supp. 2d 546, 563 (D. Del. 2010).

### 3. Harms To Business And Government Economic Interests Outweigh Plaintiffs' Alleged Harm.

An injunction's potential to cause private and governmental "financial harm can be weighed against environmental harm—and in certain instances outweigh it." *Sierra Club, Inc. v.*

---

[13] *See* Office of Natural Resources Revenue, Natural Resources Revenue Data, Wyoming (2018), https://revenuedata.doi.gov/explore/WY/ (last visited March 5, 2020). This Court may take judicial notice of government records and materials available on government websites. *See*, *e.g.*, *Banks v. Warner*, No. 94-56732, 1995 WL 465773, at *1 (9th Cir. Aug. 7, 1995); *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 519 (5th Cir. 2015). Moreover, the Court may consider extra-record materials in determining whether injunctive relief is appropriate. *See Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 369 n.7 (D.D.C. 2017) (because "there usually will be no administrative record developed on the[] issues" of injunctive relief, "it will often be necessary for a court to take new evidence" on those issues (quotation and alterations omitted)).

*Bostick*, 539 F. App'x. 885, 892 (10th Cir. 2013); *see also Amoco Prod.*, 480 U.S. at 545 (hypothetical environmental harm outweighed by "committed" oil company investments).

Oil and gas development is carried out through private companies, which acquire leases through a sealed bidding process and then engage in exploration efforts that, if successful, will lead to production. *See* Milito Decl. (Dkt. 17-2), ¶ 5. The Government receives significant revenue from both lease sales and royalties from subsequent production.[14] In exchange, lease operators obtain valuable contractual and property interests in the purchased leases. *See*, *e.g.*, *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607–08 (2000); *Union Oil Co. of Cal. v. Morton*, 512 F.2d 743, 747 (9th Cir. 1975).

All of these interests would be undermined by Plaintiffs' requested relief. *See Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 457 (S.D.N.Y. 2010) (reliance interests in preparing for planned agency action and retaining contractors precluded injunctive relief); *Idaho Power Co. v. FERC*, 312 F.3d 454, 460 (D.C. Cir. 2002) (injury where plaintiff requested "an agency [action] that replaces a certain [contract] outcome with one that contains uncertainty").

Coupled with the public interests, the injuries to these economic interests strongly weigh against Plaintiffs' requested relief. *See Winter*, 555 U.S. at 23–27 (aggregating harm to non-movants with public interest in denying injunctive relief).

---

[14] In 2018 the Government received more than $640 million in revenue from private extraction of oil and gas in Wyoming. *See* Office of Natural Resources Revenue, Natural Resources Revenue Data, Wyoming (2018), https://revenuedata.doi.gov/explore/WY/ (last visited March 5, 2020).

**B.**   **At Most, Remand Of The Lease Sale Decision Without Vacatur Of The Issued Leases Would Be Appropriate.**

While the APA provides that a reviewing court "shall . . . hold unlawful and set aside agency action . . . found to be arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), it also makes clear that "[n]othing herein . . . affects . . . the power or duty of the court to . . . deny relief on any other appropriate . . . equitable ground," *id.* § 702.   Accordingly, "[a]lthough the . . . court has power to do so, it is not required to set aside every unlawful agency action." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995).[15]

Remand may be applied in environmental cases. *See Idaho ex rel. Idaho Pub. Util. Comm'n v. ICC*, 35 F.3d 585, 599 (D.C. Cir. 1994) ("We remand . . . so that the Commission may comply with [NEPA]."); *Black Warrior Riverkeeper*, 781 F. 3d at 1289–91; *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 108-09 (D.D.C. 2017); *Sierra Club v. U.S. Dep't of Agric.*, 841 F. Supp. 2d 349, 362–63 (D.D.C. 2012); *Native Vill. of Point Hope v. Salazar*, 730 F. Supp. 2d 1009, 1019 (D. Alaska 2010).

---

[15] A majority of the Courts of Appeals "agree . . . that the remedy of remand without vacatur is within a reviewing court's equity powers under the APA." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1289 (11th Cir. 2015) (quotation and alteration omitted); *see also WildEarth Guardians*, 870 F.3d at 1240 (declining to vacate coal leases notwithstanding NEPA deficiency, and remanding to district court, which "may vacate…, or it might fashion some narrower form of injunctive relief based on equitable arguments"); *Natural Res. Defense Council v. U.S. EPA*, 808 F.3d 556, 584 (2nd Cir. 2015); *Cal. Communities Against Toxics v. EPA*, 688 F.3d 989, 992–94 (9th Cir. 2012); *Cent. Maine Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001); *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1380 (Fed. Cir. 2001); *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993).

Put simply, there is no reason why NEPA's requirements are exempt from the APA remedial discretion that courts routinely apply to violations of a wide variety of statutes.[16] Because the APA supplies Plaintiffs' cause of action under NEPA, *see, e.g.*, *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002), its reservation of remedial discretion likewise applies. Accordingly, because (1) "there is at least a serious possibility that the [agency] will be able to substantiate its decision" on remand, and (2) vacatur will lead to disruptive consequences in the interim, at most, a remand would be appropriate here. *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999) (quotation omitted). *See also Standing Rock*, 282 F. Supp. 3d at 97.

Plaintiffs contend that BLM committed discrete statutory violations by, *inter alia*, failing adequately to consider and quantify GHG emissions arising from its decision to offer parcels of oil and gas leases for sale. But BLM indisputably "did not wholly ignore" these issues. *Id*. at 99 (quotation omitted). Rather, BLM included significant discussions and quantification of emissions, and proved its ability expeditiously to augment its discussions in response to an order from this Court. *See supra* pp. 5–17. The record provides no reason to question BLM's ability to do so again, were any deficiency identified. BLM's alleged mathematical errors, assuming they exist, would likewise be readily remedied. In other words, the alleged violations "consist[] merely of a [purported] failure to fully discuss the environmental effects of [the] lease sale[]," in

---

[16] *See, e.g.*, *Stand Up for California! v. U.S. Dep't of Interior*, 879 F.3d 1177, 1190 (D.C. Cir. 2018) (Clean Air Act); *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 451 (D.C. Cir. 2017) (Securities Exchange Act); *Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 718 F.3d 974, 978 (D.C. Cir. 2013) (Export-Import Bank Act); *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2014) (Federal Power Act); *Apache Corp. v. FERC*, 627 F.3d 1220, 1223 (D.C. Cir. 2010) (Natural Gas Act).

the form Plaintiffs would prefer, and "nothing in the record indicates that on remand the agency will necessarily fail to justify its decisions . . . ."  *WildEarth*, 368 F. Supp. 3d at 84.

Because this is not a situation "in which the agency must redo its analysis from the ground up," *Standing Rock*, 282 F. Supp. 3d at 100 (quotation omitted), and "there is a nontrivial likelihood" that BLM "could justify" the challenged leasing decisions, remand without vacatur would be appropriate under the first prong, *Bauer v. DeVos*, 332 F. Supp. 3d 181, 186 (D.D.C. 2018) (quotation omitted).  *See also Black Oak Energy*, 725 F.3d at 244 (remanding where "plausible that FERC can redress its failure of explanation on remand while reaching the same result"); *WildEarth*, 368 F. Supp. 3d at 84–85 (declining to vacate leases despite "a serious failing" under NEPA (quotation omitted)).

Remand without vacatur would be justified for this reason alone.  *See Standing Rock*, 282 F. Supp. 3d at 108 (when the "first prong . . . supports remand without vacatur, the second prong is only barely relevant" (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002)); *id.* (even where "the disruptive consequences of vacatur might not be great," remand is appropriate if the first prong is satisfied (quotation omitted)).

But vacatur would also involve significant economic disruption to governmental and private interests.  *See supra* pp. 34–36.  *See also La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1085 (D.C. Cir. 2003) (remanding in light of economic harm that would result from vacatur); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (same); *Standing Rock*, 282 F. Supp. 3d at 104 (courts "have repeatedly considered the economic implications of vacatur—including in cases addressing environmental harms") (citing cases); *Alliance for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1158 (D. Mont. 2019) ("economic impact is relevant to the question of whether to vacate or remand");

*Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1106 (E.D. Cal. 2013) ("remand without vacatur should not be limited to situations where it is necessary to avoid environmental harm, but should instead be based on a broader examination of the equities").  Moreover, any post-vacatur sale would be tainted by publication of the bidding companies' confidential valuation of the issued leases, which competitors could use to disadvantage the original lessees and thereby jeopardize large sums previously invested.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied, and API's cross-motion for summary judgment should be granted.

Paul G. Afonso
Ben Norris
AMERICAN PETROLEUM INSTITUTE
1220 L St., N.W.
Washington, D.C. 20005
Phone:  (202) 682-8000
Fax:  (202) 682-8033
norrisb@api.org

*/s/  Steven J. Rosenbaum*
Steven J. Rosenbaum
Bradley K. Ervin
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

*Counsel for American Petroleum Institute*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of March, 2020, I caused a true and correct copy of the foregoing to be filed with the Court electronically via the CM/ECF system, which will serve the foregoing by electronic means on all counsel of record in this case.

_/s/  Steven J. Rosenbaum_
Steven J. Rosenbaum
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com
