**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————

WILDEARTH GUARDIANS, *et al.*

    Plaintiffs,

        v.

DAVID L. BERNHARDT, in his official
capacity as Secretary of the Interior, *et al.*

    Federal Defendants,

        and

WESTERN ENERGY ALLIANCE, *et al.*

    Intervenor Defendants.

———————————————————

Case No. 1:16-cv-1724-RC
The Honorable Rudolph Contreras

**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 1

    I.      BLM Adequately Considered the Cumulative Impacts of GHG Emissions........... 1

    II.     BLM's Analysis of Direct and Indirect GHG Emissions was Reasonable............. 9

    III.    BLM's Discussion of the Global Carbon Budget Complied with NEPA............. 11

    IV.    BLM's FONSI Complied with NEPA .................................................................. 11

    V.     Remedy .................................................................................................................. 14

CONCLUSION..................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*,
  449 F.2d 1109 (D.C. Cir. 1971) .................................................................. 2

*Envtl. Def. Fund, Inc. v. Corps of Eng'rs*,
  325 F. Supp. 749 (E.D. Ark. 1971) ............................................................. 2

*Fox Television Stations, Inc. v. FCC*,
  280 F.3d 1027 (D.C. Cir. 2002) ................................................................ 13

*League of Wilderness Defs. v. U.S. Forest Serv.*,
  549 F.3d 1211 (9th Cir. 2008) ......................................................... 5, 6, 7, 8

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017) .................................................................. 9

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F. Supp. 3d 91 (D.D.C. 2017) ............................................................ 13

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ................................................................................... 4

*W. Org. of Res. Councils v. Jewell*,
  124 F. Supp. 3d 7 (D.D.C. 2015) ........................................................... 4, 9

*Williston Basin Interstate Pipeline Co. v. FERC*,
  519 F.3d 497 (D.C. Cir. 2008) .................................................................. 14

**Regulations**

40 C.F.R. § 1508.18(b)(3) ............................................................................ 4

40 C.F.R. § 1508.7 .................................................................................. 2, 5

**Other Authorities**

81 Fed. Reg. 51866 (Aug. 5, 2016) .............................................................. 8

American Clean Energy and Security Act, H.R. 2454, 111th Cong. (2009) ................... 7

**INTRODUCTION**

In compliance with the National Environmental Policy Act's ("NEPA") "hard look" requirement and the Court's March 19, 2019 Order, the Bureau of Land Management ("BLM") prepared on remand a well-reasoned supplemental environmental assessment ("SEA") of the impacts of greenhouse gas ("GHG") emissions from the proposed action. BLM provided a reasonable analysis of the cumulative impacts from GHG emissions generated by past, present and reasonably foreseeable BLM lease sales. Similarly, BLM adequately analyzed the direct and indirect emissions from the proposed action by, *inter alia*, calculating direct and indirect emissions based on the information reasonably available to it. Plaintiffs' arguments on reply challenging BLM's NEPA analysis constitute more impermissible flyspecking and should thus be rejected.

**ARGUMENT**

**I.    BLM Adequately Considered the Cumulative Impacts of GHG Emissions**

At issue before the Court is whether BLM "consider[ed] the cumulative impacts of GHG emissions generated by past, present or reasonably foreseeable BLM lease sales in the region and nation." *See* ECF No. 99, 46. Although BLM respectfully submits that the full scope of analysis articulated by the Court and advocated by Plaintiffs is not required by NEPA's implementing regulations, BLM's analysis nevertheless complied with NEPA and the Court's March 19, 2019 Order. *See* ECF No. 149 at 16–24.

Federal Defendants have explained that the analysis of GHG emissions does not lend itself to a traditional NEPA cumulative effects analysis because the geographic scope of any cumulative impacts analysis involving GHG emissions is necessarily global, and the climate change impacts

1

of GHG emissions are necessarily cumulative in nature. The application of a traditional

cumulative impacts analysis to the proposed action would require BLM to identify all past,

present, and reasonably foreseeable GHG-emitting projects worldwide. *See* ECF No. 149 at 17.

And, while the standard created in this Court's March 19, 2019 Order attempts to cabin that

analysis, by focusing only on BLM-related emissions, NEPA's implementing regulations

specifically provide that a cumulative impacts analysis cannot ignore non-federal emissions. *See*

40 C.F.R. § 1508.7 (2019) (requiring assessment of cumulative impacts contributed by all

actions, "regardless of what agency (Federal *or non-Federal*) *or person* undertakes such other

actions") (emphasis added).

Given the impossibility of preparing a traditional NEPA cumulative effects analysis for GHG

emissions, BLM relied on available emission inventories—including at the regional, statewide,

and national levels—both to assess total cumulative GHG emissions and as context for

understanding the relative magnitude of the direct and indirect emissions that could result from

the proposed action. *See Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy*

*Comm'n*, 449 F.2d 1109, 1121 n.28 (D.C. Cir. 1971) ("NEPA does not require the impossible"

(quoting *Envtl. Def. Fund, Inc. v. Corps of Eng'rs*, 325 F. Supp. 749, 758 (E.D. Ark. 1971)).

BLM's calculations to this end are described at length in Federal Defendants' opening brief. *See*

ECF No. 149 at 18–24. And, significantly, BLM presented those calculations in combination

with a thorough qualitative discussion of the effects of GHG emissions on climate change.

Specifically, BLM considered reports from the Intergovernmental Panel on Climate Change

("IPCC"), the United States Climate Change Science Program, the Environmental Protection

Agency ("EPA"), the National Oceanic and Atmospheric Administration ("NOAA") Climate

Prediction Center, and the American Meteorological Society, discussing the environmental

impacts of climate change at the global, national, and regional levels. *See* Wyo. Ph-2 0000038-40. NOAA's Climate Prediction Center noted increases in global mean surface temperatures and that models show that average temperatures would likely be greater in the Northern Hemisphere. *See* Wyo. Ph-2 0000036. BLM also discussed that at the national level, "annual average temperatures over the contiguous United States were expected to rise" and that "temperatures of extremely cold days and extremely warm days are both expected to increase." *See* Wyo. Ph-2 0000042. As for impacts at the regional level, the SEA acknowledged, *inter alia*, that winters in the Wyoming Basin may be wetter and summers drier. Wyo. Ph-2 0000061-62. Moreover, the Fourth National Climate Assessment has projected that for the Northern Great Plains Region, "conditions will become consistently warmer over the next two to three decades and will coincide with less snowpack and high variability in annual water availability with an overall small projected decrease in average streamflow." Wyo. Ph-2 0000076. In sum, BLM's analysis presented a range of useful GHG emissions data together with a thorough qualitative discussion of climate change based on authoritative reference documents. In this manner, BLM's analysis fully satisfied NEPA's purpose of ensuring both the agency decisionmaker and public were informed of relevant cumulative climate impacts.

In light of this Court's March 19, 2019 Order, however, BLM took its analysis even further. To the extent possible based on the information reasonably available to it, BLM also provided discussion and analysis of GHG emissions generated by past, present, and reasonably foreseeable BLM lease sales in the region and the nation, and that analysis is discussed at length in Federal Defendants' opening brief.  *See* ECF. No 149 at 16–24.  Again, BLM respectfully submits that the full scope of this analysis was not required by NEPA; the regulations pertaining to cumulative impacts stop far short of requiring BLM to prepare programmatic NEPA documents

assessing the emissions of its entire oil and gas program prior to issuing individual lease sales. *See W. Org. of Res. Councils v. Jewell*, 124 F. Supp. 3d 7, 11-13 (D.D.C. 2015), *aff'd sub. nom. W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234 (D.C. Cir. 2018) (noting that "leasing decisions are made pursuant to a pre-approved and EIS-supported program," and dismissing claims for a supplemental programmatic EIS for the federal coal management program). Nonetheless, BLM's analysis fully comported with the relevant guidance in this Court's Order.

Plaintiffs again flyspeck this analysis, repeating the same argument in their opening brief that BLM failed to calculate the total lifetime direct, gross and cumulative emissions from the proposed action. *See* ECF No. 157 at 1–2. However, as Federal Defendants explained, Plaintiffs failed to raise this issue during the administrative process, and the Court should thus deem this argument waived. Plaintiffs do not explain how an assertion made during the comment period that "BLM fail[ed] to account for actual emissions over the *total lifespan* of the proposed action," ECF No. 157 at 3 n.2 (quoting Wyo. Ph-2 0012950-51) (emphasis added), could be construed as a challenge that BLM failed to calculate the lifetime emissions of cumulative actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978) (stating that the plaintiffs must "structure their participation so that it is meaningful"). To the extent Plaintiffs contend that BLM's cumulative impacts analysis is deficient because BLM presented GHG emissions data in annual terms and not as projections of "total lifetime emissions," *see* ECF No. 157 at 3, Plaintiffs fail to articulate why this method of presentation is "significantly" less useful and how it renders BLM's analysis arbitrary or capricious.[1] As Federal

---

[1] The Court should reject Plaintiffs' reliance on *South Fork Band Council of Western Shoshone of Nevada v. U.S. Dep't. of the Interior*, 588 F.3d 718 (9th Cir. 2009), and *Diné Citizens Against Ruining Our Environment v. OSMRE*, 82 F. Supp. 3d 1201 (D. Colo. 2015) as inapposite. Neither case addressed whether NEPA requires agencies to calculate "lifetime emissions" from proposed actions. *See Diné Citizens Against Ruining Our Environment v. OSMRE*, 82 F. Supp.

Defendants explained in their opening brief, the sources relied on by BLM in making its calculations "presented the data in annual terms, and it was reasonable for BLM to frame its analysis in terms of the data available to it." ECF No. 149   at 10. All models, including those prepared for the IPCC and synthesized in National Climate Assessment reports, used annual emissions over time to project future impacts. *See e.g.* Wyo. Ph-2 0006499 (presenting finding in terms of average annual temperature and discussing "annual average global temperatures"); *see also* Wyo. Ph-2 0006500 (Fig. ES.3), Wyo. Ph-2 0006636.

Plaintiffs argue that BLM's cumulative impacts analysis is flawed because "BLM only considered lease sales in Wyoming through June 2019 as part of its cumulative impacts assessment," and thus failed "to consider impacts of other recent and reasonably foreseeable lease sales in 'the region or nation.'" ECF 157 at 11. But, again, this contention assumes that CEQ's cumulative impact regulations can be read as demanding a program analysis (they cannot), *see* Footnote 1, *supra*, or as allowing an agency to focus only on the cumulative effects of its own actions (they do not), *see* 40 C.F.R. § 1508.7.  Section 1508.7 explicitly provides that agencies should not distinguish in their cumulative impacts analysis between federal and non-federal projects; BLM must instead assess the cumulative impacts of *all* GHG emissions. And the only practical means of doing so when assessing global atmospheric $CO_2$ saturation levels is to rely on emission inventories and projections in the aggregate, as BLM did here. *See, e.g.*, *League of Wilderness Defs. v. U.S. Forest Serv.*, 549 F.3d 1211,1218 (9th Cir. 2008) ("[T]o the extent that 40 C.F.R. § 1508.7 does not explicitly provide otherwise, the Forest Service is free to

---

3d at 1215; *see also South Fork Band Council of Western Shoshone of Nevada v. U.S. Dep't. of the Interior*, 588 F.3d at 725-726.

consider cumulative effects in the aggregate or to use any other procedure it deems

appropriate.").

Nevertheless, and contrary to Plaintiffs' contention, *see* ECF No. 157 at 11, BLM projected

emissions from lease sales across the region, using existing emission estimates and acreage of

producing federal leases. *See* Wyo. Ph-2 0007950-93. From this data, BLM estimated the

average annual emissions of each of the states in the Rocky Mountain and Northern Great Plains

regions for the years 2015-2018, and then assumed that based on steady leasing rates over the

same time period, regional emissions would follow the same pattern. *See* Wyo. Ph-2 0000070,

Wyo. Ph-2 0009157. Moreover, BLM analyzed the "cumulative climate impacts of the GHG

emissions from the challenged leases when added to regional or national emissions."[2] ECF No.

157 at 19. The SEA noted that "total projected direct annual emissions that could result from the

full RFD if all lands were drilled and put under production at the same time in a single year,

would represent an approximate 18% increase to existing annual emission levels." Wyo. Ph-2

00000076. BLM stated however, that "this is not a reasonable scenario," *id.*, explaining that

"under existing and potential future development of the projected RFD, the total cumulative

direct emissions from existing and reasonably foreseeable actions would potentially increase

total projected average annual direct emissions in the combined Rocky Mountain and Northern

Great Plains regions (excluding Wyoming) by 5.1% (1,781,466.2/34,904,756.4 mt/yr)." *Id.* And,

considering the impacts from the proposed action when added to regional oil and gas activity,

---

[2] BLM appropriately identified its cumulative impact analysis area in the SEA. *See* Wyo. Ph-2
0000065. It disclosed that based on the EPA's Inventory of United States Greenhouse Gas
Emissions and Sinks and estimates of United States emissions from the Global Carbon Project,
the United States, on average accounts for 14.2% of the global fossil fuel $CO_2$ emissions on an
annual basis (since 2015). *See* Wyo. Ph-2 0000076-77 (Figure 10 showing the United States'
contribution to the total global fossil fuel load). Thus, contrary to Plaintiffs' contention, BLM did
not need to recreate this information.

BLM found an "increase of approximately 2.4% of the Rocky Mountain region's annual average indirect total (156,905,058.3), and 1.08% of the Rocky Mountain/Northern Great Plains annual average indirect total (160,135,137.9 mt/yr)." [3]  Wyo. Ph-2 00000074.

Next, the SEA belies Plaintiffs' contention that BLM "failed to consider trends in regional leasing activity or explain why it was reasonable to assume constant leasing activity into the future[,]" *see* ECF No. 157 at 12. The SEA discussed that, "based on average lease sale numbers, annual average contributions to total emissions are expected to remain constant, or decrease if projections made by the EIA regarding future activity remains true." Wyo. Ph-2 0000070 (Table 14 and footnote 39); *see also* Wyo. Ph-2 0009157 (providing actual leasing data in regional states). BLM cautioned however, that "[s]ince BLM's consideration of lands for leasing is largely externally driven, it is impossible to project future leasing activity with a greater certainty than these general trends." *Id*. BLM also relied on current data projecting the growth of oil and gas development in the region. In addition to considering the projections provided in the 2009 Energy Information Administration's ("EIA") report on Energy Market and Economic Impacts of H.R.2454, which utilized the 2009 EIA Annual Energy Outlook ("AEO") as a reference case, BLM also discussed projections articulated in EIA's 2019 AEO report. *See* Wyo. Ph-2 00000051-52, 76. Those projections showed that energy demand would likely remain flat through 2050, *see* Wyo. Ph-2 00000076, 0008790. Plaintiffs' argument that BLM relied on outdated information is thus without merit. *See* ECF 157 at 12.

---

[3] Based on the projected cumulative increase in annual indirect CO2e emissions from reasonably foreseeable lease actions (Proposed Action, 20184Q, 20191Q and 20192Q) (i.e., excluding existing leases), and utilizing the statewide per-acre average identified in Table 15. *See* Wyo. Ph-2 00000074.

Equally unsound is Plaintiffs' argument that "BLM had no basis for concluding that adding GHG emissions from the new leases to other past, present, and reasonably foreseeable future emissions would not have significant cumulative impacts." ECF No. 157 at 14. BLM considered that for the Northern Great Plains Region, climatic changes and conditions are projected to increase and, "[a]ssuming that all conditions hold constant and emissions continue to increase unabated, the contributions to regional emissions from BLM Wyoming oil and gas development could contribute to these modelled projections of impact." Wyo. Ph-2 00000076. BLM explained however, that such a scenario was "unlikely, based on . . . changing national, regional and global emissions over time, and the EIA projections regarding the future energy outlook." *Id*. The SEA further articulated that "renewable energy is expected to replace some natural gas usage in a variety of applications," and that natural gas consumption in the United States is expected to decrease by 14% from 2009 to 2030. *See* Wyo. Ph-2 00000065. BLM acknowledged that "[i]f natural gas consumption decreases, natural gas production of Federal minerals in Wyoming may be less than the levels of development included in the RFD scenarios included in Section 3.4 and Table 4." *Id.* National GHG emissions from oil and gas development may also decrease, as

> U.S. GHG emissions may not necessarily increase by the magnitude of potential GHG emissions from oil and gas production of Federal minerals in Wyoming. Oil and gas development may decline in other portions of the United States, thereby decreasing total U.S. GHG emissions from oil and gas production, even when new development in these areas is added. If GHG emission reduction regulations applicable to oil and gas activities are implemented by U.S. EPA in the future, oil and gas development may preferentially increase in fields that produce these fuels with lower than average GHG emissions.

Wyo. Ph-2 00000065.

In sum, BLM's cumulative impacts analysis fully complied with NEPA, its implementing regulations, and the additional requirements imposed by this Court's March 19, 2019 Order.  The Court should, therefore, grant Federal Defendants' cross-motion for summary judgment.

II.     **BLM's Analysis of Direct and Indirect GHG Emissions was Reasonable**

BLM provided a comprehensive analysis of direct and indirect GHG emissions, which included the use of a reasonable methodology for projecting potential direct and indirect emissions, as well as useful context for understanding the relative magnitude of those emissions.[4] *See* ECF No. 149 at 8-16; *see also* Wyo. Ph-2 00000054 (explaining BLM's methodology for calculating direct emissions); Wyo. Ph-2 00000043 (methodology for calculating indirect emissions). Although Plaintiffs disagree with BLM's chosen methodology, BLM's well-reasoned explanation satisfied NEPA and is entitled to deference. *See Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017).

Plaintiffs' arguments on reply do not advance their contention that BLM's methodology was arbitrary. *See* ECF No. 157 at 8-10. They contend that "BLM arbitrarily assumed that every single acre available for leasing would, in fact, be leased," and improperly diluted the per-acre emission estimates from leasing activities. *Id*. at 9. The SEA explained however, that the pro-rated emissions (which include emissions from drilling, completing and placing the wells in

---

[4] Relying on the Council on Environmental Quality's rescinded 2016 guidance, 81 Fed. Reg. 51,866 (Aug. 5, 2016), Plaintiffs offer that it is not enough under NEPA for an agency to merely state that "emissions from a proposed Federal action represent only a small fraction of global emissions." *See* ECF No. 157 at 13 n. 19. Of course, the statement is superfluous here because BLM's analysis was far more expansive. It bears noting, nonetheless, that Plaintiffs have chosen to ignore the various portions of that rescinded guidance document that undermine their arguments. *See*, *e.g.*, 79 Fed. Reg. 77,802, 77,825 (Dec. 24, 2014) (recommending that agencies use projected GHG emissions associated with proposed actions as a proxy for assessing magnitude of climate change impacts); *id.* (explaining that this proxy methodology, together with a qualitative summary discussion of the climate impacts of GHG emissions based on authoritative reports, sufficiently addresses NEPA's requirements; *id.* at 77,825 (describing a limited—rather than program-wide—scope of analysis, that is focused on "connected" actions); *id.* at 77,826 (explaining that a separate cumulative effects analysis is not required for GHG emissions, because it is subsumed within an agency's disclosure of direct and indirect emissions together with its general analysis and discussion of climate change impacts based on authoritative reports).

production), and the expected mineral production volumes, used as the basis of BLM's methodology, are based on projected RFDs for the RMPs for the respective field offices. *See* Wyo. Ph-2 0000043 (stating that "[t]he approved RMP is associated with a particular RFD for the lands that are open to oil and gas development"). The RFDs represent an estimate of the total number of wells that *could be developed on the lands identified as open/eligible for leasing,* and are "based upon known geologic and economic conditions, current development technology, and industry-provided data about future planned development." *Id.* BLM used the RFDs to estimate the emissions that could result from that development for each year of the RMPs' expected life. *See id.* Because the RMPs assume that the entire RFD associated with the lands open to leasing will be developed over the life of the plan, and consequently all of the associated emissions from that development will occur, and not the leasing and development of some subset of those lands "actually leased or projected to be leased," Plaintiffs' contentions are unfounded.

Plaintiffs also misleadingly contend that BLM "could have readily projected future leased acreage based on its assumption of constant leasing activity to calculate the appropriate denominator by which to divide the total emissions rate from RFD development." ECF No. 157 at 9 (citing Wyo. Ph-2 0000070). As an initial matter, and for the reasons explained above and in Federal Defendants' opening brief, such a calculation would be inconsistent with the method that BLM used to develop the emission estimates for the RMPs. Plaintiffs have failed to cite any authority that NEPA requires this approach. Moreover, Plaintiffs' contention and supporting citation refers to regional leasing emission rates which more aptly relate to BLM's cumulative impacts analysis, *see* Wyo. Ph-2 0000070, rather than direct and indirect emissions from the proposed action, as suggested in their reply brief. Because Plaintiffs have failed to specifically

articulate how this contention advances their argument that BLM's cumulative impacts analysis is somehow deficient, the Court should reject their proposed apples-to-oranges comparison.

### III.    BLM's Discussion of the Global Carbon Budget Complied with NEPA

This Court unequivocally rejected Plaintiffs' argument that NEPA required BLM to use the global carbon budget to analyze the impacts of GHG emissions on climate change. *See* ECF No. 99 at 49-50 (stating that "BLM did not act arbitrarily and capriciously in not utilizing the global carbon budget"). The SEA nevertheless discussed the global carbon budget at some length, *see* ECF No. 149 at 25-26 , and BLM reasonably concluded that it would not undertake a global carbon budget analysis because of shortcomings inherent in the protocol, *id*; *see also* Wyo. Ph-2 0000057-58, 77-78. While it did not conduct a global carbon budget analysis, BLM acknowledged the global carbon budget as a tool developed by the international scientific community, particularly the IPCC, to account for and track global emissions. *See* Wyo. Ph-2 0000038. This acknowledgment however, and BLM's decision to not use the global carbon budget methodology, do not suggest a violation of NEPA's hard look requirement—particularly in light of BLM's well-reasoned cumulative impacts analysis which considered, *inter alia*, the contributions of the proposed action and existing national fossil fuel emissions to global emissions, and the global carbon budget. *See* Wyo. Ph-2 0000075-76.[5] And indeed, Plaintiffs have failed to cite to any authority to the contrary.

### IV.    BLM's FONSI Complied with NEPA

Plaintiffs ignore the Court's plain pronouncement that the effects of leasing were not highly uncertain. *See* ECF No. 157 at 19-22; *see also* ECF No. 99, 55 (noting that the uncertainty factor

---

[5] *See supra* Argument I, n.2.

is implicated in situations such as "when an action involves new science, or when an action's impact on a species is unknown"). They now contend that the SEA's reference to "scientific uncertainty" concerning the "magnitude of future climate change" contradicts BLM's finding of no significant impact. *See* ECF No. 157 at 21. However, as Federal Defendants explained in their opening brief, the impacts of GHG emissions from leasing are not wholly unknown. *See* ECF No. 149 at 29. The SEA and the record by extension articulated the impacts. *See* ECF No. 157 at 22 (conceding that the record articulates known impacts of GHG emissions); *see also* Wyo. Ph-2 0000077 (discussing global temperature change), Wyo. Ph-2 0006894 (Fourth National Climate Assessment report discussing impacts from GHG emissions on climate). Moreover, the scientific uncertainty referenced by Plaintiffs did not pertain to and should not be equated with "new science." The SEA's discussion of uncertainty pertained to the "'timing and magnitude of future [global] climate change [due to] ambiguity by human choices [and] *scientific modeling and climate sensitivity,*'" including the ultimate volume of emissions that could be emitted as a result of developing the proposed leases and other regional and national activities—not to the predicted effects of changing climates due to increasing volumes of global GHG emissions. *See* Wyo. Ph-2 0000077-78 (emphasis added) (noting uncertainties in modeling, but nevertheless recognizing the impact of increases in temperature); *see also* Wyo. Ph-2 0000036 (discussing uncertainties in older modeling, but noting that "newer models and assessments have become better in their ability to minimize some of this uncertainty but remain imprecise in being able to predict how, where and when those effects may manifest at multiple scales"). The Court should therefore reject Plaintiffs' misrepresentation of the SEA's discussion of uncertainty to support their claim that the proposed action would have significant impacts.

Plaintiffs next complain that BLM failed to discuss the "significance of the cumulative effects in the FONSI," discussing instead the "significance of emissions from the leases in isolation." ECF No. 157 at 22. Plaintiffs are wrong. As explained above and in Federal Defendants' opening brief, BLM's cumulative impacts analysis complied with NEPA's "hard look" requirement, as well as the Court's March 19, 2019 Order that BLM "consider the cumulative impact of GHG emissions generated by past, present, or reasonably foreseeable BLM lease sales in the region and the nation." *See supra* Argument I; *see also* ECF No. 149 at 16-24; ECF No. 99 at 46. The record belies Plaintiffs' contention that BLM discussed the significance of the leases in isolation, as the SEA not only provided a qualitative discussion of the effects of GHG emissions on climate change but also analyzed cumulative direct and indirect emissions estimates for all existing and reasonably foreseeable federal lease projects in Wyoming, the region, and nationwide, as well as other nationwide emission estimates, and examined appropriate comparisons among them. *See, e.g.*, Wyo. Ph-2 0000044-45, 0000048. Moreover, the SEA and FONSI articulated that the volume of emissions from the proposed action would be less than 1% of the volume at the global and national levels.[6] *See* Wyo. Ph-2 0000103, 0000075. Insofar as Plaintiffs require more, BLM has explained that it cannot translate emissions into actual impacts. Wyo. Ph-2 0000057-58. Indeed, as Federal Defendants have explained, the only practical means of assessing the cumulative impacts of GHG emissions from the proposed action, including significance, would be to rely on emission inventories and other quantitative projections, as BLM did here. *See supra* Argument I; *see also* ECF No. 149 at19.

---

[6] As Federal Defendants explained in their opening brief, the FONSI inadvertently stated that "BLM Wyoming's cumulative contribution to global oil and gas-related emissions in 2018 was 'less than 0.01%,'" instead of less than 1%. *See* ECF No. 149 at 29 n. 17. Federal Defendants maintain that this constitutes harmless error and does not render BLM's decision arbitrary or capricious.

## V.   Remedy

BLM's analysis on remand complied with NEPA and this Court's March 19, 2019 Order. But if the Court nonetheless finds error, Federal Defendants request that the Court order remand without vacatur, to allow BLM an opportunity to address any deficiencies the Court may identify. *See* ECF No. 149 at 36. As Federal Defendants have explained, vacatur of the leases would be disruptive to public and private interests, and as the Court opined in the previous litigation, "the probability that [BLM] will be able to justify retaining [its prior leasing decisions] is sufficiently high that vacatur . . . is not appropriate." ECF No. 99 at 58 (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002)); *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017) (citing *Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008)). Plaintiffs' contention that BLM would fail "to give 'serious consideration to the Court's concerns,'" *see* ECF No. 157 at 31, is contradicted by BLM's efforts on remand to faithfully comply with NEPA and the Court's March 19, 2019 Order. Plaintiffs' citation to an out of circuit, non-binding decision in the District of Idaho vacating five oil and gas lease sales for BLM lands in Utah, Nevada, and Wyoming, on the basis of deficient NEPA analyses, *see* ECF No. 157 at 30-31, is unavailing and should be disregarded by this Court, especially considering that the District of Idaho has since stayed vacatur of the leases pending appeal and ordered the leases suspended, in view of "the potential for injury in the absence of stay pending appeal." Mem. Decision & Order at 8–11, *W. Watersheds Project v. Zinke*, No. 1:18-CV-00187-REB  (D. Idaho May 15, 2020), ECF No. 226.

## CONCLUSION

For the reasons stated above and in Federal Defendants' opening brief, Federal Defendants respectfully request that the Court grant their cross-motion for summary judgment.

Respectfully submitted this 22nd day of May, 2020.

PRERAK SHAH
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

/s/ *Michelle-Ann C. Williams*
MICHELLE-ANN C. WILLIAMS
Natural Resources Section
P.O. Box 7611, Washington, D.C. 20044
202-305-0420 || 202-305-0506 (fax)
michelle-ann.williams@usdoj.gov

*Counsel for Federal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2020, a copy of the foregoing notice was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/Michelle-Ann C. Williams*
MICHELLE-ANN C. WILLIAMS